UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

HAWAII STRUCTURAL IRONWORKERS :    Civil Action No.
PENSION TRUST FUND, Individually and on :
Behalf of All Others Similarly Situated, :    <u>CLASS ACTION</u>
                                     :
                 Plaintiff, :    COMPLAINT FOR VIOLATION OF THE
                                       :    FEDERAL SECURITIES LAWS
     vs. :
                                       :
AMC ENTERTAINMENT HOLDINGS, INC., :
ADAM M. ARON, CRAIG R. RAMSEY, :
CHRIS A. COX, LIN ZHANG, JACK Q. :
GAO, MAOJUN ZENG, ANTHONY J. :
SAICH, LLOYD HILL, GARY F. LOCKE, :
HOWARD W. KOCH, JR., KATHLEEN M. :
PAWLUS, CITIGROUP GLOBAL :
MARKETS INC., MERRILL LYNCH, :
PIERCE, FENNER & SMITH :
INCORPORATED, BARCLAYS CAPITAL :
INC. and CREDIT SUISSE SECURITIES :
(USA) LLC, :
                                       :
                 Defendants. :
                                       :

—————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Hawaii Structural Ironworkers Pension Trust Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's counsel, alleges the following upon information and belief based on the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by AMC Entertainment Holdings, Inc. ("AMC" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of AMC Class A common shares (hereinafter the "common stock" or "common shares") in the Company's secondary public offering (the "SPO") on or about February 8, 2017 seeking to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), as well as on behalf of purchasers of AMC common shares between December 20, 2016 and August 1, 2017, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v], §27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

3.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

4.      Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, as the representatives of the underwriters of the SPO maintain their principal places of business and conducted the SPO in this District, AMC was represented in the SPO by the New York City office of Weil, Gotshal & Manges, the Underwriter Defendants (as defined below) were represented by the New York City office of Latham & Watkins LLP, and AMC common stock is listed and trades on the New York Stock Exchange ("NYSE").

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Hawaii Structural Ironworkers Pension Trust Fund purchased AMC common shares, as set forth in the accompanying certification incorporated by reference herein, and was damaged thereby.

7.      Defendant AMC is principally involved in the theatrical exhibition business and owns, operates or has interests in theaters located in the United States and Europe.

8.      Defendant Adam M. Aron ("Aron") served, at all relevant times, as President, Chief Executive Officer and a director of AMC.

9.      Defendant Craig R. Ramsey ("Ramsey") served, at all relevant times, as Executive Vice President and Chief Financial Officer of AMC.

10.      Defendant Chris A. Cox ("Cox") served, at all relevant times, as Senior Vice President and Chief Accounting Officer of AMC.

11.      Defendants Lin Zhang ("Zhang"), Jack Q. Gao ("Gao"), Maojun Zeng ("Zeng"), Anthony J. Saich ("Saich"), Lloyd Hill ("Hill"), Gary F. Locke ("Locke"), Howard W. Koch, Jr.

("Koch") and Kathleen M. Pawlus ("Pawlus"') are, or were at the time of the SPO, members of AMC's Board of Directors.

12.     Defendants Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch and Pawlus are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants signed the materially inaccurate Registration Statement (as defined below) issued in connection with the SPO.

13.     Defendants Citigroup Global Markets Inc. ("Citigroup"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Barclays Capital Inc. ("Barclays") and Credit Suisse Securities (USA) LLC ("Credit Suisse") each served as joint book-running underwriters for the SPO and are collectively referred to herein as the "Underwriter Defendants."  Together, the underwriters for the SPO  received commissions and other professional fees of approximately $23.6 million in connection therewith.

14.     The Underwriter Defendants participated in the drafting and dissemination of the Registration Statement for the SPO.  The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters and were negligent in failing to ensure that the Registration Statement for the SPO was prepared accurately and in accordance with the rules governing its preparation.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

15.     Unless otherwise noted, defendant AMC, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

**CLASS ACTION ALLEGATIONS**

16.     Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) individually and on behalf of all persons, other than Defendants, who

purchased AMC common stock in the SPO on or about February 8, 2017, as well as on behalf of purchasers of AMC's common shares during the Class Period (the "Class").

17.     Excluded from the Class are Defendants, members of the immediate families of each of the Individual Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any of the Defendants has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, between 34 and 55 million AMC common shares were outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that they number in the hundreds or thousands.  The names and addresses of the Class members can be ascertained from the books and records of AMC, its transfer agent or the Underwriter Defendants.  Notice can be provided to such record owners by a combination of published notices and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

20.     Plaintiff's claims are typical of the claims of the other members of the Class, as all Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

21.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether the Registration Statement and Prospectus issued in connection with the SPO omitted and/or misrepresented material facts about the Company and its business;

(c)     whether certain statements made by defendants AMC, Aron and Ramsey to the investing public during the Class Period were materially false and misleading;

(d)     whether the price of AMC common stock was artificially inflated during the Class Period; and

(e)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## BACKGROUND

**The Company**

23.     Defendant AMC is a holding company that describes itself as the world's largest theatrical exhibition company.  Having recently completed a string of acquisitions, AMC currently owns and operates the world's largest chain of movie theaters.  As of December 31, 2016, the

Company owned, operated or held interests in 660 theaters with a total of 8,293 screens in the United States and 246 theaters and 2,265 screens in the United Kingdom and Europe.

24.     AMC offers consumers a range of entertainment alternatives, including traditional film programming, independent and foreign films, performing arts, and music and sports, as well as food and beverage alternatives, including made-to-order meals, customized coffee, healthy snacks, beer, wine, premium cocktails and dine-in theater options.

25.     AMC's revenues are derived primarily from box office admissions, the Company's largest source of revenue, and theater food and beverage sales, the Company's second largest source of revenue.  AMC also generates revenue from ancillary sources, including on-screen advertising, fees earned from its AMC Stubs customer loyalty program, rental of theater auditoriums, income from gift card and exchange ticket sales, and on-line ticketing fees.

26.     According to its Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") the Company's loyalty program (AMC Stubs) allows its members to earn rewards, receive discounts and participate in exclusive members-only offerings and services.  As of December 31 2016, AMC had more than 5.2 million active member households enrolled in its AMC Stubs program.  According to the 2016 Form 10-K, the AMC Stubs program is designed to strengthen guest loyalty, attract new guests and drive additional return visits.

**Recent AMC Acquisitions**

27.     On March 3, 2016, AMC and Carmike Cinemas, Inc. ("Carmike") announced that they had entered into a definitive merger agreement.  Pursuant to the merger agreement, AMC agreed to acquire all of the outstanding shares of Carmike for $30.00 per share in cash, or approximately $757 million.  In connection with the merger agreement, AMC agreed to enter into a debt financing commitment letter, which provided for loans to fund the acquisition.

28.     On December 21, 2016, AMC completed the acquisition of Carmike for $858.2 million, comprising $584.3 million in cash and $273.9 million in common stock.  In connection with the Carmike acquisition, AMC also assumed $230 million in debt.

29.     As of the acquisition date, Carmike operated 271 theaters and 2,923 screens located in 41 states across the United States.  AMC's SEC filings describe Carmike as one of the nation's largest motion picture exhibitors and a U.S. leader in digital cinema, 3-D cinema deployments and alternative programming.

30.     To obtain the necessary regulatory approval to acquire Carmike, AMC entered into a settlement agreement with the U.S. Department of Justice pursuant to which it agreed, among other things, to divest 17 AMC theaters in markets where the Company's business overlapped that of Carmike.

31.     On November 30, 2016, AMC completed the acquisition of the outstanding equity of Odeon and UCI Cinemas Holdings Limited ("Odeon") for $637 million, comprising $480.3 million in cash and $156.7 million in common stock.  In connection with the acquisition, AMC also paid Odeon's indebtedness totaling $593.2 million.

32.     As of the acquisition date, Odeon operated 242 theaters with 2,243 screens in four major markets: United Kingdom, Spain, Italy and Germany; and three smaller markets: Austria, Portugal and Ireland.

33.     On January 23, 2017, AMC announced it had agreed to acquire Stockholm-based Nordic Cinema Group Holding AB ("Nordic"), the largest theater exhibitor in seven countries in Scandinavia and the Nordic and Baltic regions, from a European private equity firm and a Swedish media group in an all-cash transaction valued at $929 million.

34.     AMC incurred various forms of debt to finance the above-noted acquisitions.  In particular, in connection with the Carmike acquisition, AMC entered into a $350 million bridge loan agreement with affiliates of Citigroup, Merrill Lynch, Barclays, Credit Suisse and HSBC Securities (USA) Inc., each of whom were underwriters in the SPO.  Under the terms of the agreement with these lenders, more than $30 million of the proceeds received by AMC in the SPO was to be used to repay the above-noted bridge loan.

**THE SPO**

35.     On the same day the Company completed its acquisition of Carmike, December 21, 2016, AMC filed with the SEC a Form S-3 shelf registration statement (the "Form S-3").  The Form S-3 was filed to permit the Company and its selling stockholders to offer and/or sell, from time to time, AMC common shares in one or more offerings or resales.

36.     Securities issuers utilizing a Form S-3 are permitted to incorporate by reference prior periodic filings made with the SEC, including Forms 10-K and 10-Q.

37.     On February 9, 2017, AMC filed with the SEC a prospectus (the "Prospectus") for the SPO offering to register for sale 21,904,761 common shares (including 2,857,142 common shares pursuant to an overallotment option issued to the Underwriter Defendants) to be issued by AMC at a price of $31.50 per share.  The Company sold 20,330,874 common shares to the public in the SPO and received net proceeds of approximately $618 million therefrom.

38.     The SPO was sold pursuant to the Form S-3 and Prospectus (jointly referred to herein as the "Registration Statement") that contained inaccurate statements of material fact and omitted material information required pursuant to the regulations governing their preparation.

39.     The Registration Statement included materially inaccurate statements incorporated by reference from Carmike's Form 10-Q for the quarter ended September 30, 2016 (the "Carmike Q3 Form 10-Q"), including statements that inaccurately portrayed Carmike's revenue growth in the first

nine months of 2016.  With respect to Carmike's operations during the first nine months of 2016, the

Registration Statement stated, in pertinent part, as follows:

*Revenues.* We collect substantially all of our revenues from the sale of admission tickets and concessions. The table below provides a comparative summary of the operating data for this revenue generation.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Average theatres | 272 | 269 | 274 | 271 |
| Average screens | 2,928 | 2,875 | 2,940 | 2,885 |
| Average attendance per screen | 5,898 | 5,320 | 16,624 | 16,859 |
| Average admission per patron | $ 7.30 | $ 7.23 | $ 7.59 | $ 7.36 |
| Average concessions and other sales per patron | $ 4.85 | $ 4.55 | $ 5.11 | $ 4.68 |
| Total attendance (in thousands) | 17,269 | 15,294 | 48,874 | 48,475 |
| Total operating revenues (in thousands) | $209,730 | $ 180,241 | $ 620,592 | $ 583,674 |

\*       \*       \*

Total operating revenues increased 6.3% to $620.6 million for the nine months ended September 30, 2016 compared to $583.7 million for the nine months ended September 30, 2015, due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 for the nine months ended September 30, 2015 to $7.59 for the nine months ended September 30, 2016 and an increase in average concessions and other sales per patron from $4.68 for the nine months ended September 30, 2015 to $5.11 for the nine months ended September 30, 2016.  Excluding operating revenues from the acquired Sundance theatres which totaled $16.2 million, total operating revenues increased 3.5% to $604.4 million.  The increase in total operating revenues, excluding the acquired Sundance theatres, was due to an increase in attendance from 48.5 million for the nine months ended September 30, 2015 to 48.1 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 to $7.53 and an increase in average concessions and other sales per patron from $4.68 to $5.04.  Average admission per patron for the nine months ended September 30, 2016 increased due to the adoption of a tax on top pricing policy in the fourth quarter of 2015, the acquired Sundance theatres and revenues related to unredeemed gift cards, partially offset by summer promotional activities.  Average concessions and other sales per patron increased primarily due to concession promotions, expanded food and beverage menus at certain locations, including our

in-theatre dining locations, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards.

\*      \*      \*

Admissions revenue increased 3.9% to $370.8 million for the nine months ended September 30, 2016 from $357.0 million for the same period in 2015, due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016 and an increase in average admissions per patron from $7.36 for the 2015 period to $7.59 for the 2016 period. Excluding admissions revenue from the acquired Sundance theatres of $8.8 million, admissions revenue increased 1.4% to $362.0 million in 2016 from $357.0 million in 2015.

\*      \*      \*

Concessions and other revenue increased 10.2% to $249.7 million for the nine months ended September 30, 2016 compared to $226.7 million for the same period in 2015 due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average concessions and other sales per patron from $4.68 for the 2015 period to $5.11 for the 2016 period, revenues related to unredeemed gift cards and settlement funds related to the 2010 BP oil spill of $0.7 million. Excluding concessions and other revenues from the acquired Sundance theatres of $7.3 million, concessions and other revenues increased 6.9% to $242.4 million in the 2016 period from $226.7 million in the 2015 period.

40.     The above-noted statements were materially inaccurate because the Registration Statement failed to disclose that Carmike had been experiencing a significant loss in market share during the first nine months of 2016 that was then having a material and on-going adverse effect on its operating performance.

41.     Once the Registration Statement spoke about Carmike's revenues, its patron sales and attendance, it had a duty to speak completely and accurately, including speaking about the effects of issues that were then having a material adverse impact on Carmike's operating results.

42.     Indeed, by the time of the SPO, AMC had identified numerous issues, which the Registration Statement failed to disclose, that were then having a material adverse effect on Carmike's operations.

43.     Approximately one and one-half months prior to the SPO (on December 20, 2016), AMC held a conference call with analysts and investors to discuss the Company's acquisition of Carmike (the "Carmike conference call").  On the Carmike conference call, defendant Aron told investors that, by December 20, 2016, AMC had had "plenty of time to look at . . . Carmike" and understand and analyze its operations, including, among other things, the customer visitation-related data associated with the Carmike theaters.

44.     Approximately eight months later, and six months after the SPO, AMC held a conference call (the "Q2 conference call") with analysts and investors to discuss the Company's operating results for the its fiscal 2017 second quarter ("Q2"), the period ended June 30, 2017.  As noted below, during the Q2 conference call, defendant Aron disclosed that after Carmike had entered into the merger agreement with AMC in March 2016, it ceased making necessary investments in its business that caused it to experience a significant loss in market share.

45.     On the Q2 conference call, defendant Aron identified "literally 6" different issues that were having a material adverse effect on Carmike's operations and patron attendance at the time of the SPO, which AMC estimated would take until 2018 to resolve.  Among these issues were: (i) only a small number of Carmike's loyalty program members were willing to join AMC's loyalty program after the acquisition; (ii) patronage lost to competitors that had upgraded and/or renovated their facilities; and (iii) the closure of two of Carmike's "biggest, most successful" theaters.

46.     Pursuant to Instruction 11(a) of Form S-3, an issuer utilizing Form S-3 must disclose "***any and all material changes in the registrant's affairs*** which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to

security holders and which have not been described in a report on Form 10-Q . . . or Form 8-K . . . filed under the Exchange Act."[1]

47.     Here, the Registration Statement, including those SEC filings it incorporated by reference, negligently failed to disclose the material changes that were having an adverse effect on Carmike's business at the time of the SPO, including those matters highlighted by defendant Aron on the Q2 conference call.  As a result, the Registration Statement omitted to state material facts required to be stated therein in violation of the Securities Act.

48.     In addition, the Registration Statement omitted material facts and included materially inaccurate statements associated with its newly acquired international business.  In particular, the Registration Statement negligently failed to disclose that the gross margins on AMC's second highest source of revenue, food and beverage sales, associated with its newly acquired international business were, and are, materially lower than what the Company had historically reported for its domestic operations.  In fact, food and beverage costs as a percentage of food and beverage revenue associated with the Company's international operations are approximately *50%* greater than those associated with its domestic operations.

49.     As a result, the Registration Statement failed to comply with Instruction 11(a) of Form S-3 and omitted to state material facts required to be stated therein in violation of the Securities Act.

50.     Moreover, the Registration Statement was required to furnish the above-noted information about Carmike's operations pursuant to Item 303 of Regulation S-K, *Management's discussion and analysis of financial condition and results of operations* ("MD&A").

_____

[1]     Unless otherwise noted, all emphasis herein is added.

51.     The instructions to Item 303(a) of Regulation S-K require that the Registration Statement provide disclosure about and "focus specifically" on material events and uncertainties that would cause AMC's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past," stating, in pertinent part, as follows:

> The discussion and analysis shall *focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* or of future financial condition. *This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past*, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

52.     Lastly, the Registration Statement contained materially inaccurate statements with respect to the seasonality of AMC's foreign business.

53.     Items 1 and 7 of Form 10-K required AMC to furnish the information called for under Item 101 of Regulation S-K [17 C.F.R. §229.101(c)(1)(v)] and Item 303 of Regulation S-K [17 C.F.R. §229.303(b)], respectively, including, among other things, disclosure about the seasonal nature of its business.

54.     The Registration Statement, via AMC's Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), which was incorporated by reference therein, disclosed, in pertinent part, as follows:

> **Seasonality**
>
> Our revenues are dependent upon the timing of motion picture releases by distributors. The most marketable motion pictures are usually released during the summer and the year-end holiday seasons. Therefore, *our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons*. Our results of operations may vary significantly from quarter to quarter.

55.     The statements above were materially inaccurate because, contrary to the above-noted disclosure, AMC's newly acquired international operations generally experience *lower* attendance and revenues during the summer months.

56.     Accordingly, the Registration Statement contained materially inaccurate information about the seasonality of AMC's operations.  As noted above, Instruction 11(a) of Form S-3 required that the Registration Statement be updated to disclose "any and all material changes" in AMC's affairs, including the fact that AMC's newly acquired international operations generally experience *lower* attendance and revenues during the summer months, which it did not.

57.     The Registration Statement otherwise failed to identify and disclose known trends, events, demands, commitments and uncertainties associated with AMC's Carmike and international operations that were then having and were reasonably likely to have an on-going  material adverse effect on AMC's operating performance.

58.     As set forth in the SEC's May 18, 1989 interpretative release to Item 303 of Regulation S-K (the "1989 Interpretive Release"), a disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effect on the registrant's financial condition or results of operation.  In this regard, the 1989 Interpretive Release provides, in pertinent part, as follows:

> Item 303(a)(2)(i) requires a description of the registrant's material "commitments" for capital expenditures as of the end of the latest fiscal period. However, even where no legal commitments, contractual or otherwise, have been made, *disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend*.  Similarly, if the same registrant determines not to incur such expenditures, a known uncertainty would exist regarding continuation of the current growth trend.  If the adverse effect on the registrant from discontinuation of the growth trend is reasonably likely to be material, disclosure is required.  *Disclosure of planned material expenditures is also required, for example, when such expenditures are necessary to support a new, publicly announced product or line of business*.

*      *      *

Events that have already occurred or are anticipated often give rise to known uncertainties.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  ***More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant***, or may have been advised by the government that the contract may not be renewed.  ***The registrant also would have factual information relevant to the financial impact*** of non-renewal ***upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

*Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at *15, *18 (May 18, 1989) (footnote omitted).

59.    As set forth in the SEC's December 19, 2003 interpretative release to Item 303 of Regulation S-K (the "2003 Interpretive Release"), the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on AMC's operating results.  The 2003 Interpretive Release states, in pertinent part, as follows:

As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty ***is required unless*** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

*Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

60.    In violation of these disclosure obligations, the Registration Statement failed to disclose events and uncertainties associated with AMC's Carmike and international operations,

which were known by Defendants prior to the SPO and were reasonably likely to have a material effect on the future operating results or future financial condition of AMC.

61.     At the time of the filing of this complaint, AMC common shares were trading at approximately $14 per share, less than half of the SPO price of $31.50 per share.

## COUNT I

### For Violations of §11 of the Securities Act
### Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class against all Defendants.  For purposes of this Count, plaintiff does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

64.     The Registration Statement for the SPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein accurate and omitted to state material facts required to be stated therein.

65.     Plaintiff acquired AMC common shares pursuant to, and in reliance upon, the Registration Statement, without knowledge of the untruths and/or admissions alleged herein.

66.     Defendant AMC was the registrant for the SPO.  As such, AMC is strictly liable to the plaintiff and the Class under §11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

67.     The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

contained in the Registration Statement.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to plaintiff and the Class.

68.     The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters and were negligent in failing to ensure that the Registration Statement was prepared completely and accurately.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.  As such, the Underwriter Defendants are strictly liable to plaintiff and the Class.

69.     The Defendants were responsible for the contents and dissemination of the Registration Statement.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material fact, and were not inaccurate.  By reasons of the conduct herein alleged, Defendants violated §11 of the Securities Act.

## COUNT II

### For Violations of §12(a)(2) of the Securities Act
### Against Defendants AMC, Aron, Ramsey, Cox and the Underwriter Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against defendants AMC, Aron, Ramsey, Cox and the Underwriter

Defendants.  For purposes of this Count, plaintiff does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

72.     The defendants named in this Count were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus issued in connection with the SPO.  The Prospectus was used to induce investors, such as plaintiff and the other members of the Class, to purchase the common stock registered in the SPO.

73.     The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements contained therein not inaccurate, and omitted to state material facts required to be stated therein.  These defendants' actions of solicitation included participating in the preparation of the false and inaccurate Prospectus and participating in road shows to market the SPO to investors.

74.     The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit.  But for their participation in the SPO, including their solicitation as set forth herein, the SPO could not and would not have been accomplished.  Specifically:

(a)     The Underwriter Defendants made the decision to underwrite the SPO and do it at the price set forth in the Prospectus.  The Underwriter Defendants drafted, revised and/or approved the Prospectus.  The Prospectus was calculated to create interest in AMC common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose.

(b)     The Underwriter Defendants orchestrated all activities necessary to affect the sale of the common stock in the SPO to the investing public by issuing the common stock, promoting the common stock, and supervising its distribution and ultimate sale to the investing public.

- 18 -

75.     The defendants named in this Count owed to the purchasers of AMC common stock, including plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and to ensure that such statements were accurate and that they did not contain any misstatements or omissions of material fact.  These defendants, in the exercise of reasonable care, should have known that the Prospectus contained misstatements and omissions of material fact.

76.     Plaintiff and the other members of the Class purchased or otherwise acquired AMC common stock pursuant to the Prospectus, and neither plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Prospectus.

77.     By reason of the conduct alleged herein, the defendants named in this Count violated §12(a)(2) of the Securities Act.  Accordingly, plaintiff, individually and on behalf of the Class, hereby offers to tender to these defendants those shares of stock that plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### For Violation of §15 of the Securities Act
### Against the Individual Defendants

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted by plaintiff against the Individual Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o.  For purposes of this Count, plaintiff does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

80.     The Individual Defendants acted as controlling persons of AMC within the meaning of §15 of the Securities Act.

81.     By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause AMC to engage in the conduct complained of herein and were therefore control persons of AMC.  By reason of such conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.

82.     Each of the Individual Defendants was a culpable participant in the violations of §§11 and/or 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process that allowed the SPO to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

83.     For the purposes of this section of the complaint, the term "Defendants" refers only to defendants AMC, Aron and Ramsey.

84.     On the first day of the Class Period, December 20, 2016, AMC issued a press release announcing that it had obtained the regulatory approval necessary to complete the acquisition of Carmike.  Later that day, AMC held the Carmike conference call with analysts and investors to discuss the Company's acquisition of Carmike.

85.     Defendant Aron began the conference call by announcing that, "[i]n total, we are as confident today as we were back in March [2016] when this transaction was first announced, that the growth potential for AMC is enhanced by joining forces with Carmike Cinemas."

86.     During the Carmike conference call, defendant Aron explained that AMC had become thoroughly familiar with the acquired operations of both Odeon and Carmike.  With respect to the operations of Odeon, defendant Aron stated, in pertinent part, as follows:

On November 30, we completed the acquisition of Odeon [and] UCI Cinemas Group, since renamed Odeon[,] and *our teams have already been on the ground since day one in Europe working with our colleagues at Odeon to integrate the UK and Europe's largest movie exhibition circuit into the growing world of AMC*.

87.     Concerning Carmike, defendant Aron, in response to a securities analyst's question, explained that AMC had already spent "plenty of time" analyzing Carmike and understood, among other things, Carmike's customer visitation trends.  The following exchange, in pertinent part, transpired:

[Eric Handler, Analyst, MKM Partners:]  Thanks for taking my question. Two questions for you guys.  *First, with regards to Carmike, now you've had quite a bit of time to go through the Company's books and access their assets*.  I'm just curious how fast do you think you can move in terms of doing some renovations and reseats at the circuit and *what have you found from kicking the tires on the assets over the past, what's nearly a year now*? . . .

[Defendant Aron:]  Eric.  I will take two of your three and Craig will take the third. In terms of what we've learned over the year, the blessing of – we announced the transaction in March.  It's now December.  *So we've had plenty of time to look at the Carmike circuit and to plan for the integration*. . . .

In terms of what we've learned, *we've learned that*, for all of our talk, including in my prepared remarks about – *[AMC is] in big markets and [Carmike is] in small markets* and actually there is a big chunk of theaters that overlap and so what we've decided to do is proceed with what we are calling a two-brand strategy, three brands if you count the dine-in theaters as its own sub-brand.  *You have some theaters that will be branded and taken to the public as AMC and other theaters that have less visitation that might have slightly lower service standards, branded as a second brand, but what we found is that there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand.  And there are a lot of AMC theaters that also have lower visitation levels that we think are more like a Carmike theater than like an AMC theater*.

*So I would expect* that in excess of 50 current AMC theaters will move into the second brand and *in excess of 100 [of the 271] Carmike theaters will move into the AMC brand*.  Now, just because they are different brands doesn't mean that guest satisfaction will be lower in brand 2 than brand 1.  It just means that we will offer different levels of service, amenities and price points and better marry consumer expectations to the reality of what's being offered.

So, I think that's what we've learned . . . .

- 21 -

88.     Concerning the loyalty program, defendant Aron stated, in pertinent part, that the combination of AMC and Carmike was "expected to broaden our appeal with moviegoers with more people having access to the AMC Stubs loyalty program."

89.     The above-noted statements were materially false and misleading when made because, as Defendants knew, but failed to disclose, AMC had identified several major issues associated with Carmike's operations that were then having a material adverse effect on its operations and theater attendance.  Indeed, AMC would later acknowledge that it would need until the summer of *2018*, if not longer, to remedy such matters.

90.     On January 23, 2017, AMC issued a press release announcing that it had entered into a definitive agreement to acquire Nordic, the largest theater exhibitor in seven countries in the affluent northern region of Europe.  According to the press release, Nordic operated 68 theaters and had a substantial minority interest (approximately a 50% ownership) in another 50 associated theaters.   After the acquisition of Nordic, the Company's domestic operations accounted for approximately 70% of its total attendance, screens and revenue, while its newly acquired Odeon and Nordic foreign operations accounted for approximately 30% of its total attendance, screens and revenue.

91.     Later that day, AMC held a conference call with analysts and investors to discuss the Company's acquisition of Nordic.  During the conference call, defendant Aron touted the execution of AMC's integration of Carmike and Odeon as being "flawless," stating, in pertinent part, as follows:

> So far, vis-a-vis ***Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been flawless***. We fully expect this also will be the case on our third go-round in one year.  With some practice, ***we're getting pretty good at putting companies together***, and of course everyone knows the old saying, about how you get to Carnegie Hall.

- 22 -

92.     During that same conference call, defendant Aron suggested that AMC's foreign acquisitions would close in time to benefit from a "busy summer film slate," while deceptively failing to disclose that any such benefit would be offset by seasonal factors, stating, in pertinent part, as follows:

> Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick. **We expect closing to happen well within the first half of 2017, and ahead of the busy summer film slate**.

93.     On February 9, 2017, AMC filed the Prospectus for the SPO with the SEC.  The Registration Statement and Prospectus failed to disclose material information required to be disclosed therein pursuant to the regulations governing their preparation and incorporated by reference materially false and misleading SEC filings that they failed to update, as detailed herein.

94.     On February 28, 2017, AMC issued a press release announcing its 2016 fourth quarter and year-end financial results.  The press release highlighted AMC's record-setting fourth quarter and year-end results across its revenue categories – admissions, food and beverage, and other – and commented that the SPO's proceeds would be used to pay for AMC's recent acquisitions, stating, in pertinent part, as follows:

> In connection with the acquisitions of Odeon/UCI and Carmike, and the planned acquisition of Nordic, in February 2017 AMC raised more than $640 million of additional equity through the sale of 20,330,874 shares of the Company's Class A common stock, par value $0.01 per share, at $31.50 per share.

> The net proceeds of the offering were approximately $618.0 million after deducting underwriting commissions and before deducting estimated offering expenses. **AMC used the net proceeds from this offering to repay $350 million principal amount of outstanding bridge loans incurred in connection with its completed acquisition of Carmike Cinemas, Inc. and intends to use the remaining proceeds to finance a portion of the previously announced acquisition of Nordic**. If the Nordic acquisition is not consummated, AMC will use the net proceeds from the offering for general corporate purposes.

95.     Defendant Aron commented on AMC's financial results, stating, in pertinent part, as follows:

> "***AMC's laser-like focus on the priorities*** that drive considerable growth is what differentiates us, and what has established AMC as the clear and undisputed leader among movie-theater operators . . . . Our innovations with powered recliner seats, enhanced food and beverage initiatives and the expansion of premium large format offerings, combined with AMC's world class marketing efforts, has created industry defining guest experiences and engagement.  In concert with a prudent and opportunistic acquisition strategy, 2016 resulted in the successful acquisition of Odeon, Europe's largest movie exhibitor, and Carmike Cinemas, the nation's then fourth largest domestic exhibitor, and presented AMC with the opportunity to acquire Nordic Cinema Group, announced in January of 2017.  ***AMC has never been better positioned to leverage our proven strategic initiatives across a growing platform both here in the U.S. and across the globe***."

96.     After the earnings announcement, AMC held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the call, defendant Aron deceptively spoke about the seasonality of AMC's newly acquired international operations, calling the month of December one of the busiest of the year, stating, in pertinent part, as follows:

> Internationally, for the year, the year being defined as November 30 to December 31, the time in which we owned Odeon, total revenues were in Europe were [sic] $118.9 million, $118.9 million, and adjusted EBITDA was $28.4 million.

> Please keep in mind that this adjusted EBITDA in Europe is a result of ***December*** movies, ***one of the busiest months of the year*** and should not be extrapolated merely by multiplying by 12 for full-year 2017.

97.     In addition, defendant Aron stated that AMC's integration of Carmike had "begun . . . in earnest," and AMC had identified "$35 million of cost synergies" associated with the Carmike acquisition, which it expected to be "substantially realized" within the next ten months, stating, in pertinent part, as follows:

> Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint.

> We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating.  ***We have also identified $35 million of cost synergies, which we believe will be substantially***

*realized by the end of 2017.  We've already begun the integration in earnest*, converting point-of-sale systems and vendor contracts and commencing initiative deployments.

98.     Concerning AMC's 2017 guidance, defendant Aron noted that consensus revenue and earnings estimates set forth by securities analysts at that time "seem to be in the right ballpark."  Per *Thomson First Call*, the consensus Wall Street estimates at that time were as follows:

AMC 2017 Wall Street Analysts' Consensus Estimates

| (Totals do not add due to rounding) | Revenue | Earnings Per Share |
|---|---|---|
| Q1, March 31, 2017 | $1.168 billion | $0.11 |
| Q2, June 30, 2017 | $1.301 billion | $0.37 |
| Q3, September 30, 2017 | $1.198 billion | $0.10 |
| Q4, December 31, 2017 | $1.359 billion | $0.48 |
| Full Year 2017 | $5.044 billion | $1.04 |

99.     During the conference call's Q&A session, defendant Aron falsely and misleadingly announced that "you'll start to see Carmike cinemas getting renovated in 2018 but, that's probably a 2018, 2019 and – or 2018 and 2019, or 2018, 2019, and 2020 renovation plan."

100.    On March 10, 2017, AMC filed the 2016 Form 10-K with the SEC, which was signed by the Individual Defendants.  The 2016 Form 10-K contained materially false and misleading disclosures concerning: (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) the Company's loyalty program, AMC Stubs; (iv) AMC's MD&A; and (iv) AMC's disclosure controls.

101.    In addition, the 2016 Form 10-K contained false and misleading certifications by defendants Aron and Ramsey on AMC's disclosure controls and procedures, which stated, in pertinent part, as follows:

I, [defendant Aron/defendant Ramsey] certify that:

1.      I have reviewed this annual report on Form 10-K of AMC Entertainment Holdings, Inc.;

- 25 -

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a‑15(e) and 15d‑15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a‑15(f) and 15d‑15(f)) for the registrant and have:

   a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

   a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

102.     The above-referenced false and misleading statements, omissions and certifications in the 2016 Form 10-K were falsely and misleadingly repeated, in all material respects, in the Form 10-Q that AMC filed with the SEC later in the Class Period.

103.     On March 10, 2017, AMC issued a press release announcing its intention to offer $475 million in aggregate principal amount of dollar-denominated senior subordinated notes due 2027 and an additional £250 million aggregate principal amount of sterling-denominated 6.375% Senior Subordinated Notes due 2024 in a private offering exempt from the registration requirements of the Securities Act.  According to the press release, AMC intended to use the net proceeds from the offering to finance the acquisition of Nordic and pay related fees and expenses and to use any remaining proceeds for general corporate purposes.

104.     On April 19, 2017, AMC filed with the SEC a registration statement on Form S-4 offering to exchange all of the Company's new 6.375% Senior Subordinated Notes due 2024 for all of its outstanding 6.375% Senior Subordinated Notes due 2024, all of its new 5.875% Senior Subordinated Notes due 2026 for all of its outstanding 5.875% Senior Subordinated Notes due 2026, and all of its new 6.125% Senior Subordinated Notes due 2027 for all of our outstanding 6.125% Senior Subordinated Notes due 2027.

105.     Also on April 19, 2017, AMC issued a press release "to facilitate greater transparency and clarity [and to provide] additional financial disclosure primarily related to its three recent acquisitions."  Defendant Aron commented in the press release, in pertinent part, as follows:

> "We remain committed to providing appropriate and relevant financial disclosure to our shareholders.  We believe that with the complexity and close timing of the three transformative acquisitions we have successfully completed in the last five months, the additional disclosure we are providing today, beyond the pro forma financial information we have already published, will be helpful for investors . . . .  We

continue to be excited about the earnings potential for AMC as we have grown to a network of approximately 1,000 theaters and 11,000 screens in 15 countries in the U.S. and Europe.  As we deploy our proven growth initiatives across our system, ***we expect to unlock both near-term and long-term value***, as evidenced already by the fact that, as of today we expect to exceed the current FACTSET consensus EBITDA estimate for the first quarter ended March 31, 2017.  When appropriate and feasible, we expect to provide additional financial disclosure related to the acquisitions and their contributions for the balance of 2017."

106.     On May 8, 2017, AMC issued a press release announcing its financial results for the 2017 first quarter ("Q1"), the period ended March 31, 2017.  The press release highlighted AMC's record setting Q1 results across its revenue categories: admissions, food and beverage, and other.  Defendant Aron commented on the results, stating, in pertinent part, as follows:

> "***AMC is off to a tremendous and record start in 2017***.  AMC's ability to purposefully act on the opportunities and innovations that drive growth continues to set us apart and further solidifies our leadership position among movie-theatre operators in the U.S. and Europe . . . .  Achieving record first quarter 2017 ***Adjusted EBITDA of $251.3 million is tangible evidence of what we have been saying for the better part of a year, that the earnings power of this new incarnation of a larger and more influential AMC is enormous compared to other operators and even to our own recent past***."

> . . . "We would particularly point out three important developments at AMC so far this year.  First, at the legacy pre-acquisition AMC theatres, we grew revenues at a meaningfully faster pace than the industry at large, due in part to our commitment to renovating theatres and the strength of our impactful marketing programs.  Second, with our domestic acquisition, ***our rapid move to achieve cost synergies and efficiencies brought immediate bottom line benefit, offsetting revenue weakness that had been prevalent at Carmike for eight of the twelve months and three of the last four months of 2016.  We are directly focused on improving revenues at the acquired domestic theatres, as well as furthering the cost reduction efforts that already are well in hand***.  And third, we are thrilled both by our brisk start in driving immediate revenue and earnings growth in constant currency in Europe, and the likelihood that our plans to drive even more earnings through renovation of European theatres will come to initial fruition in quantity as early as the end of 2018."

> . . . "***We are only just beginning to unlock the growth potential of our recent acquisitions. The initial integration efforts of creating a transformed AMC have been done quickly and have been very smooth.  As we now move to make what we expect will be highly lucrative investments in guest-facing initiatives like powered recliner seats, enhanced food and beverage offerings and the expansion of premium large format experiences, we are as confident as we could be in the***

*future earnings potential of AMC*.  We remain optimistic about the opportunity to continue to deliver meaningful value to our shareholders both in the balance of 2017 and in the years ahead."

107.    Later that day, AMC held a conference call with analysts and investors to discuss the Company's Q1 earnings release and operations.  During the conference call, defendant Aron highlighted customer participation in AMC's loyalty program, stating, in pertinent part, as follows:

> And speaking of the efficacy of those marketing programs, *AMC Stubs* . . . *participation continues to soar*.  As of today, we have 7,553,209 AMC Stubs member households.  We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago. *So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly*.

*       *       *

> As previously mentioned, our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States.  These tens of millions of purchase histories now captured in our database offer us a treasure trove of data and consumer information for us to use to market AMC and future moviegoing more effectively.

108.    After touting the integration of Carmike, defendant Aron deceptively stated that "[t]here have literally been no operational snafus of any note to report."  Defendant Aron stated, in pertinent part, as follows:

> *The integration of Carmike into AMC is running very smoothly*. As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S.  However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.

> *We have made great progress with the conversion of the acquired theaters*. We only have 2 Carmike theaters as we speak, and by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands. *There have literally been no operational snafus of any note to report to you*, and the new larger AMC is showing movies every day without pain in a much bigger national footprint.

- 29 -

109.    Defendant Aron then misleadingly noted that Carmike experienced "revenue weakness" during 2016, but that AMC expected to "reverse soon" Carmike's "short-term revenue softness," stating, in pertinent part, as follows:

> **[W]ith Carmike, we have inherited a circuit that was showing revenue weakness in** 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of **2016.** Candidly, that was one of the allures to us of acquiring Carmike.  As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform.
>
> Fortunately, **we were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness** – again, which I'm quick to add, **we expect to reverse soon** on our watch.

110.    Later on the conference call, defendant Aron, in response to an analyst's question, spoke about Carmike's revenue softness and AMC management's ability to remedy it, stating, in pertinent part, as follows:

> With respect to the Carmike theaters, **when I talk about revenue softness**, I'm not talking about revenue declines.  **What I'm talking about is that the AMC Theatres have been growing faster than the Carmike theaters have been growing**, if you take, though, the totality of it all.  So no, we're – there's no thought to shuttering any Carmike theaters.
>
> We think we have an A team in place here in Kansas City that has generated great results for AMC over the past year.  That's why AMC revenues are up 6.2% when the industry is up 4%, 5%.  That same team is now wholly focused on the Carmike theaters, not only from a system basis but also theater-by-theater.  And we're highly confident we're going to make a lot of progress across the Carmike system.
>
> *          *          *
>
> And so – but it took Carmike a year to get into this position.  We said that their revenue softness was 8 months out of 12, so we're not going to get out of it in a week.  But I think, as we look to the second half of '17, as we look certainly to '18, we'll start to see the Carmike theaters perform in a really good way.  And as I said, something on the order of 2/3 of the incremental dollar drops down to the bottom line.

111.     Near the end of the conference call, defendant Aron stated that "a lot of Carmike theaters . . . are doing just great" and that AMC had studied Carmike to the point were "we've gotten quite granular looking theater by theater by theater."   Defendant Aron also noted that while Carmike's results were adversely impacted by the renovation of two of its largest theaters, "potent marketing programs" and "some targeted investment" would improve Carmike's performance, stating, in pertinent part, as follows:

> On the issue of Carmike, I – it's really complicated.  There are a ***lot of Carmike theaters that are doing just great.  So we've gotten quite granular looking theater by theater by theater***, and there are so many reasons.  And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team. It's a problem that we inherited.  It's a problem that we'll solve.

> You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner.  That's one argument.

> Another argument is some of the Carmike theaters did have competitive activity around them. And they – since Carmike was not a company that really believed in recliner reseats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own. Clearly, that's something that will change.

> When we have a theater that we renovate, we do it in 3 to 6 months.  ***Two of the largest theaters in their system, they shut down for renovation***, and I believe they're going to be closed for 15 months – which, again, I know it's 2 theaters out of 270, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, ***it matters***.

> There's a lot more than that.  We've already taken 5 of their theaters.  For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price.  We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.

> So there are a lot of reasons there – for as many of their theaters, there are sort of reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.

> The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days.  The first cut-over was mid-January, and the last cut-over is

going to be mid-May.  So as these theaters become AMC-branded theaters with more ***potent marketing programs*** and the like and ***some targeted investment to improve the product***, we think we'll see real benefits.

So we're not at all upset about all this.  ***It's just more upside to come***.  And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with.

112.    That same day, May 8, 2017, AMC filed with the SEC its Form 10-Q for the quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"), which was signed by defendants Aron and Ramsey.  The Q1 2017 Form 10-Q contained materially false and misleading disclosures about: (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) AMC's loyalty program, AMC Stubs; (iv) AMC's MD&A; and (iv) AMC's disclosure controls, as well as defendants Aron's and Ramsey's certifications thereon.  *See* ¶101, *supra*.

113.    The statements referenced above in ¶¶85-88, 90-101, 103, 105-111 were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the operations of Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters;

(b)    that Carmike had experienced a significant loss in market share when its loyal patrons migrated to competitors that had renovated and upgraded their theaters;

(c)    that AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition;

(d)    that the issues identified in (a)-(c) above were then having a material adverse effect on Carmike's  operations and theater attendance and, in response, AMC planned to boost visitation levels at Carmike theaters by materially expanding promotional and capital investment

spending activity, which was reasonably likely to have a material adverse effect on AMC's near-term operating results;

(e) Defendants' representations about the seasonality of AMC's business were materially false and misleading;

(f) the representations in AMC's 2016 Form 10-K and Q1 2017 Form 10-Q concerning Carmike's operations, the seasonality of its business, AMC's MD&A and AMC's disclosure controls were materially false and misleading;

(g) the certifications issued by defendants Aron and Ramsey concerning AMC's disclosure controls were materially false and misleading; and

(h) that, as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about AMC's then-current business and future financial prospects, including their statements relating to AMC's financial guidance, as well as the cost synergies associated with the "flawless" integration of Carmike.

114. On August 1, 2017, after the close of the market, AMC issued a press release announcing its preliminary financial results for Q2 2017, the period ending June 30, 2017. The press release announced that AMC expected to report total Q2 revenues of approximately $1.2 billion and a net loss in the range of $178.5 to $174.5 million, or a loss of $1.36 to $1.34 per diluted share. The press release also announced that AMC's 2017 revenues were expected to be between $5.10 and $5.23 billion and its 2017 net loss to be between $150 and $125 million, or a loss of $1.17 to $0.97 per diluted share.

115. In response to these much worse-than-expected results, the price of AMC common stock plummeted nearly *27%*, on very heavy trading volume, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017.

116.   On August 4, 2017, AMC held a conference call with analysts and investors to discuss the Company's preliminary Q2 results.  Defendant Aron commented that Q2 was "simply a bust" and highlighted several reasons for the Company's poor results during the quarter.

117.   The reasons highlighted by defendant Aron included the seasonality of AMC's international business.  For the first time, defendant Aron revealed that "Q2, seasonally, is often the smallest quarter of the year in Europe."

118.   Later, during the conference call's Q&A session, a securities analyst asked Defendants if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?"  In response, defendant Aron used the pretext of AMC's international operations being accounted for under international accounting standards as the reason for the non-disclosure.  Indeed, the seasonality of AMC's international business is not predicated upon the accounting standards it utilizes.  After the release of the Q2 preliminary earnings results, securities analysts issued reports calling out the seasonality of AMC's international business, including one that noted it "played a role in our (and likely the Street's) mismodeling of the quarter."

119.   In addition, defendant Aron highlighted Carmike's performance as a major contributor to AMC's much worse-than-expected Q2 results, stating that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars." Defendant Aron explained that, during Q2, the box office results in the entire United States were down 4.4%, while, in contrast, admissions revenue at legacy AMC theaters were down only 3.1%. However, the newly acquired Carmike theaters suffered an ***11.3%*** revenue decline during Q2, or ***150% more than the national average***.

120.   During the Q2 conference call's Q&A session, defendant Aron explained that Carmike's poor Q2 performance was caused by a loss of market share that occurred during 2016 and

identified "literally 6" different issues that had been having a material adverse effect on Carmike's operations and patron attendance, which AMC estimated would take until at least 2018 to resolve. Among these issues were: (i) only a small number of Carmike's loyalty program members were willing to join AMC's loyalty program after the Carmike acquisition; (ii) Carmike lost patronage to competitors that had upgraded and/or renovated their facilities; and (iii) the closure of two of Carmike's "biggest, most successful" theaters.

121.    Defendant Aron stated, in pertinent part, as follows:

[W]e mentioned this a little bit on the first quarter call, as we went back and looked, in 8 of the 12 months in '16, *Carmike, as a circuit, had declining market share*, including 3 of the past – 3 of the 4 months between September and December, *it had declining market share*.  When you look at *what Carmike as a company* did between April and December *to modernize its circuit* after it put itself under contract to be sold, it *didn't do very much.  And so the circuit essentially went on dead stop* around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16.  What *we found* is that we've already gone through each of the several hundred Carmike theaters one by one with this – across the top – departmental team that I've told you about, and *there are literally 6 different reasons that tend to come up most often* as to what's going on in a particular theater.

122.    Defendant Aron further noted that Carmike had lost market share because AMC was unable to retain Carmike loyalty program members and that it essentially had to rebuild the program "from scratch," stating, in pertinent part, as follows:

I'll give you another.  *When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program*.  Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program.  *So we've had to start the loyalty program essentially over from scratch*.

123.    Defendant Aron also commented on Carmike's poor performance and discussed how long it might take for AMC to turn around Carmike's operations, stating, in pertinent part:

And as I said, there have been many identified issues.  And they got to be knocked down one at a time.  And *as we looked at the issues* that were floating around the Carmike circuit, *about 40% of the attendance issues in the Carmike circuit was*

*because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded. . . . Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation*. And the theaters were closed for over a year. And they're just coming back on stream this summer. *So we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online*. And it's literally issue-by-issue. . . . Can we turn this circuit around in 9 months? So is it January to March of '18? Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that? I don't know. But I'm hopeful that we can get it sorted out and turned in the first half of '18.

124.    The market for AMC common stock was open, well developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged herein, AMC common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired AMC common stock relying upon the integrity of the market price of AMC common stock and market information relating to AMC, and have been damaged thereby.

125.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AMC common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations, as alleged herein.

126.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about AMC's operations, acquisitions and future financial prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically

positive assessment of AMC common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

127.    For the purposes of this section of the complaint, the term "Defendants" refers only to AMC, Aron and Ramsey.

128.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding AMC, and their control over and/or receipt and/or modification of AMC's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

129.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including defendants Aron and Ramsey.

130.    Defendants Aron and Ramsey, because of their positions with AMC, controlled the contents of AMC's public statements during the Class Period. Defendants Aron and Ramsey were

each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, defendants Aron and Ramsey knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the Defendants is responsible for the accuracy of AMC's corporate statements and is, therefore, responsible and liable for the representations contained therein.

131.    Defendants were motivated to engage in their fraudulent conduct to facilitate and maximize the amount of money the highly leveraged AMC could raise in the SPO.  As noted herein, AMC raised approximately $618 million in the SPO, a portion of which was used to repay outstanding bridge loans incurred in connection with AMC's acquisition of Carmike, with the remaining proceeds used to finance a portion of the Nordic acquisition.

132.    In addition, the scienter of the Defendants is underscored by the Sarbanes-Oxley mandated certifications of defendants Aron and Ramsey, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about AMC was made known to them and that the Company's disclosure-related controls were operating effectively.

### Loss Causation

133.    For the purposes of this section of the Complaint, the term "Defendants" refers only to AMC, Aron and Ramsey.

134.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AMC common stock and operated as a fraud or deceit on Class Period purchasers of AMC common stock by failing to

disclose and misrepresenting the adverse facts detailed herein.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AMC common stock declined significantly as the prior artificial inflation came out of the stock's price.

135.    As a result of their purchases of AMC common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused AMC common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $35.45 per share on December 27, 2016.

136.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of AMC's business, risks and future financial prospects.   When the truth about the Company was revealed to the market, the price of AMC common stock fell significantly, removing the inflation therefrom and causing real economic loss to investors who had purchased AMC common stock during the Class Period.

137.    The decline in the price of AMC common stock after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.   The timing and magnitude of the price decline in AMC common stock negates any inference that the losses suffered by plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

138.    The economic loss*, i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of AMC common

stock and the subsequent significant declines in the value of AMC common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

139.    At all relevant times, the market for AMC common stock was an efficient market for the following reasons, among others:

(a)    AMC common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)    as a regulated issuer, AMC filed periodic public reports with the SEC and the NYSE;

(c)    AMC regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AMC was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

140.    As a result of the foregoing, the market for AMC common stock promptly digested current information regarding AMC from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of AMC common stock during the Class Period suffered similar injury through their purchases of AMC common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

141.    For the purposes of this section of the complaint, the term "Defendants" refers only to AMC, Aron and Ramsey.

142.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements plead herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of AMC who knew that those statements were false when made.

**COUNT IV**

**Violation of §10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants AMC, Aron and Ramsey**

143.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

144.    During the Class Period, AMC, Aron and Ramsey disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145. Defendants AMC, Aron and Ramsey violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon the plaintiff and others similarly situated in connection with their purchases of AMC common stock during the Class Period.

146. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AMC common stock. Plaintiff and the Class would not have purchased AMC common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

147. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of AMC common stock during the Class Period.

**COUNT V**

**Violation of §20(a) of the Exchange Act**
**Against Defendants AMC, Aron and Ramsey**

148. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149. Defendants Aron and Ramsey acted as controlling persons of AMC within the meaning of §20(a) of the Exchange Act. By reason of their positions as officers and/or directors of

AMC, defendants Aron and Ramsey had the power and authority to cause AMC and its employees to engage in the wrongful conduct complained of herein.  AMC controlled defendants Aron and Ramsey and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the other members of the Class damages together with interest thereon;

C.      Awarding rescission or a rescissory measure of damages;

D.      Awarding plaintiff and the other members of the Class the costs and expenses of this litigation, including reasonable attorneys' fees, accountants' and experts' fees, and other costs and disbursements; and

E.      Awarding plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  January 12, 2018,             ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                           SAMUEL H. RUDMAN

                                                   */s/ Samuel H. Rudman*
                                                  SAMUEL H. RUDMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

                                         Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

HAWAII IRON WORKERS PENSION TRUST FUND ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

AMC ENTERTAINMENT

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this *29th* day of *December*, 2017.

HAWAII IRON WORKERS PENSION TRUST FUND

By: T. George Paris, Chairman

- 2 -

AMC ENTERTAINMENT

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 02/08/2017 | 632 | $31.50 |
| 05/25/2017 | 223 | $23.67 |
| 05/26/2017 | 125 | $24.10 |
| 05/30/2017 | 596 | $23.54 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/31/2017 | 89 | $33.94 |

*Opening position of 1,639 shares.