IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

HAWAII STRUCTURAL IRONWORKERS :    Lead Case No. 1:18-cv-00299-AJN-HP
PENSION TRUST FUND, Individually and on :
Behalf of All Others Similarly Situated, :    <u>CLASS ACTION</u>
                                       :
                     Plaintiff, :    **AMENDED CLASS ACTION**
                                         :    **COMPLAINT**
       vs. :
                                         :
AMC ENTERTAINMENT HOLDINGS, INC., :
ADAM M. ARON, CRAIG R. RAMSEY, :
CHRIS A. COX, LIN ZHANG, JACK Q. :
GAO, MAOJUN ZENG, ANTHONY J. :
SAICH, LLOYD HILL, GARY F. LOCKE, :
HOWARD W. KOCH, JR., KATHLEEN M. :
PAWLUS, CITIGROUP GLOBAL :
MARKETS INC., MERRILL LYNCH, :
PIERCE, FENNER & SMITH :
INCORPORATED, BARCLAYS CAPITAL :
INC. and CREDIT SUISSE SECURITIES :    <u>**JURY TRIAL DEMANDED**</u>
(USA) LLC, :
                                         :
                     Defendants. :
                                         :

———————————————————— X

The International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware (the "Operating Engineers' Fund" or "Lead Plaintiff") and Hawaii Iron Workers Pension Trust Fund ("Hawaii Iron Workers' Fund"), referred to collectively herein as "Plaintiffs," bring this federal securities class action on behalf of themselves and all other persons and entities similarly situated who purchased or otherwise acquired: (i) the common stock of AMC Entertainment Holdings, Inc. ("AMC" or the "Company") pursuant or traceable to its secondary public offering (the "SPO") on or about February 8, 2017; and (ii) all persons and entities who purchased or acquired the publicly traded common stock of AMC between December 20, 2016 and August 1, 2017, inclusive (the "Class Period").

Plaintiffs allege the following based upon personal knowledge as to themselves, their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of their counsel. This investigation included, but was not limited to, a review and analysis of: (i) AMC's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of AMC's earnings and conference calls and industry conferences; (iv) AMC's press releases and media reports; (v) economic analyses of AMC's common stock movement and pricing data; (vi) consultations with relevant experts; (vii) interviews of confidential witnesses with knowledge about AMC and/or its acquired entities; and (viii) other publicly available materials and data identified herein. Such investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants (defined below) and are exclusively within their custody or control. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation and discovery.

- 1 -

## I.     NATURE OF THE ACTION

1.      Plaintiffs assert two sets of claims on behalf of purchasers (the "Class") of AMC Class A common shares (hereinafter the "common stock" or "common shares").

2.      First, the Hawaii Iron Workers' Fund asserts claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of itself and Class members who purchased shares of AMC common shares pursuant or traceable to the SPO.  The Hawaii Iron Workers' Fund expressly disclaims any allegations of scienter or fraudulent intent with respect to the Securities Act claims alleged herein.

3.      Second, Plaintiffs assert claims on behalf of themselves and Class members who purchased AMC common shares during the Class Period seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

4.      AMC is the largest movie theater chain worldwide, with movie theaters throughout the U.S. and Europe.

5.      On December 21, 2016, AMC filed with the SEC a Form S-3 registration statement, which incorporated a prospectus and prospectus supplements that were later filed with the SEC (collectively referred to herein as the "Registration Statement"), offering to sell to the public 21,904,761 common shares (including 2,857,142 common shares pursuant to an overallotment option issued to the Company's underwriters) in the SPO at a price of $31.50 per share.

6.      The Registration Statement, which utilized a shelf registration process and was automatically declared effective by the SEC upon its filing, provided AMC with net proceeds of approximately $618 million.

7.      Shortly before the SPO, during the fourth quarter of 2016, AMC consummated two major acquisitions: Carmike Cinemas, Inc. ("Carmike"), which owned and operated movie

theaters throughout the United States; and Odeon and UCI Cinemas Holdings Limited ("Odeon"), which owned and operated movie theaters in seven European countries. These acquisitions were primarily financed with debt, causing the Company's indebtedness of $3.4 billion as of September 30, 2016 to nearly double, to $6.6 billion, by December 31, 2016. Thereafter, on January 23, 2017, AMC announced it had agreed to acquire Stockholm-based Nordic Cinema Group Holding AB ("Nordic").

8.      According to the Registration Statement, the SPO was undertaken to help finance the above noted acquisitions, with AMC intending to use the SPO's net proceeds to repay a bridge loan it had procured to acquire Carmike and finance a portion of AMC's acquisition of Nordic.

9.      As detailed herein, the Registration Statement for the SPO contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed therein pursuant to the regulations governing its preparation.

10.     Specifically, the Registration Statement contained inaccurate statements about the Company's newly-acquired Carmike and Odeon businesses, and failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operating performance.

11.     The Registration Statement failed to disclose matters with respect to the acquisition of Carmike that then were having a material adverse effect on AMC's capital resources and operating results, and were reasonably likely to continue to have a material adverse effect on AMC, including: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after its acquisition of Carmike.

12.     The Registration Statement also negligently stated and disclosed, with respect to the acquired Odeon business, that AMC's new business from Odeon was seasonally stronger in the summer months, when, in fact, Odeon's business has traditionally been slower during that period.

13.     At the time of the filing of the initial action in this consolidated case, AMC common stock traded at $14.45 per share, or 54% less than the SPO price.

14.     With respect to the Exchange Act claims, the Class Period begins on December 20, 2016.  On that date, AMC held a conference call (the "December 20, 2016 Conference Call") to discuss the acquisition of Carmike.  During the December 20, 2016 Conference Call, Adam M. Aron ("Aron"), AMC's President and Chief Executive Officer ("CEO"), told investors that, during the period between the announcement of AMC's intention to acquire Carmike in March 2016 and the closing of the transaction in December 2016, Defendants "had plenty of time" to learn about the operations of Carmike and that Defendants had been "working with the [U.S. Department of Justice] to provide them with the necessary information" it required in connection with its antitrust regulatory review in accordance with the Hart-Scott-Rodino Act.

15.     As a result of the foregoing, as well as other due diligence conducted by AMC, during the December 20, 2016 Conference Call, Aron communicated that AMC had acquired detailed knowledge about the operations of Carmike when he spoke about: (i) the cash flow levels of Carmike theaters; (ii) customer visitation data at Carmike theaters; and (iii) those Carmike theaters that were capable of supporting an "AMC style renovation."

16.     While in possession of granular details about Carmike's operations by no later than the beginning of the Class Period, Defendants, including Aron, made materially false and misleading statements and omissions concerning the operations of Carmike.

17.     Defendants specifically made false and/or misleading statements and/or failed to disclose that AMC's operating performance was being adversely impacted by the following factors/facts, which were known to them at the time that the false statements at issue were made: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

18.     Indeed, later during the Class Period, on May 8, 2017, ***Aron specifically admitted that the previously undisclosed operational challenges and underperformance at Carmike noted above, which Aron now disclosed also had caused it to underperform financially prior to its acquisition by AMC, made Carmike an attractive acquisition candidate***, stating that "one of the allures to us of acquiring Carmike" was the "revenue weakness" it had been experiencing during 2016.  Importantly, prior to May 8, 2017, none of the Defendants ever disclosed that Carmike's revenue weakness was a basis or reason for the acquisition.

19.     Defendants also made materially false and misleading statements about AMC's newly acquired international business, as discussed more fully below, by failing to disclose during the Class Period that AMC's international business had different seasonal trends and that, unlike AMC's domestic business, its international business did not experience peak attendance and sales during the summer months.

20.     As a result of Defendants' false statements and/or omissions, AMC's shares of common stock traded at artificially inflated prices during the Class Period.  At the end of the Class Period, when Defendants revealed the truth about the Company's newly-acquired operations, the price of AMC common stock plummeted nearly ***27%***, on very heavy trading volume.

- 5 -

## II.     JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27(a) of the Exchange Act (15 U.S.C. § 78aa(a)), and 28 U.S.C. § 1331.

22.     The claims asserted herein arise under Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), and 28 U.S.C. § 1391(b). The acts and conduct complained of herein occurred, in substantial part, in this District because, *inter alia* (a) the representatives of the underwriters of the SPO maintain their principal places of business and conducted the SPO in this District; (b) AMC was represented in the SPO by counsel located in New York, New York; (c) the Underwriter Defendants (defined below) were represented by their counsel located in New York, New York; and (d) AMC's common stock is listed and trades on the New York Stock Exchange ("NYSE").

24.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    THE PARTIES

25.     Lead Plaintiff is a Taft-Hartley fund based in Fort Washington, Pennsylvania, which provides healthcare and retirement benefits to, and manages in excess of $100 million on behalf of approximately 5,000 participants.  As set forth in its certification previously filed in this action and incorporated by reference herein, the Operating Engineers' Fund purchased shares of

AMC common stock during the Class Period and was damaged thereby.  On May 30, 2018, the Court appointed the Operating Engineers' Fund to serve as a lead plaintiff in this consolidated securities class action.

26.    The Hawaii Iron Workers' Fund purchased shares of AMC common stock pursuant, or traceable, to the SPO, as well as during the Class Period, as set forth in the certification previously filed in this action and incorporated herein by reference, and was damaged thereby.

27.    AMC is principally involved in the theatrical exhibition business and owns, operates or has interests in theaters located throughout the United States and Europe.  AMC is incorporated under the laws of Delaware and its common stock is traded on the NYSE under the ticker symbol "AMC."

28.    Aron served, at all relevant times, as President, Chief Executive Officer ("CEO") and a member of the Board of Directors of AMC.  As detailed herein, Aron signed the materially inaccurate Registration Statement issued in connection with the SPO and made materially false and misleading statements during the Class Period.

29.    Defendant, Craig R. Ramsey ("Ramsey"), served, at all relevant times, as Executive Vice President and Chief Financial Officer of AMC.  As detailed herein, Ramsey signed the materially inaccurate Registration Statement issued in connection with the SPO and made materially false and misleading statements during the Class Period.

30.    Defendant, Chris A. Cox ("Cox"), served, at all relevant times, as Senior Vice President and Chief Accounting Officer of AMC.  As detailed herein, Cox signed the materially inaccurate Registration Statement issued in connection with the SPO.

31.    Defendants, Lin Zhang ("Zhang"), Jack Q. Gao ("Gao"), Maojun Zeng ("Zeng"), Anthony J. Saich ("Saich"), Lloyd Hill ("Hill"), Gary F. Locke ("Locke"), Howard W. Koch, Jr

("Koch") and Kathleen M. Pawlus ("Pawlus"'), each served as members of AMC's Board of Directors at the time of the SPO and signed the materially inaccurate Registration Statement issued in connection with the SPO.

32.     Defendants, Citigroup Global Markets Inc. ("Citigroup"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Barclays Capital Inc. ("Barclays") and Credit Suisse Securities (USA) LLC ("Credit Suisse"), each served as joint book-running underwriters for the SPO and are collectively referred to herein as the "Underwriter Defendants."  Together, the underwriters for the SPO, including certain underwriters other than the Underwriter Defendants, received commissions and other professional fees of approximately $23.6 million in connection with the SPO.

33.     The Underwriter Defendants, who participated in the drafting and dissemination of the Registration Statement for the SPO, failed to perform adequate due diligence in connection with their roles as underwriters and were negligent in failing to ensure that the Registration Statement for the SPO was prepared accurately and in accordance with the rules governing its preparation.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

34.     Defendants, Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch, and Pawlus, are collectively referred to herein as the "Individual Defendants."  Unless otherwise noted, AMC, the Individual Defendants and the Underwriter Defendants are collectively referred to herein as "Defendants."

## IV.   CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased AMC common stock in the SPO, as well as on behalf of purchasers of shares of AMC's common stock

during the Class Period. Excluded from the Class are (i) Defendants; (ii) members of the immediate family of any Defendant; (iii) any subsidiaries and/or affiliates of any Defendant; (iv) any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

36. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, between 34 million and 55 million shares of AMC common stock were outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that they number in at least the hundreds or thousands. The names and addresses of the Class members can be ascertained from the books and records of AMC, its transfer agent or the Underwriter Defendants. Notice can be provided to such record owners by a combination of published notices and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

37. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

38. Plaintiffs' claims are typical of the claims of the other members of the Class, as all Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

39. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

40. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the Registration Statement issued in connection with the SPO negligently omitted and/or misrepresented material facts about the Company and its business;

(c) whether Defendants can sustain their burden of establishing an affirmative defense under the applicable statute in connection with Plaintiffs' claims associated with the SPO;

(d) whether the SEC filings and press releases, and/or other public statements issued by AMC, Aron and Ramsey to the investing public during the Class Period were fraudulent in nature;

(e) whether the price of AMC common stock was artificially inflated during the Class Period; and

(f) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## V. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A. AMC and Its Operations

41. AMC is a holding company that, after a recently completed string of acquisitions, owns and operates the world's largest chain of movie theaters. As of December 31, 2017, the

Company owned, operated, or held interests in 649 theaters with a total of 8,224 screens in the United States and 365 theaters with 2,945 screens in Europe.

42.     AMC offers consumers a range of entertainment alternatives, including traditional film programming, independent and foreign films, performing arts, and music and sports.  In addition, the Company provides consumers with food and beverage alternatives, including made-to-order meals, customized coffee, healthy snacks, beer, wine, premium cocktails and dine-in theater options.

43.     The Company's revenues are derived primarily from box office admissions, with theater food and beverage sales accounting for its second largest source of revenue.  AMC also generates revenue from ancillary sources, including on-screen advertising, fees earned from its customer loyalty program (AMC Stubs), the rental of theater auditoriums, income from gift card and exchange ticket sales, and on-line ticketing fees.

44.     According to its Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K"), AMC believes movie-goers want to be recognized and rewarded for attending movies at its theaters.  Thus, the Company's AMC Stubs loyalty program allows its members to earn rewards, receive discounts and participate in exclusive "members' only" offerings and services, thereby strengthening guest loyalty, attracting new guests, and driving additional return visits.  As of December 31, 2016, AMC had more than 5.2 million active member households enrolled in its AMC Stubs program.

### B.     AMC Acquires Carmike, Odeon and Nordic

45.     During the fourth quarter of 2016, AMC completed the acquisitions of Carmike and Odeon.  Thereafter, on January 23, 2017, AMC announced its intention to acquire Nordic.  Upon completion of the Odeon acquisition, AMC began operating its business via two reportable segments: the U.S. markets segment and the International markets segment.  During the Class

Period, the Company's International markets segment consisted of its newly-acquired Odeon and Nordic businesses.

46.     AMC's intention to acquire Carmike was first disclosed on March 3, 2016, when AMC and Carmike issued a joint press release announcing that AMC agreed to acquire Carmike for approximately $1.1 billion, pursuant to a definitive merger agreement.  The proposed merger agreement, which was subject to regulatory approval, provided that AMC would agree to acquire all of the outstanding shares of Carmike for $30.00 per share in cash and to assume Carmike's net indebtedness.

47.     AMC disclosed that it would fund the Carmike acquisition with cash on hand and incremental debt financing (the "March 2016 Debt Commitment") it procured from Citigroup, an Underwriter Defendant in this action.  The Company also announced that Citigroup was to serve as AMC's exclusive financial advisor on the Carmike acquisition.

48.     Pursuant to the March 2016 Debt Commitment, Citigroup committed to provide AMC with the following: (i) a senior secured incremental term loan in an aggregate amount of up to $560 million; and (ii) a senior subordinated bridge loan in an aggregate amount of up to $300 million.

49.     On July 25, 2016, AMC issued a press release announcing that it had entered into an amended and restated merger agreement with Carmike.  Pursuant to such agreement, AMC agreed to acquire all of the outstanding shares of Carmike for $33.06 per share in cash and stock, and to assume Carmike's net indebtedness.  The completion of the amended and restated merger agreement with Carmike was subject to, among other requirements, antitrust regulatory approval and the SEC's declaring effective a Form S-4 registration statement with respect to additional AMC common stock to be issued in connection with the proposed merger.

50.     As the same time that it entered into the amended and restated merger agreement with Carmike, on July 24, 2016, AMC also entered into an amended and restated debt financing commitment (the "July 2016 Debt Commitment") with Citigroup, Merrill Lynch, and Credit Suisse, each Underwriter Defendants in this action; HSBC Securities (USA) Inc. ("HSBC"), the Senior Co-Managing underwriter in the SPO, HSBC Bank USA, N.A, an affiliate of HSBC; Barclays Bank PLC, an affiliate of Defendant Barclays; Credit Suisse AG, an affiliate of Defendant Credit Suisse; and Bank of America, N.A.

51.     Pursuant to the July 2016 Debt Commitment, the above noted lenders committed to provide AMC with the following financing: (i) a senior secured incremental term loan in an aggregate amount of up to $225 million; and (ii) a senior subordinated bridge loan in an aggregate amount of up to $300 million.

52.     On October 11, 2016, the SEC declared effective the Form S-4 registration statement related to the additional common stock AMC was to issue in connection with the proposed Carmike acquisition.

53.     On December 20, 2016, the first day of the Class Period, AMC announced that the DOJ had completed its antitrust review of the pending Carmike acquisition, and that the Company and the DOJ had reached an agreement to allow AMC's acquisition of Carmike to proceed. According to the agreed-upon terms, the DOJ authorized AMC's merger with Carmike provided, for the most part, that the combined entities divest theaters in 15 overlapping local trading areas. As a result, AMC agreed to divest the majority of its equity interest and relinquish all of its governance rights in National Cinemedia LLC; and to transfer 24 theaters to Screenvision LLC.

54.     On December 21, 2016, AMC completed the acquisition of Carmike in exchange for $858.2 million, consisting of $584.3 million in cash, $273.9 million in AMC common stock

- 13 -

(8.2 million shares), and AMC's assumption of $230 million in Carmike's debt.  In connection with the acquisition of Carmike, AMC entered into a $350 million bridge loan agreement with Citicorp North America, Inc., as administrative agent, and Underwriter Defendants Citigroup, Merrill Lynch, Credit Suisse, as joint lead arrangers and joint bookrunners.[1]

55.     As of the acquisition date, Carmike operated 271 theaters and 2,923 screens located in 41 states across the United States.  AMC's SEC filings describe Carmike as one of the nation's largest motion picture exhibitors and a U.S. leader in digital cinema, 3-D cinema deployments and alternative programming.

56.     With respect to the acquisition of Odeon, on November 30, 2016, AMC issued a press release announcing that it had acquired all of the outstanding equity of Odeon, the largest theater exhibitor in Europe, in a transaction valued at approximately $1.2 billion.  AMC acquired the equity of Odeon in exchange for $480.3 million in cash, $152.7 million AMC common stock (4.5 million shares), and the repayment of $593.2 million of Odeon debt.  On November 29, 2016, AMC borrowed $500 million to pay for a portion of the consideration it issued to acquire Odeon.

57.     As of the acquisition date, Odeon operated 242 theaters with 2,243 screens in four major markets: the United Kingdom, Spain, Italy and Germany; and three smaller markets: Austria, Portugal and Ireland.

58.     On January 23, 2017, AMC issued a press release announcing that it had agreed to acquire Nordic, the largest theater exhibitor in seven countries in Scandinavia and the Nordic and Baltic regions, from a European private equity firm and a Swedish media group.  In connection with the announced acquisition of Nordic, AMC entered into a debt financing commitment letter

---

[1]Barclays Bank PLC, Securities (USA) LLC, an affiliate of Defendant Barclays, and HSBC were also parties to the bridge loan financing.

(the "January 2017 Debt Commitment") with Defendant Citigroup pursuant to which it agreed to provide AMC with a $675 million term loan and $325 million bridge loan.

59.     Thereafter, on March 17, 2017, AMC issued $475 million and £250 million in notes to fund a portion of the consideration it issued to acquire Nordic.

60.     On March 28, 2017, AMC completed the acquisition of Nordic in an all-cash transaction valued at $964 million.  As of March 31, 2017, Nordic operated 71 theaters with 467 screens in approximately 50 large- and medium-sized cities in the Nordic and Baltic nations, and held a substantial minority investment in 51 associated theaters with 216 screens.

### C.     Knowledge On The Part Of AMC, Aron and Ramsey Regarding Carmike's Operations

61.     For purposes of this section of the Complaint only, the term "Defendants" refers only to AMC, Aron and Ramsey.

62.     With respect to Carmike, Defendants *knew* that AMC's operating performance was being adversely impacted by the following factors: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

63.     These undisclosed matters, which were having a materially adverse effect on Carmike's operations and theater attendance at the time of and before the SPO, were likely to continue to have a material adverse effect on AMC's capital resources and its operating results during the Class Period.

64.     In fact, *by their own admission*, Defendants *knew* detailed facts about and possessed a comprehensive understanding of the operations of Carmike, including the material adverse facts related thereto, by no later than *the beginning of the Class Period*.  On May 8, 2017,

Aron *now admitted* that the previously undisclosed matters about Carmike's operations identified in ¶ 62 above, which caused it to underperform financially prior to its acquisition by AMC, had made Carmike an attractive acquisition candidate, stating that "*one of the allures to us of acquiring Carmike*" was "revenue weakness" it had been experiencing during 2016.[2]

65.     During the December 20, 2016 Conference Call, Aron made it clear that Defendants had gained a comprehensive understanding of Carmike's business and operations – but he did not disclose any negative issues related to Carmike's operations or its revenues as a basis for the acquisition.

66.     For example, when a securities analyst asked what Defendants had learned about Carmike, given that AMC had "quite a bit of time to go through [Carmike's] books" during its due diligence process, Aron explained to investors that "we announced the transaction in March - - it's now December - - *so we've had plenty of time to look at the Carmike circuit*." Aron also told investors that AMC "*spen[t] eight months with the Justice Department of the United States*" related to its due diligence and regulatory review of AMC's pending merger of Carmike.

67.     Given the amount of time with which Defendants had been provided to learn about Carmike's business, Aron was able to comment on specific, underlying details with respect to Carmike's operations during the December 20, 2016 Conference Call. For example, Aron commented on Carmike's "*theater-level cash flows*," and theater level "*visitation levels*." Defendant Aron also stated that *the knowledge AMC gained during the due diligence process allowed it to already identify those low cash generating Carmike theaters it planned to divest pursuant to AMC's settlement agreement with the DOJ, as well as which Carmike theaters it considered to be suitable for an "AMC-style renovation*."

---

[2]Unless otherwise noted, all emphasis herein is added.

68.    Indeed, AMC's due diligence into Carmike's operations began long before AMC and Carmike announced their intention to merge on March 3, 2016.

69.    On October 10, 2016, Carmike filed a definitive proxy statement (the "Carmike Proxy Statement") with the SEC, which, among other things, provided investors with information about the history of AMC's merger discussions with Carmike.

70.    According to the Carmike Proxy Statement, AMC first proposed to acquire Carmike in May **2014**.  Thereafter, from October 2014 through the first quarter of 2015, AMC "engaged in due diligence" related to the potential merger with Carmike and on April 10, 2015, AMC notified Carmike that it was no longer interested in pursuing the transaction because "its management and board grew increasingly less comfortable with the terms of the transaction."[3]

71.    Thereafter, in January 2016, AMC expressed a renewed interest in acquiring Carmike after its former President and CEO, Gerry Lopez, stepped down and Aron became the CEO of AMC.

72.    In January 2016, Carmike provided AMC with additional due diligence materials. Among the materials made available to AMC were Carmike's February 2015 financial projections. These projections set forth, among other things, Carmike's 2015 estimated revenue and earnings before interest, taxes, depreciation and amortization ("EBITDA").  Prior to its acquisition by AMC, Defendants were further put on notice that Carmike was underperforming when it publicly announced its 2015 financial results, which missed Carmike's internal 2015 revenue and EBITDA estimates set forth in the February 2015 financial projections by approximately 10% and 17%, respectively.

---

[3] *Investopedia* defines due diligence as an investigation or audit of a potential investment or product to confirm all facts, such as reviewing all financial records, plus anything else deemed material.

73.     Defendants' knowledge of Carmike's operations during the Class Period is further demonstrated, and corroborated by information obtained from confidential witnesses ("CWs") who possess specific knowledge about the business and operations of AMC and Carmike.

74.     For example, CW-1, employed by AMC as a systems administrator between June 2011 and December 2017, confirmed that AMC originally considered acquiring Carmike in 2014, but ultimately "pulled the plug" after its due diligence uncovered unexpected issues and weaknesses.

75.     According to CW-1, the Company's potential acquisition of Carmike was first examined by AMC's executive leadership in 2014, prior to Aron joining the Company.  CW-1 stated that, during this earlier review, he/she and other AMC employees were scheduled to visit Carmike's headquarters in Atlanta, Georgia, to conduct a thorough review of its information technology ("IT") infrastructure.  CW-1 stated that such review never materialized when AMC's management came to the conclusion that Carmike was a "lemon."

76.     CW-1 corroborated exactly what AMC would acknowledge at the end of the Class Period -- namely, that Carmike suffered from an extended period of underinvestment.  According to CW-1, Carmike had been outsourcing its IT infrastructure needs to save money, thereby necessitating "major renovations" to its IT infrastructure.  CW-1 also noted that the Carmike theaters needed updates to their physical equipment, including theater wiring, as well as hardware, such as projectors.

77.     According to CW-1, AMC constantly "struggled" with the outdated state of Carmike's theaters, as it was difficult to determine how to support the equipment in its theaters and network them operationally.  CW-1 explained that, while AMC eventually developed a process

for integrating each of the Carmike theaters, it had to employ a "paradigm shift" in order to accommodate the newly acquired Carmike theaters.

78.     According to CW-1, the process of integrating and renovating the infrastructure of the Carmike theaters remained on-going from the close of the acquisition until the end of his/her tenure in December 2017.

79.     The representations made by CW-1 were echoed by CW-2, one of twelve (12) Carmike district managers, who was employed by Carmike from October 2005 to December 2016.

80.     According to CW-2, who was responsible for overseeing about 10% of Carmike theaters located in twelve (12) states across the western United States, approximately *70%* of the theaters he/she managed were in "disrepair," a figure that CW-2 relayed was likely true for the entire population of Carmike theaters.

81.     CW-2 stated that, in some cases, even more critical renovations and repairs were not approved by Carmike's corporate offices when theaters suffered losses.  By way of example, CW-2 said that it took *years* to get corporate approval to fix a broken HVAC system on the roof of one of his/her managed theaters.  In fact, CW-2 even went as far as to say that Carmike "consciously neglected" the theater chain and that, as a result, the cost to update the circuit would be "huge."

82.     As noted below, at the end of the Class Period, when Defendants finally disclosed to investors that Carmike's operations had been suffering because of underinvestment, Aron falsely stated that Carmike failed to make investments in its theaters *after* AMC announced its intention to merge with Carmike in March 2016.  Aron stated, in pertinent part, that "when you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do very much.  And so the circuit

essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16. . . ." CW-2, however, specifically confirmed that Carmike had pursued an extremely slow pace of making renovations to its theaters for a period of at least 3-4 years preceding the announcement that AMC would acquire Carmike, and that there was no change in the pace at which Carmike renovated its theaters following the acquisition announcement in March of 2016.

83.    CW-2 also stated that Carmike was very meticulous in tracking the operational and financial performance of its theaters, and that it compiled and disseminated extensive profit and loss reports on the status of each theater on a monthly basis.   Moreover, CW-2 confirmed that a significant number of theaters in Carmike's circuit had been losing money for the last few years of CW-2's tenure.

84.    CW-2 relayed that corporate personnel in Carmike's headquarters provided AMC with operational and financial data about Carmike during AMC's due diligence process.  Based on conversations with personnel in Carmike's headquarters, CW-2 specifically learned that AMC representatives began working out of Carmike's headquarters on a daily basis beginning in April 2016.

85.    CW-2 stated that none of Carmike's data was off limits to the AMC representatives, and added that, by the summer of 2016, Carmike executives directed its managers to give the AMC representatives access to "whatever they wanted," including operational and financial data that was recorded on a real time basis.  CW-2 reiterated that the AMC representatives had direct access to Carmike's data for months during their due diligence process.

86.    CW-2 also stated it was clear that Carmike's theaters were underperforming and that it was common knowledge among the employees and executives at Carmike that the theater

chain was experiencing significant revenue weaknesses during AMC's due diligence process.  In fact, CW-2 believes that Carmike's former CEO, David Passman, had acknowledged in some manner that Carmike would have gone bankrupt in six months had the deal with AMC not been finalized.

87.     As Aron acknowledged on the December 20, 2016 Conference Call, the due diligence process conducted by AMC, which included working with the DOJ as part of its antitrust examination, provided Defendants with detailed knowledge, both positive and adverse, about the operations of Carmike prior to the beginning of the Class Period.

88.     Defendants also knew that, contrary to its U.S. business operations, AMC's newly acquired international operations were slower during the summer season.

89.     CW-3 served as a Senior Project Manager contractor on the Company's Odeon integration project from September 2016 to January 2017.  In this capacity, CW-3's team was responsible for receiving, mapping, and integrating Odeon's financial reporting data into AMC's Hyperion Financial Management system ("Hyperion"), which CW-3 explained was AMC's financial planning and budgeting software program.  The technical business lead for CW-3's team working on integrating the financial reporting of Odeon's business with AMC was Ryan Gound, who is AMC's Director of Accounting Systems.

90.     According to CW-3, AMC began receiving raw financial data from Odeon in September 2016, and such data was successfully mapped and integrated into the Company's Hyperion system by December 31, 2016.  CW-3 confirmed that the information received from Odeon and integrated into the Company's Hyperion system was granular enough to allow Defendants to understand monthly and seasonal financial performance trends in Odeon's business.

- 21 -

D.     **AMC's Debt and Need For The SPO**

91.     The acquisitions of Carmike, Odeon and Nordic caused AMC's debt to swell.  As of September 30, 2016, AMC's indebtedness totaled $3.4 billion.  After the 2016 acquisitions of Carmike and Odeon, AMC's debt nearly doubled, totaling $6.6 billion as of December 31, 2016. In addition to these debt obligations, the Registration Statement for the SPO disclosed that, as of December 31, 2015, after giving effect to the acquisitions of Carmike and Odeon, AMC was obligated for undiscounted rental payments under operating leases totaling approximately $6.8 billion.

92.     Thereafter, in January 2017, AMC announced that it had agreed to acquire Nordic and entered into the January 2017 Debt Commitment, whereby Defendant Citigroup committed to provide AMC with a $675 million term loan and $325 million bridge loan.

93.     Accordingly, the Registration Statement warned investors that AMC had amassed "substantial debt" that could, among other things, limit the Company's ability to obtain future financing, limit its planning, and consume a substantial portion of its cash flow from operations. Indeed, prior to the SPO, Aron told securities analysts that he would be "much more comfortable" if AMC possessed a lower debt load.

94.     The SPO, which raised approximately $618 million, was undertaken to help deleverage the Company by financing a portion of the Nordic acquisition and repaying the $350 million bridge loan for the acquisition of Carmike owed by AMC to Defendants Citigroup, Merrill Lynch, Barclays, and HSBC, the Senior Co-Managing underwriter in the SPO.

VI.     **THE SECURITIES ACT CLAIMS**

95.     For purposes of claims asserted under the Securities Act, the term Defendants refers to all defendants named in this Complaint.

96.    In this section of the Complaint, the Hawaii Iron Workers' Fund asserts strict-liability and negligence claims based on Sections 11, 12, and 15 of the Securities Act on behalf of the Class and expressly disclaims any allegations of scienter.

97.    The Securities Act claims alleged herein ensue from AMC's public offering of 21,904,761 shares of common stock (including 2,857,142 common stock shares pursuant to an overallotment option issued to the underwriters) at a price of $31.50 per share on or about February 8, 2017.

A.    **Background**

98.    On December 21, 2016, AMC filed with the SEC a shelf registration statement and prospectus on Form S-3 for the SPO.  Thereafter, on February 7, 2017 and February 9, 2017, AMC filed with the SEC prospectus supplements for the SPO.  The shelf registration statement, prospectus and prospectus supplements for the SPO incorporated by reference certain filings that AMC and Carmike made with the SEC pursuant to their Exchange Act periodic reporting obligations, which, as noted above, are collectively referred to herein as the Registration Statement.

99.    The Registration Statement for the SPO contained inaccurate statements of material fact and omitted material information required to be disclosed therein pursuant to the regulations governing its preparation.

B.    **The Registration Statement Contained Materially Inaccurate Statements of Fact and Omitted Information Required to be Disclosed Therein.**

100.   The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation.  First, the Registration Statement negligently failed to identify and disclose known trends, events, demands, commitments

and uncertainties that were then having and were reasonably likely to have a material effect on AMC's operating performance. Second, the Registration Statement negligently failed to advise investors about material changes in AMC's affairs. Third, the Registration Statement negligently failed to disclose that AMC's Odeon business was seasonally slower during the summer months.

101.    Form S-3 permits securities issuers to incorporate by reference prior periodic filings made with the SEC, including Forms 10-Q and 10-K.

102.    Items 2 and 7 of Forms 10-Q and 10-K, respectively, require the disclosure of information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A").

103.    The instructions to Item 303(a) of Regulation S-K require that the Registration Statement provide disclosure about, and "focus specifically" on, material events and uncertainties that would cause AMC's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and ***uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results*** or of future financial condition. ***This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

104.    On May 18, 1989, the SEC issued an interpretative release to Item 303 of Regulation S-K (the "1989 Interpretive Release"), stating that a disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have a material effect on the registrant's capital resources or results of operation. In this regard, the 1989 Interpretive Release provides, in pertinent part, as follows:

Item 303(a)(2)(i) requires a description of the registrant's material "commitments" for capital expenditures as of the end of the latest fiscal period.  However, even where no legal commitments, contractual or otherwise, have been made, *disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend*.  Similarly, if the same registrant determines not to incur such expenditures, a known uncertainty would exist regarding continuation of the current growth trend.  If the adverse effect on the registrant from discontinuation of the growth trend is reasonably likely to be material, disclosure is required.  *Disclosure of planned material expenditures is also required, for example, when such expenditures are necessary to support a new, publicly announced product or line of business*.

\*     \*     \*

*Events that have already occurred or are anticipated often give rise to known uncertainties*.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required*.

*Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Release Nos. 33-6835 and 34-26831, 1989 SEC LEXIS 1011, at \*15, \*18 (May 18, 1989) (footnote omitted).

105.    On December 29, 2003, the SEC issued another interpretative release to Item 303 of Regulation S-K (the "2003 Interpretive Release"), reiterating that the purpose of MD&A is to provide investors with information necessary to reach an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

106.     The 2003 Interpretive Release also provides that the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that management determined: (i) were not reasonably likely to occur; or (ii) would *not* have a material effect on AMC's operating results.   The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

*Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350 and 34-48960, 2003 SEC LEXIS 3034, at *36 (Dec. 19, 2003) (footnote omitted).

107.     In violation of the above disclosure obligations, the Registration Statement failed to identify and disclose known trends, events, demands, commitments and uncertainties that were known to management and were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operating performance, including: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

108.     In addition, Item 1 of Form 10-K requires the disclosure of information called for under Item 101 of Regulation S-K [17 C.F.R. §229.101], *Description of Business*.   Item 101(c)(1)(v) of Regulation S-K [17 CFR 229.101(c)(1)(v)], required the Registration Statement to disclose the seasonal natural of ***each*** of its business segments.   When AMC acquired Odeon on November 29, 2016, it disclosed that it began operating its business via two reportable segments: the U.S. markets segment and the International markets segment.

109.   In violation of the above disclosure requirements, the Registration Statement negligently failed to disclose that AMC's International markets segment experienced lower sales during the summer months.

110.   Lastly, Instruction 11(a) of Form S-3 mandates the disclosure of "***any and all material changes*** in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934."

111.   In violation of the above disclosure obligations, the Registration Statement failed to disclose that AMC's operating performance was being adversely impacted by the following factors: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

112.   After the end of the Class Period, on August 4, 2017, AMC held a conference call with investors and securities analysts (the "August 2017 Conference Call") to discuss AMC's reported operating results for the periods ended June 30, 2017.   During the August 2017 Conference Call, Aron told investors that "the quarter was simply a bust" because of four specific matters that were having a material adverse effect on the Company's results.   One of the four matters identified by Defendants was the performance of Carmike.

113.   Aron stated that the newly-acquired Carmike theaters had a revenue ***decline of 11.3%*** during the 2017 second quarter, while the Company's legacy AMC theaters, which he referred to as "stars," outperformed relative to the U.S. industry box office average.

114.    During the August 2017 Conference Call, Aron explained why the performance of the legacy AMC theaters had been "relatively so strong," and indicated that Carmike's underperformance was generally attributable to "literally six different reasons."  Thereafter, Aron specifically identified three of the six reasons for Carmike's poor results.

115.    First, Aron stated that Carmike had been experiencing a prolonged period of financial underperformance due, in large part, to a protracted period of underinvestment in its theaters: "when you look at what Carmike as a company did between April and December [of 2016] to modernize its circuit after it put itself under contract to be sold, it didn't do very much. And so the circuit essentially went on dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16...."  Aron further noted that "about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded."

116.    Second, Carmike had experienced a significant loss in market share during 2016 when its patrons migrated to competitors that had renovated and upgraded their theaters.  In this regard, Aron stated on the August 2017 Conference Call that "in 8 of the 12 months in '16, Carmike, as a circuit, had declining market share, including 3 of the past -- 3 of the 4 months between September and December, it had declining market share."

117.    Third, AMC was able to retain only a very small number of Carmike's loyalty program members after the Carmike acquisition.  On the August 2017 Conference Call, Aron explained that, "[w]hen Carmike was handed over to us on December 21, [2016] only 200,000 individuals from their loyalty program joined our loyalty program. . . .  So we've had to start the loyalty program essentially over from scratch."

118.    Thereafter, Aron commented that the above noted reasons were among the "many" for Carmike's underperformance and that "it's going to take us a good year to essentially turn around Carmike.  So I do think this [underperformance] is going to continue with us until '18."

119.    These undisclosed material trends, events and uncertainties associated with Carmike, which were reasonably like to have a material adverse effect on the Company's operating results at the time of the SPO, were required to be disclosed in, but were negligently omitted from, the Registration Statement pursuant to Item 303(a) of Regulation S-K and Instruction 11(a) of Form S-3.

120.    Further, Carmike's Form 10-Q for the periods ended September 30, 2016, incorporated by reference in the Registration Statement, contained materially inaccurate statements about Carmike's revenue growth during the first nine months of 2016.  The Registration Statement disclosed, in pertinent part, as follows:

*Revenues.* We collect substantially all of our revenues from the sale of admission tickets and concessions. The table below provides a comparative summary of the operating data for this revenue generation.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Average theatres | 272 | 269 | 274 | 271 |
| Average screens | 2,928 | 2,875 | 2,940 | 2,885 |
| Average attendance per screen | 5,898 | 5,320 | 16,624 | 16,859 |
| Average admission per patron | $ 7.30 | $ 7.23 | $ 7.59 | $ 7.36 |
| Average concessions and other sales per patron | $ 4.85 | $ 4.55 | $ 5.11 | $ 4.68 |
| Total attendance (in thousands) | 17,269 | 15,294 | 48,874 | 48,475 |
| Total operating revenues (in thousands) | $209,730 | $ 180,241 | $ 620,592 | $ 583,674 |

*          *          *

Total operating revenues increased 6.3% to $620.6 million for the nine months ended September 30, 2016 compared to $583.7 million for the nine months ended September 30, 2015, due to an increase in total attendance from 48.5 million for

the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 for the nine months ended September 30, 2015 to $7.59 for the nine months ended September 30, 2016 and an increase in average concessions and other sales per patron from $4.68 for the nine months ended September 30, 2015 to $5.11 for the nine months ended September 30, 2016.  Excluding operating revenues from the acquired Sundance theaters which totaled $16.2 million, total operating revenues increased 3.5% to $604.4 million. The increase in total operating revenues, excluding the acquired Sundance theaters, was due to an increase in attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average admissions per patron from $7.36 to $7.53 and an increase in average concessions and other sales per patron from $4.68 to $5.04.  Average admission per patron for the nine months ended September 30, 2016 increased due to the adoption of a tax on top pricing policy in the fourth quarter of 2015, the acquired Sundance theaters and revenues related to unredeemed gift cards, partially offset by summer promotional activities. Average concessions and other sales per patron increased primarily due to concession promotions, expanded food and beverage menus at certain locations, including our in-theater dining locations, the adoption of a tax on top pricing policy in the fourth quarter of 2015 and revenues related to unredeemed gift cards.

\*       \*       \*

Admissions revenue increased 3.9% to $370.8 million for the nine months ended September 30, 2016 from $357.0 million for the same period in 2015, due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016 and an increase in average admissions per patron from $7.36 for the 2015 period to $7.59 for the 2016 period.  Excluding admissions revenue from the acquired Sundance theaters of $8.8 million, admissions revenue increased 1.4% to $362.0 million in 2016 from $357.0 million in 2015.

\*       \*       \*

Concessions and other revenue increased 10.2% to $249.7 million for the nine months ended September 30, 2016 compared to $226.7 million for the same period in 2015 due to an increase in total attendance from 48.5 million for the nine months ended September 30, 2015 to 48.9 million for the nine months ended September 30, 2016, an increase in average concessions and other sales per patron from $4.68 for the 2015 period to $5.11 for the 2016 period, revenues related to unredeemed gift cards and settlement funds related to the 2010 BP oil spill of $0.7 million. Excluding concessions and other revenues from the acquired Sundance theaters of $7.3 million, concessions and other revenues increased 6.9% to $242.4 million in the 2016 period from $226.7 million in the 2015 period.

- 30 -

121.     The above-noted disclosure was materially inaccurate because it failed to identify and disclose known trends, events, demands, commitments and uncertainties that were known to management and were then having, and were reasonably likely to continue to have, a material adverse effect on Carmike's capital resources and operating results, including: (i) a protracted period of underinvestment in Carmike's theaters, and (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters.

122.     In addition, the Registration Statements included materially inaccurate statements and omitted material facts regarding Odeon.

123.     For example, the Registration Statement represented that AMC's business was seasonally stronger during the summer months, stating, in pertinent part, that "[t]he most attended films are usually released during the summer and the calendar year-end holidays, making our business highly seasonal."

124.     In addition, AMC's Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), which was incorporated by reference in the Registration Statement, disclosed, in pertinent part, as follows:

**Seasonality**

Our revenues are dependent upon the timing of motion picture releases by distributors.  The most marketable motion pictures are usually released during the summer and the year-end holiday seasons.  Therefore, ***our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons.***  Our results of operations may vary significantly from quarter to quarter.

125.     These statements were materially inaccurate because, contrary to the above-noted disclosure, Odeon's operations, part of AMC'S international business segment, generally experience *lower* attendance and revenues during the summer months.

126.    As noted above, the Registration Statement was required to disclose the seasonal nature of *each* of its business segments and to disclose "any and all material changes" in AMC's affairs, including the fact that operations of Odeon generally experience lower attendance and revenues during the summer months, which it did not.

127.    This negligent misrepresentation caused Wall Street analysts to "mismodel" AMC's post-SPO earnings.   Accordingly, the Registration Statement contained materially inaccurate information about the seasonality of AMC's operations.

128.    For the reasons discussed above, the Registration Statement contained inaccurate statements about the Company's Carmike and Odeon businesses and failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having, and were reasonably likely to have, a material adverse effect on AMC's operating performance.

129.    At the time of the filing of the initial action in this consolidated case, AMC common stock traded at $14.45 per share, or 54% less than the SPO price.

## COUNT I

### For Violations of Section 11 of the Securities
### Act Against All Defendants

130.    Plaintiff, the Hawaii Iron Workers' Fund, incorporates by reference the previous averments of this Complaint as if fully set forth herein.

131.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class against all Defendants.   For purposes of this Count, the Hawaii Iron Workers' Fund does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

132.    The Registration Statement for the SPO was inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein accurate and omitted to state material facts required to be stated therein.

133.    The Hawaii Iron Workers' Fund acquired AMC common shares pursuant to, and in reliance upon, the Registration Statement, without knowledge of the untruths and/or omissions alleged herein.

134.    AMC was the registrant for the SPO.  As such, AMC is strictly liable to the Hawaii Iron Workers' Fund and the Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the Registration Statement and its failure to be complete and accurate.

135.    The Individual Defendants signed the Registration Statement either personally or through an Attorney-in-Fact and thereby caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Registration Statement inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to the Hawaii Iron Workers' Fund and the Class.

136.    The Underwriter Defendants failed to perform adequate due diligence in connection with their roles as underwriters and were negligent in failing to ensure that the Registration Statement was prepared completely and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm

- 33 -

complained of herein.  As such, the Underwriter Defendants are strictly liable to the Hawaii Iron Workers' Fund and the Class.

137.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Registration Statement contained untrue statements of material facts and omitted to state material facts required to be stated or necessary to make the statements particularized above not misleading when they purchased or acquired the stock.

138.    As a direct and proximate result of the acts and omissions of the Defendants, in violation of the Securities Act, the Hawaii Iron Workers' Fund and the Class suffered substantial damages in connection with their purchases of AMC common stock pursuant and/or traceable to the SPO.

139.    The Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material fact, and were not inaccurate.  By reasons of the conduct herein alleged, Defendants violated Section 11 of the Securities Act.

## COUNT II

**For Violations of Section 12(a)(2) of the Securities Act Against
Defendants AMC, Aron, Ramsey, Cox and the Underwriter Defendants**

140.    Plaintiff, the Hawaii Iron Workers' Fund, incorporates by reference the previous averments of this Complaint as if fully set forth herein.

141.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class against AMC, Aron, Ramsey, Cox and the Underwriter Defendants.   For purposes of this Count, the Hawaii Iron Workers' Fund does not claim that the

Defendants named in this Count committed intentional or reckless misconduct or that they acted with scienter or fraudulent intent.

142.    The Defendants named in this Count were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Registration Statement issued in connection with the SPO.  The Registration Statement was used to induce investors, such as the Hawaii Iron Workers' Fund and the other members of the Class, to purchase the common stock registered in the SPO.

143.    The Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements contained therein not inaccurate, and omitted to state material facts required to be stated therein.  These Defendants' actions of solicitation included participating in the preparation of the false and inaccurate Registration Statement and participating in road shows to market the SPO to investors.

144.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Registration Statement for their own financial benefit.  But for their participation in the SPO, including their solicitation as set forth herein, the SPO could not and would not have been accomplished.  Specifically, the Underwriter Defendants engaged in the following acts and omissions:

(a)    The Underwriter Defendants made the decision to underwrite the SPO and at the price set forth in the Registration Statement.  The Underwriter Defendants drafted, revised and/or approved the Registration Statement.  The Registration Statement was calculated to create interest in AMC common stock and was widely distributed by or on behalf of the Underwriter Defendants for that purpose; and

(b)      The Underwriter Defendants orchestrated all activities necessary to affect the sale of the common stock in the SPO to the investing public by issuing the common stock, promoting the common stock, and supervising its distribution and ultimate sale to the investing public.

145.    The Defendants named in this Count owed to the purchasers of AMC common stock, including the Hawaii Iron Workers' Fund and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and to ensure that such statements were accurate and that they did not contain any misstatements or omissions of material fact.  These Defendants, in the exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

146.    The Hawaii Iron Workers' Fund and the other members of the Class purchased or otherwise acquired AMC common stock pursuant to the Registration Statement, and neither the Hawaii Iron Workers' Fund nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement.

147.    By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff, the Hawaii Iron Workers' Fund, individually and on behalf of the Class, hereby offers to tender to these Defendants those shares of stock that the Hawaii Iron Workers' Fund and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon.  Class members who have sold their shares are entitled to rescissory damages.

## COUNT III

### For Violation of Section 15 of the Securities Act
### Against the Individual Defendants

148.    Plaintiff, the Hawaii Iron Workers' Fund, incorporates by reference the previous averments of this Complaint as if fully set forth herein.

149.    This Count is asserted by Plaintiff, the Hawaii Iron Workers' Fund, against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the members of the Class who purchased or otherwise acquired AMC common stock pursuant or traceable to the SPO.  For purposes of this Count, the Hawaii Iron Workers' Fund asserts strict-liability and negligence claims and expressly disclaims any allegation of fraud or intentional misconduct.

150.    The Individual Defendants acted as controlling persons of AMC within the meaning of Section 15 of the Securities Act.

151.    By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause AMC to engage in the conduct complained of herein, and were therefore control persons of AMC.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

152.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and/or 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process that allowed the SPO to be successfully completed.

## VII.    THE EXCHANGE ACT CLAIMS

153.    For the purposes of this section of the complaint, the term "Exchange Act Defendants" refers, collectively, to AMC, Aron and Ramsey.

154.    During the Class Period, the Exchange Act Defendants made materially false and misleading statements about the operations of Carmike, as well as the Company's newly acquired international businesses.

155.    With respect to Carmike, the Exchange Act Defendants knew, but failed to disclose to investors, that AMC's operating performance was being adversely impacted by the following factors: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

156.    During the Class Period, the Exchange Act Defendants made positive statements about the following: (a) migrating Carmike's loyalty program members to AMC Stubs; (b) Carmike's patron visitation levels; (c) member growth in AMC's Stubs program; and (d) the enhancement of AMC's growth potential by joining forces with Carmike.

157.    Such statements were materially false and misleading when made because when the Exchange Act Defendants spoke about the operations of Carmike, they failed to disclose the adverse matters identified in ¶ 155 above.  Once Defendants chose to speak about the operations of Carmike, they had a duty to speak completely and truthfully, including speaking about the matters in ¶ 155 above that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's capital resources and operating results.

158.    The Exchange Act Defendants also failed to disclose that, contrary to its U.S. business operations, AMC's newly-acquired international operations were slower during the

summer season.   Specifically, notwithstanding the Exchange Act Defendants' knowledge of the foregoing, and the Company's disclosure obligations related thereto, the Exchange Act Defendants failed to disclose that Odeon's and Nordic's operations were seasonally slower during the summer months.

159.   At the end of the Class Period, securities analysts issued reports calling out the non-disclosure of the slow summer seasonality of AMC's international business, including one that noted it "played a role in our (and likely the Street's) mismodeling of [AMC's 2017 second] quarter."

160.   As alleged herein, the Exchange Act Defendants **knew**, but failed to disclose, material adverse facts about Carmike and the seasonality of AMC's international operations.  The Exchange Act Defendants were motivated to and issued materially false and misleading half-truths about Carmike, and failed to disclose that AMC's international operations experienced lower sales during the summer months in a deliberate attempt to inflate the price of the Company's stock in advance of the SPO, thereby maximizing the amount of money the highly-leveraged AMC could raise and minimizing the amount of cash consideration it needed to pay to acquire Carmike and Odeon.

A.   **The December 20, 2016 Conference Call**

161.   The Class Period begins on December 20, 2016, when AMC issued a press release announcing that it had obtained the regulatory approval necessary to complete the acquisition of Carmike and held the December 20, 2016 Conference Call with analysts and investors to discuss the Company's acquisition of Carmike.

162.   Aron began the December 20, 2016 Conference Call by announcing, in pertinent part, that the combination of AMC and Carmike would expand the Company throughout the U.S., but also stated as follows:

> *[E]ven more importantly, it will allow us to introduce our successful guest experience initiatives proven at AMC to tens of millions of new customers improving the movie-going experience for them*.  *It's also expected to broaden our appeal at moviegoers with more people having access to the AMC Stubs loyalty program* redesigned in July and our new website, www.amctheaters.com, and smartphone apps launched just three weeks ago. . . . In total, *we are as confident today as we were back in March [2016] when this transaction was first announced, that the growth potential for AMC is enhanced by joining forces with Carmike Cinemas*.

163.   During the December 20, 2016 Conference Call, Aron explained that the Company intended to classify the combined portfolio of its AMC and Carmike theaters into two distinct brands: the AMC brand for those theaters in bigger markets with higher visitation and service levels, and a then, yet to be determined brand for those theaters in smaller markets with lower visitation and service levels.

164.   Aron noted that, during AMC's due diligence process, AMC determined that "there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand," and that, "[w]e have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation."

165.   Concerning the DOJ's regulatory review, Aron stated "we did spend eight months with the Justice Department of the United States," and that the Company expected to divest between 15 and 20 theaters, most of which would come from the then-existing Carmike portfolio circuit that had theater level cash flows in "the modest single-digit millions of dollars."  Aron further noted that a buyer had already been identified for two Carmike theaters, with the remaining theaters to be sold in sixty (60) days.

166.   Concerning theater attendance and renovation, Aron stated, in pertinent part, as follows:

> We do think the fact that we're going to commit to renovate a significant number of AMC theaters and a significant number of Carmike theaters and a significant

number of Odeon theaters is going to cause attendance at those theaters to increase. That's good for studios, that's good for us.

*          *          *

We are in the business as all companies are rationally deploying and allocating capital and we will put our monies where we get the best returns as best we can figure out what they'll be.  There is opportunity for investment at the AMC circuit. There's opportunity for investment at the Carmike circuit and there's opportunity for investment at the Odeon circuit.   I expect that you will see us make improvements at each of the three circuits, although as I said on the margin, we ration capital where it produces the highest return.  And so, we look at these projects one at a time, theater by theater.

167.    The statements in ¶¶ 163 through 166 above were materially false and misleading when made because Aron couched such statements in a manner sufficient to deceptively mask the fact, and the extent to which, Carmike's theaters had suffered from a protracted period of underinvestment and a material loss in market share, resulting in a material loss of revenue and theater attendance.  Once Aron chose to speak about the attendance, operations and renovations of Carmike's theaters, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on Carmike's previous operations and now AMC's current operations.

### B.     The January 23, 2017 Conference Call

168.    On January 23, 2017, AMC issued a press release announcing that it had entered into a definitive agreement to acquire Nordic and hosted a conference call that day with analysts and investors to discuss the acquisition.  During the conference call, Aron touted the execution of AMC's integration of Carmike and Odeon as "flawless," and confirmed his confidence and optimism that such acquisitions would have a positive impact on the Company's future, stating, in pertinent part, as follows:

So far, vis-a-vis ***Carmike and Odeon, our efforts as best we can tell, surrounding integration planning and integration execution have been flawless***. . . . ***Allocating our capital*** so dramatically ***to growth through acquisition, in both our theater***

- 41 -

*count and countries served obviously confirms that AMC is confident and optimistic about the future of being in the movie theater business*.  We further believe that confidence is well-placed.

169.    Aron then proclaimed that AMC's acquisitions, including Carmike and its loyalty program, were going to help it grow its revenues and EBITDA, and the Company's renovation efforts were also going to generate growth, stating, in pertinent part, as follows:

> I think *AMC has grown smartly this year, through M&A activity*.  It's not the only way we've grown, but I like our new website, and *I like our new AMC Stubs loyalty program*, and I like our new pricing department, and they're going to help us grow revenues and grow EBITDA, too.  But, and we are obviously investing in renovating theaters in the US and putting in recliner seating to another third of our circuit over the next two years, so there's plenty that's going to cause growth.

170.    The statements in ¶¶ 168 through 169 above were materially false and misleading when made because Aron knew, but failed to disclose, that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.  Once Aron chose to speak about AMC's loyalty programs and the operations and renovations of its acquired theaters, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operations.

171.    During that same conference call, Aron announced that AMC's acquisition of Nordic would close in time to benefit from a "busy summer film slate," stating, in pertinent part, as follows:

> Like in our Odeon transaction, European Commission approval will be required for closing, but as we've had recent experience with [the] EU, and as we have no theaters in these seven Northern European countries presently, we believe that securing EU approval should be both painless and quick.  *We expect closing to happen well within the first half of 2017, and ahead of the busy summer film slate*.

172.     The statements in ¶ 171 above were materially false and misleading when made because Aron knew, but deceptively failed to disclose, that any financial benefit AMC may realize from the closing of its acquisition of Nordic "ahead of the busy summer film slate" would be offset by the seasonally slow summer seasons in the legacy Odeon and Nordic circuits.

### C.     The Registration Statement

173.     On February 9, 2017, AMC filed with the SEC a prospectus supplement incorporated in the Registration Statement for the SPO.   On February 13, 2017, AMC sold 19,047,619 common shares in the SPO at $31.50 per share, generating net proceeds of $579 million.   On February 17, 2017, AMC sold 1,283,255 common shares in the SPO at a price of $31.50 per share pursuant to the partial exercise of the over-allotment option granted to the underwriters, generating net proceeds of $39 million.

174.     The Registration Statement contained materially false and misleading statements and failed to disclose material information required to be disclosed therein pursuant to the regulations governing its preparation, as detailed above.

### D.     The 2016 Fourth Quarter And Year-End Results

175.     On February 28, 2017, AMC issued a press release announcing its 2016 fourth quarter and year-end financial results.   The press release highlighted AMC's record-setting fourth quarter and year-end results across its revenue categories – admissions, food and beverage, and other – and commented that the SPO's proceeds would be used to pay for AMC's recent acquisitions, stating, in pertinent part, as follows:

> In connection with the acquisitions of Odeon/UCI and Carmike, and the planned acquisition of Nordic, in February 2017, AMC raised more than $640 million of additional equity through the sale of 20,330,874 shares of the Company's Class A common stock, par value $0.01 per share, at $31.50 per share.

> The net proceeds of the offering were approximately $618.0 million after deducting underwriting commissions and before deducting estimated offering expenses.

*AMC used the net proceeds from this offering to repay $350 million principal amount of outstanding bridge loans incurred in connection with its completed acquisition of Carmike Cinemas, Inc. and intends to use the remaining proceeds to finance a portion of the previously announced acquisition of Nordic*.  If the Nordic acquisition is not consummated, AMC will use the net proceeds from the offering for general corporate purposes.

176.   Aron commented on AMC's financial results, stating, in pertinent part, as follows:

*AMC's laser-like focus on the priorities that drive considerable growth* is what differentiates us, and what has established AMC as the clear and undisputed leader among movie-theater operators . . . .  Our innovations with powered recliner seats, enhanced food and beverage initiatives and the expansion of premium large format offerings, combined with AMC's world class marketing efforts, has created industry defining guest experiences and engagement.  In concert with a prudent and opportunistic acquisition strategy, 2016 resulted in the successful acquisition of Odeon, Europe's largest movie exhibitor, and Carmike Cinemas, the nation's then fourth largest domestic exhibitor, and presented AMC with the opportunity to acquire Nordic Cinema Group, announced in January of 2017.  *AMC has never been better positioned to leverage our proven strategic initiatives across a growing platform both here in the U.S. and across the globe*.

177.   After the earnings announcement, AMC held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the call, Aron announced that AMC set all-time revenue and EBITDA records in 2016 and that the "*record we set in 2016 is one that we will literally shatter in 2017*," stating, in pertinent part, as follows:

*AMC set new all-time high records for every revenue segment and adjusted EBITDA, exceeding $3 billion in total revenues for the first time ever, growing nearly 10% to a record $3.2 billion*.  *That $3.2 billion record we set in 2016 is one that we will literally shatter in 2017, with revenues that are likely to well exceed $5 billion*.

178.   In addition, Aron highlighted the importance of the Company's AMC Stubs loyalty program and announced that, since its recent redesign, its membership has "exploded," with "stunning" new member household sign-up rates, stating, in pertinent part, as follows:

During the latter half of 2016, we revolutionized our already successful loyalty program, redesigning and relaunching AMC Stubs.  AMC Stubs had been locked in with about 2.5 million member households but without meaningful growth in some three years.  By contrast, *membership in the redesigned AMC Stubs has simply exploded*.

AMC Stubs membership has just recently crossed over the six million member household mark.  Some 5.5 million of these households have purchased an AMC ticket in the past 12 months and all have had some interaction with us in the past 24 months.  *With sign-up rates of a stunning 400,000 to 500,000 new member households continuing right now each month*, we hope that we can reach 10 million member households in the AMC Stubs program and the AMC customer database sometime in 2017.

With an average of roughly three to four family members per household, our consumer database has already grown to approximately 20 million known moviegoers and should rise to 30 million to 40 million known moviegoers by later this year.  To whom, we are marketing one to two times each week to sway them to see a movie, the kind of movie that they individually prefer based on past purchases and to do so at an AMC theater.

*I just cannot emphasize enough the value to our Company, of this consumer data and information.  We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC*.

179.    Aron also touted the Company's other marketing programs, with "phenomenal" ticket sale growth from the relaunch of AMC's website and mobile apps, stating, in pertinent part, as follows:

Further evidence of our marketing prowess can be found in the relaunch of the AMC website and mobile apps on November 30....  For the fourth quarter, online ticketing represented more than 31% of our total ticket sales.  *AMC's online presence has experienced phenomenal growth*, *seeing a 1,000 basis point increase compared to last year* and the percentage of online tickets being sold through the website and apps.

*More recent data indicates that AMC's mobile app ticket sales and AMC's website ticket sales are up even more*.  Just last week, movie tickets sold on the AMC website were up 93%, 9-3, 93% and movie tickets sales from our smartphone apps were up some 77%, 7-7, 77% year over year.  This results emboldens us to do even more.  Activities are already underway to heighten our social media presence.  We're also starting to test creative a pricing concepts, and we have a raft of good ideas for new marketing programs and new marketing activity that will be launched in 2017 that we are highly confident will take sway with consumers in AMC's direction.

180.    The statements in ¶¶ 175 through 179 above were materially false and misleading when made because Aron couched such statements in a manner to deceptively mask the fact that, and the extent to which, Carmike's theaters had suffered from a protracted period of

underinvestment, a material loss in market share, and its inability to retain loyalty program members after being acquired by AMC.   Once Aron chose to speak about the attendance, operations and renovations its theaters, and AMC's loyalty program, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on Carmike's previous operations and AMC's newly-acquired operations.

181.     Aron then noted that 2017 will be a "transition" year for Carmike, with AMC having to incur "start-up and transition costs." and commented that the benefits from "recliner renovations" won't be visible until very late in 2017 and 2018, stating, in pertinent part, as follows:

> . . . 2017 will be a transition year for Odeon and Carmike Theaters.  ***There are start-up and transition costs***; additionally, since ***the recliner renovations*** deployments take on average six to 12 months to complete and although we have already begun, the lift in these ***investments won't be visible until very late in 2017 and well into 2018***.  Having said all that, these are absolutely the right investments to make and ***we are very confident in their earnings power***.

> The Carmike acquisition combined, as you know, the number two and number four circuits in the US to create the largest exhibition circuit in the US.  Carmike offers AMC -- excuse me, one second.  Carmike offers AMC complementary markets in suburban and rural regions of the country, with little market overlap and gives AMC a truly national footprint.  ***We will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating***.

> We have also identified $35 million of cost synergies, which we believe will be substantially realized by the end of 2017.  We've already begun the integration in earnest, converting point-of-sale systems and vendor contracts and commencing initiative deployments.

182.     The statements in ¶ 181 above were materially false and misleading when made because Aron deceptively referred to 2017 as being Carmike's year in transition because of "start-up and transition costs" and "recliner renovations."   In truth and in fact, Aron knew, but misleadingly failed to disclose, that the operations of Carmike were suffering from a protracted period of underinvestment, a material loss in market share, and its inability to retain loyalty

program members after being acquired by AMC, which were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's capital resources and operating results.

183.    Concerning AMC's 2017 guidance, Aron noted that consensus revenue and earnings estimates set forth by securities analysts at that time "seem to be in the right ballpark." Per *Thomson First Call*, the consensus Wall Street estimates at that time were as follows:

**AMC 2017 Wall Street Analysts' Consensus Estimates**

| (Totals do not add due to rounding) | Revenue | Earnings Per Share |
|---|---|---|
| Q1, March 31, 2017 | $1.168 billion | $0.11 |
| Q2, June 30, 2017 | $1.301 billion | $0.37 |
| Q3, September 30, 2017 | $1.198 billion | $0.10 |
| Q4, December 31, 2017 | $1.359 billion | $0.48 |
| Full Year 2017 | $5.044 billion | $1.04 |

184.    The statements in ¶ 183 above were materially false and misleading when made because given the numerous, undisclosed matters that were then having, and were reasonably likely to continue to have, an adverse effect on Carmike's previous operations and AMC's current/inherited operations, Aron's 2017 financial guidance regarding AMC was without any reasonable basis.

185.    During the Q&A session of the conference call, Aron continued to mislead investors and make materially false and misleading statements about renovations at AMC's theaters.  The following exchange, in pertinent part, transpired:

Eric Wold, B. Riley & Co. – Analyst:

*[O]n the remodels, you talk about the benefits you're seeing from the remodels vis-a-vis attendance lift and box office lift?*  Can you give us a sense of relative performance of theaters that have not been reseated or given enhanced food and beverage?  Trying to get a sense of the potential level of drag those theaters are having on the overall average. . . .

Defendant Aron:

… [W]hat is the difference between the renovated theaters and non-renovated theaters? . . . Well, *when you renovate theaters, okay, you get a big pop*.  Does it sort of then, like, disappear?  And the answer is no.  *Once we get our big pop and that tends to institutionalize the renovated theaters doing really well and they stay up* there at the renovated -- *at the elevated level of performance*.

Where we are exposed, and where I believe our competitor is exposed, is that our renovated theaters, whether they were renovated three months ago or 24 months ago, *our renovated theaters, as a class, are doing extremely well, with significant double-digit revenue growth that would blow your mind if we shared that number with you*.

But, *the non-renovated theaters are growing at single-digit growth*, which blows our minds because we are the same Company, which shows us the power of recliner seats.  So, our conclusion is the faster we can renovate theaters, the better off we are.

 … [Y]ou'll start to see Carmike Cinemas getting renovated in 2018 but, that's probably an 2018, 2019 and -- or 2018 and 2019, or 2018, 2019, and 2020 renovation plan.  *There is no doubt that renovated theaters are just killing in the marketplace*.

*Consumers are voting with their feet. And our way to handle that is to have more theaters that are renovated than anybody else* and it will be by a country mile.  We already have a big lead over any other large circuit in terms of renovation.  And our plans for 2017 and 2018 are more aggressive than anybody else as well.

186.    The statements in ¶ 185 above were materially false and misleading when made because Defendant Aron knew, but failed to disclose, that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.  Once Aron chose to speak about the renovations of AMC's

acquired theaters, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operations.

### E.    The 2016 Form 10-K

187.    On March 10, 2017, AMC filed its 2016 Form 10-K with the SEC, which was signed by Aron and Ramsey.  The 2016 Form 10-K contained materially false and misleading disclosures and omissions relating to: (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) the Company's AMC Stubs loyalty program; (iv) AMC's MD&A; (v) AMC's financial statements; (vi) AMC's disclosure controls; and (vii) the certifications by Aron and Ramsey regarding AMC's disclosure controls.

188.    With respect to Carmike, the 2016 Form 10-K disclosed, in pertinent part, as follows:

> ***Legacy Carmike theaters, are located primarily in smaller, suburban and rural markets***, ***which affects total revenues per theater***.  However, in general, theaters located in smaller suburban and rural markets tend to have less competition and a lower cost structure, and we believe when combined with our innovative strategic initiatives that productivity will improve.
>
> \*        \*        \*
>
> Carmike Cinemas, Inc.  In December 2016, we completed the acquisition of Carmike for cash and stock. The purchase price for Carmike was $858.2 million comprised of cash of $584.3 million and 8,189,808 shares of our Class A common stock with a fair value of $273.9 million (based on a closing share price of $33.45 per share on December 20, 2016).  We also assumed $230.0 million aggregate principal amount of 6.00% Senior Secured Notes due June 15, 2023 (the "Senior Secured Notes due 2023"), in connection with the acquisition of Carmike.  As of December 21, 2016, Carmike operated 271 theaters with 2,923 screens in small and mid-sized markets in 41 states, which further complements our U.S. markets segment.  ***We expect to realize approximately $35.0 million of synergies and cost savings related to this acquisition as a result of purchasing and procurement economies of scale and general and administrative expense savings, particularly with respect to the consolidation of corporate related functions and elimination of redundancies***.

- 49 -

189.    The statements in ¶ 188 above were materially false and misleading when made because Defendants knew, but failed to disclose, that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition.

190.    Concerning the seasonality of AMC's business, the 2016 Form 10-K disclosed, in pertinent part, as follows:

**Seasonality**

Our revenues are dependent upon the timing of motion picture releases by distributors.  The most marketable motion pictures are usually released during the summer and the year-end holiday seasons.  ***Therefore, our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons***. Our results of operations may vary significantly from quarter to quarter.

191.    The statements in ¶ 190 above were materially false and misleading because, as noted herein, the 2016 Form 10-K was required to disclose the seasonality of ***each*** of its business segments.   Contrary to the above-noted disclosure about its U.S. business segment, AMC's international business segment generally experienced lower attendance and revenues during the summer months.

192.    Concerning AMC Stubs, the 2016 Form 10-K disclosed, in pertinent part, as follows:

AMC is engaging moviegoers [sic] marketing activities to strengthen the bonds with our current guests and create new connections with potential customers that drive both growth and loyalty. This effort begins with the legacy AMC loyalty program, AMC Stubs®, which we believe is one of the most popular loyalty programs in the industry.  AMC Stubs® is a customer loyalty program which allows members to earn rewards, receive discounts and participate in exclusive members-only offerings and services. It features both a traditional paid tier called AMC Stubs

Premiere™ and a new non-paid tier called AMC Stubs Insider™.  Both programs reward loyal guests for their patronage of AMC theaters. . . .

*As of June 30, 2016, prior to our national relaunch, we had 2,672,000 active member households in the AMC Stubs® program.  As of December 31, 2017, we had more than 11,408,000 member households enrolled in both the AMC Stubs Premiere™ and AMC Stubs Insider™ programs, combined*.  Our AMC Stubs® members represented approximately 23% of AMC U.S. markets attendance during the year ended December 31, 2017.  *We expect the number of member households to continue to increase over the next 24 to 36 months*.  We believe movie-goers want to be recognized and rewarded for attending our theaters and as a result, our new AMC Stubs® program is designed to strengthen guest loyalty, attract new guests and drive additional return visits.  Our much larger database of identified moviegoers also provides us with additional insight into our customers' movie preferences, and this enables us to have both a larger and a more targeted marketing effort to support our Hollywood studio partners.  We intend to creatively mine this rapidly growing consumer database to increase sales and otherwise boost loyalty to AMC.

193.    The statements in ¶ 192 above were materially false and misleading when made because, as Defendants knew, but the 2016 Form 10-K failed to disclose, AMC's operating performance was being adversely impacted by AMC's inability to retain Carmike's loyalty program members after the acquisition.

194.    For the reasons alleged herein, the MD&A in the 2016 Form 10-K also failed to disclose known trends, events, demands, commitments and uncertainties associated with Carmike's previous operations that were known to management and that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's capital resources and results of operations.

195.    The 2016 Form 10-K also falsely and misleadingly represented that the financial statements contained therein were presented in conformity with Generally Accepted Accounting Principles ("GAAP").  GAAP, in Accounting Standards Codification 270-10-45-11, *Interim Reporting*, requires the financial statements included in the 2016 Form 10-K to disclose the seasonal nature of AMC's business activities.  In violation of GAAP, the financial statements in

the 2016 Form 10-K failed to disclose that AMC's international business activities experience lower attendance and revenues during the summer months.

196.    Further, Item 9A of Form 10-K required the 2016 Form 10-K to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures*.  Item 307 of Regulation S-K required the 2016 Forms 10-K to disclose the conclusions that Aron and Ramsey had reached about the effectiveness of AMC's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

197.    The 2016 Form 10-K falsely and misleadingly represented that AMC's disclosure controls were operating effectively when they were not, for the reasons alleged herein.

198.    Finally, the 2016 Form 10-K contained false and misleading certifications by Aron and Ramsey on AMC's disclosure controls and procedures, which stated, in pertinent part, as follows:

I, [Defendant Aron/Defendant Ramsey] certify that:

1.      I have reviewed this annual report on Form 10-K of AMC Entertainment Holdings, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial

reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

> a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

199.    The above-referenced false and misleading statements, omissions and certifications in the 2016 Form 10-K were falsely and misleadingly repeated or referred to, in all material respects, in the Form 10-Q that AMC filed with the SEC later in the Class Period.

F.      **The 2017 First Quarter Results**

200.    On May 8, 2017, AMC issued a press release announcing its record financial results

for the period ended March 31, 2017.  Aron commented on the results, stating, in pertinent part,

as follows:

> ***AMC is off to a tremendous and record start in 2017***.  AMC's ability to
> purposefully act on the opportunities and innovations that drive growth continues
> to set us apart and further solidifies our leadership position among movie-theater
> operators in the U.S. and Europe . . . .  Achieving record first quarter 2017 Adjusted
> EBITDA of $251.3 million is tangible evidence of what we have been saying for
> the better part of a year, that the earnings power of this new incarnation of a larger
> and more influential AMC is enormous compared to other operators and even to
> our own recent past.
>
> . . . We would particularly point out three important developments at AMC so far
> this year.  First, at the legacy pre-acquisition AMC theaters, we grew revenues at a
> meaningfully faster pace than the industry at large, due in part to our commitment
> to renovating theaters and the strength of our impactful marketing programs.
> Second, with our domestic acquisition, ***our rapid move to achieve cost synergies***
> ***and efficiencies brought immediate bottom line benefit, offsetting revenue***
> ***weakness that had been prevalent at Carmike for eight of the twelve months and***
> ***three of the last four months of 2016.  We are directly focused on improving***
> ***revenues at the acquired domestic theaters, as well as furthering the cost***
> ***reduction efforts that already are well in hand***.  And third, we are thrilled both by
> our brisk start in driving immediate revenue and earnings growth in constant
> currency in Europe, and the likelihood that our plans to drive even more earnings
> through renovation of European theaters will come to initial fruition in quantity as
> early as the end of 2018.
>
> . . . **We are only just beginning to unlock the growth potential of our recent**
> **acquisitions.  The initial integration efforts of creating a transformed AMC**
> **have been done quickly and have been very smooth.  As we now move to make**
> **what we expect will be highly lucrative investments in guest-facing initiatives**
> **like powered recliner seats, enhanced food and beverage offerings and the**
> **expansion of premium large format experiences, we are as confident as we**
> **could be in the future earnings potential of AMC**.  **We remain optimistic about**
> **the opportunity to continue to deliver meaningful value to our shareholders**
> **both in the balance of 2017 and in the years ahead**.

201.    After the earnings announcement, AMC held a conference call with analysts and

investors on May 8, 2017 to discuss the Company's earnings release and operations.  During the

- 54 -

conference call, Aron highlighted AMC's "outstanding record results for Q1 [that] exceed[ed] all

consensus estimates for both revenue and EDITDA."  Aron noted, in pertinent part:

> AMC's first quarter was marked most noticeably by our growth to more than 1,000 theaters and more than 11,000 screens, thanks to the closing of our Carmike and Odeon acquisitions late in Q4 '16, and the signing and ahead-of-schedule closing of our Nordic Cinema Group acquisition, wholly within Q1 '17.  *Our integration of these added theaters has gone incredibly smoothly and we have moved fast to capture expense synergies that were promised as these acquisitions were announced*.

> *As for theater enhancement*, we quickened the deployment pace for our strategic initiatives, *with more theaters now equipped with recliner seating than anyone else in our industry, and their attendant investment return metrics still being quite lucrative and well ahead of the 25% cash-on-cash unlevered returns of our investment hurdles*....

> Our marketing activity continues to amaze even us.  *Literally all of the Carmike Theaters will cut over to the AMC brands, programs, websites and systems by the end of this week*, with the Carmike name retired.  *And speaking of the efficacy of those marketing programs, AMC Stubs partition -- participation continues to soar*.  As of today, we have 7,553,209 AMC Stubs member households.  We previously announced hitting 5 million member households on December 19 of last year; announced 6 million member households on February 13 of this year; and 7 million member households on April 13, less than a month ago.  *So in a year, we've tripled the Stubs membership to numbers that we believe are light-years ahead of any other exhibitor program and the numbers continue to grow rapidly*.

202.    The statements in ¶ 201 above were materially false and misleading when made

because Aron knew, but failed to disclose, that AMC's operating performance was being adversely

impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant

loss in Carmike's market share when its patrons migrated to competitors that had renovated and

upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members

after the acquisition.  Once Aron chose to speak about the renovations of AMC's acquired theaters,

he had a duty to speak completely and truthfully, including speaking about those matters that were

then having, and were reasonably likely to continue to have, a material adverse effect on AMC's

operations.

203.    Aron commented further during the May 8, 2017 conference call on AMC's theater

renovations, stating, in pertinent part, as follows:

> We see *that our commitment to improving the guest experience continues to serve us and our guests very well*. . . .
>
> *As of March 31, 2017*, including our Dine-In Theater locations, spot acquisitions, new builds, Dolby Cinema auditoriums and full recliner reseat renovations, *AMC operated 2,078 U.S. recliner screens in 208 theaters.  Of the 75 theaters with recliners that have been open for more than a year, these theaters are seeing attendance lifts between 40% and 60%, average ticket price increases of 7% and total revenue increases averaging 64% in the first 12 months after renovation compared to the last 12 months before renovation*.
>
> *Our recliner renovation investments are still comfortably exceeding our 25% unlevered cash on cash return hurdles, while handily outperforming the first quarter U.S. industry box office revenue per screen* by 830 basis points and also outpacing U.S. industry attendance per screen by 270 basis points.
>
> In having more recliner screens than any other U.S. circuit, recliners as a percentage of AMC's U.S. theater count are now 32%, virtually all of them in the legacy AMC circuit and very few in the Carmike circuit.  As long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters in the United States, representing 1,480 U.S. screens in 2017 and 2018, which would bring us to 326 recliner-equipped theaters in the U.S.  That's about 51% of our entire domestic footprint, including all of the theaters of the newly-acquired Carmike circuit, which were off to a very slow start under prior ownership.  *So the opportunity with all these recliner-equipped theaters to deliver outsized performance of returns in the immediate term ahead is clear*.  Continued investment in our strategic initiatives across both our legacy and acquired theaters will continue to create value for AMC and for our shareholders.

204.    The statements in ¶ 203 above were materially false and misleading when made

because Aron knew, but failed to disclose, that AMC's operating performance was being adversely

impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant

loss in Carmike's market share when its patrons migrated to competitors that had renovated and

upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members

after the acquisition.  Once Aron chose to speak about the renovations of AMC's acquired theaters,

he had a duty to speak completely and truthfully, including speaking about those matters that were

then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operations.

205.    Aron then provided additional commentary during the May 8, 2017 conference call on AMC's loyalty program and marketing efforts, stating, in pertinent part, as follows:

> Let's do a little more on marketing, which is designed to create ways to keep our customers coming back. *We could not be more excited about our AMC Stubs loyalty program and the redesigned website and mobile apps* that span the divide between the physical theater setting and the digital experiences our consumers prefer.
>
> As previously mentioned, *our rapidly growing number of AMC Stubs members accounted for approximately 25% of all ticket sales in Q1, and will soon account for more than 30% of all AMC moviegoers in the United States*. These tens of millions of purchase histories now captured in our database offer us a treasure trove of data and consumer information for us to use to market AMC and future moviegoing more effectively.
>
> Thanks to our new website and smartphone app, both launched on November 30, more and more of our guests are utilizing the AMC website and app to buy their tickets. In the first quarter, we sold 31% of our tickets online; that's a 600-basis-point increase over last year. And of our total online sales, the AMC channels sold 49% of those online tickets. That's a 1,300-basis-point increase compared to last year.
>
> *Clearly, we're developing the desired connections with our guests by offering a fast, easy and convenient solution that's driving ticket sales*.

206.    The statements in ¶ 205 above were materially false and misleading when made because Aron knew, but failed to disclose, that AMC's operating performance was being adversely impacted by its inability to retain Carmike's loyalty program members after the acquisition. Once Aron chose to speak about the Company's loyalty program, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operations.

207.    Concerning the operations of Carmike, Aron deceptively stated during the May 8, 2017 conference call that "[t]here have literally been no operational snafus of any note to report." Defendant Aron then stated during this conference call, in pertinent part, as follows:

> *The integration of Carmike into AMC is running very smoothly*.  As you know, we are retiring the Carmike name and are rebranding all our theaters as AMC, about 400 of the 644; or AMC Dine-In, about 45 of the 644; or AMC Classic, about 200 of the remaining theater locations in the U.S.  However, as our AMC and AMC Dine-In Theaters are considerably larger and get considerably more visitation, only about 10% of our revenues will fall under the AMC Classic marquee.
>
> *We have made great progress with the conversion of the acquired theaters*.  We only have 2 Carmike theaters as we speak, and *by the end of this week, all Carmike theaters will have gone through their cutover to AMC systems, processes and brands.  There have literally been no operational snafus of any note to report to you*, and the new larger AMC is showing movies every day without pain in a much bigger national footprint.

208.    Aron then stated "*one of the allures to us of acquiring Carmike*" was the "revenue weakness" it had experienced during 2016, which AMC expected to "reverse soon," stating, in pertinent part, as follows:

> **...with Carmike, we have inherited a circuit that was showing revenue weakness in 8 of the 12 months in 2016 and in 3 of the 4 months in the last trimester of 2016.  Candidly, that was one of the allures to us of acquiring Carmike**.  As we look to the end of 2017 and into 2018, we are highly confident that AMC's marketing activity and product ideas will generate a meaningful revenue boost to the Carmike theaters just newly added to our domestic platform.
>
> Fortunately, *we were so aggressive in reducing expense and in achieving expense synergies that the cost savings are offsetting short-term revenue softness* – again, which I'm quick to add, *we expect to reverse soon* on our watch.

209.    Later on during the May 8, 2017 conference call, Aron, in response to analysts' questions, walked back the significance of Carmike's revenue softness, and noted that two of its largest theaters were closed for renovations and that "a lot of Carmike theaters . . . are doing just great," stating, in pertinent part, as follows:

> With respect to the Carmike theaters, *when I talk about revenue softness, I'm not talking about revenue declines.  What I'm talking about is that the AMC Theaters*

- 58 -

*have been growing faster than the Carmike theaters have been growing*, *if you take, though, the totality of it all*.  So no, we're – there's no thought to shuttering any Carmike theaters.

We think we have an A team in place here in Kansas City that has generated great results for AMC over the past year.  That's why AMC revenues are up 6.2% when the industry is up 4%, 5%.  That same team is now wholly focused on the Carmike theaters, not only from a system basis but also theater-by-theater.  And *we're highly confident we're going to make a lot of progress across the Carmike system*.

*       *       *

And so – but it took Carmike a year to get into this position.  We said that *their revenue softness was 8 months out of 12, so we're not going to get out of it in a week.  But I think, as we look to the second half of '17, as we look certainly to '18, we'll start to see the Carmike theaters perform in a really good way*.  And as I said, something on the order of 2/3 of the incremental dollar drops down to the bottom line.

*       *       *

On the issue of Carmike, I – it's really complicated.  There are *a lot of Carmike theaters that are doing just great.  So we've gotten quite granular looking theater by theater by theater*, and there are so many reasons.  And I want to be careful what I say because I don't want to say anything uncharitable to the prior management team.  *It's a problem that we inherited*.  It's a problem that we'll solve.

You could imagine, with any company that announced it was for sale in March and got sold in December, that decisions that might have been taken to drive short-term performance might have been put on hold, thinking those are more appropriate decisions that should be taken by the new owner.  That's one argument.

Another argument is some of the Carmike theaters did have competitive activity around them.  And they – since Carmike was not a company that really believed in recliner seats, they didn't counter some of that competitive activity by putting in re-seated theaters of their own.  Clearly, that's something that will change.

When we have a theater that we renovate, we do it in 3 to 6 months.  *Two of the largest theaters in their system, they shut down for renovation*, and I believe they're going to be closed for 15 months – which, again, *I know it's only 2 theaters* out of 270, but when they're significant theaters of size and when you're starting to look at all these things on 0.10% here and 1% over there, *it matters*.

There's a lot more than that.  We've already taken 5 of their theaters.  For example, that they had as sub-run theaters, meaning they're showing older films, and we've already converted those – at a very deeply discounted price.  We've already converted those theaters to first-run movie houses, showing the latest Hollywood releases at full price.

- 59 -

So there are a lot of reasons there – for as many of their theaters, there are sort of reasons that affect big patches of their theaters, and we think we have a solid understanding of what the issues have been, theater by theater, and we're putting in solutions, theater by theater.

The Carmike theaters in question have only been branded as AMC theaters in the last 30, 60, 90 days. The first cut-over was mid-January, and the last cut-over is going to be mid-May. So as these theaters become AMC-branded theaters with more potent marketing programs and the like and some targeted investment to improve the product, we think we'll see real benefits.

***So we're not at all upset about all this. It's just more upside to come***. And I said it before, but I'll say it again, thank goodness we moved fast to get cost synergies because that's one of the things that allowed us to have a blowout quarter, even with these Carmike issues to deal with.

210.    The statements in ¶ 209 above were materially false and misleading when made because Aron knew, but failed to disclose, that AMC's operating performance was being adversely impacted by: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition. Once Aron chose to speak about Carmike's operations, he had a duty to speak completely and truthfully, including speaking about those matters that were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operations.

### G.    The Form 10-Q

211.    On May 8, 2017, AMC filed with the SEC its Form 10-Q for the quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"), which was signed by Aron and Ramsey. The Q1 2017 Form 10-Q contained the same materially false and misleading disclosures and omissions detailed above with respect to AMC's 10-K and other Class Period statements regarding (i) the operations of Carmike; (ii) the seasonality of AMC's foreign operations; (iii) AMC's loyalty program, AMC Stubs; (iv) AMC's MD&A; (v) AMC's financial statements; and (vi) AMC's disclosure controls, as well as Defendants Aron's and Ramsey's certifications thereon.

## VIII.   **THE TRUTH IS REVEALED**

212.   On August 1, 2017, after the close of the market, AMC issued a press release announcing its preliminary financial results for the 2017 second quarter, the period ending June 30, 2017.  The press release announced that AMC expected to report total revenues during the quarter of approximately $1.2 billion and a net loss in the range of $178.5 to $174.5 million, or a loss of $1.36 to $1.34 per diluted share.  The press release also announced that AMC's 2017 revenues were expected to be between $5.10 and $5.23 billion and its 2017 net loss to be between $150 and $125 million, or a loss of $1.17 to $0.97 per diluted share.

213.   In response to these much worse-than-expected results, the price of AMC common stock plummeted nearly *27%*, on very heavy trading volume, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017.

214.   Thereafter, on August 4, 2017, AMC held a conference call with analysts and investors to discuss the Company's preliminary second quarter results.  Aron commented that the second quarter was "simply a bust" and highlighted several reasons for the Company's poor results.

215.   First, Aron noted, for the first time, that "Q2, seasonally, is often the smallest quarter of the year in Europe."

216.   Later, during the conference call's Q&A session, a securities analyst asked if there was "a reason why [they] weren't able to disclose [the seasonality of AMC's international business]?"  In response, Aron used the pretext of AMC's international operations being accounted for under international accounting standards as the reason for the non-disclosure.  But that explanation was facially frivolous and false because the seasonality of a Company's business is not predicated upon the accounting standards it utilizes.

- 61 -

217.    After the release of AMC's 2017 second quarter preliminary earnings results, securities analysts issued reports calling out the seasonality of AMC's international business, including one observation that it "played a role in our (and likely the Street's) mismodeling of the quarter."

218.    Second, Aron now highlighted Carmike's performance as a major contributor to AMC's much worse-than-expected 2017 second quarter results, stating that "[o]ur legacy AMC theaters were stars, outperforming the industry, but our acquired Carmike theaters . . . were not stars."  Aron explained that, during the 2017 second quarter, the box office results in the entire United States were down 4.4%, while, in contrast, admissions revenues at legacy AMC theaters were down only 3.1%.  However, the newly acquired Carmike theaters suffered an *11.3%* revenue decline during Q2, or *150% more than the national average*.

219.    Aron further noted that the "substantial savings" AMC realized during the quarter were "all absorbed by and offset by higher operating costs," including theater upgrades.

220.    During the Q&A session of the conference call, Aron explained that Carmike's poor 2017 second quarter performance was caused by "literally six" different issues that had been having a material adverse effect on Carmike's operations and patron attendance, which AMC estimated would take until at least 2018 to resolve.  Among these issues were a significant loss in market share when its patrons migrated to competitors that had renovated and upgraded their theaters and AMC's inability to retain Carmike's loyalty program members after the acquisition.

221.    Aron stated, in pertinent part, as follows:

[W]e mentioned this a little bit on the first quarter call, as we went back and looked, in 8 of the 12 months in '16, *Carmike, as a circuit, had declining market share, including 3 of the past – 3 of the 4 months between September and December, it had declining market share.  When you look at what Carmike as a company did between April and December to modernize its circuit after it put itself under contract to be sold, it didn't do very much.  And so the circuit essentially went on*

- 62 -

*dead stop around April-ish of – remember, we put them under contract in March, April-ish of '16, and we didn't get to change that until December of '16.* What we found is that we've already gone through each of the several hundred Carmike theaters one by one with this – across the top – departmental team that I've told you about, and *there are literally six different reasons that tend to come up most often* as to what's going on in a particular theater.

222.     Aron further noted that Carmike had lost market share because AMC was unable

to retain Carmike loyalty program members and that it essentially had to rebuild the program "from

scratch," stating, in pertinent part, as follows:

> I'll give you another. *When Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program.* Even though – even though, at the same time, AMC has over 9 million people from our loyalty program coming – stemming out of the – by then, it would have been about 7 million in the loyalty program. *So we've had to start the loyalty program essentially over from scratch.*

There is no defensible basis for this highly material information to have been withheld from

Plaintiffs and the Class throughout the Class Period.

223.     Aron also commented on Carmike's poor performance and discussed how long it

might take for AMC to turn around Carmike's operations, stating, in pertinent part:

> And as I said, there have been many identified issues.  And they got to be knocked down one at a time.  And *as we looked at the issues that were floating around the Carmike circuit, about 40% of the attendance issues in the Carmike circuit was because somebody came into town and put a recliner theater near a Carmike theater and Carmike never responded. . . .  Another issue for Carmike is it had 2 of its biggest, most successful theaters that were closed for renovation*.  And the theaters were closed for over a year.  And they're just coming back on stream this summer.  So we're going to get a material bump theoretically by 2 of their biggest, strongest and best-performing theaters finally reopening and coming back online.  And it's literally issue-by-issue. . . .  *Can we turn this circuit around in 9 months? So is it January to March of '18?  Or is it taking us 12 months and it's January to June of '18? Or does it taking us slightly longer than that?  I don't know.*  But I'm hopeful that we can get it sorted out and turned in the first half of '18.

224.     The market for AMC common stock was open, well developed and efficient at all

relevant times.  As a result of the materially false and misleading statements and omissions alleged

herein, AMC common stock traded at artificially inflated prices during the Class Period.  Plaintiffs

- 63 -

and other members of the Class purchased or otherwise acquired AMC common stock relying upon the integrity of the market price of AMC common stock and market information relating to AMC, and have been damaged thereby.

225.     During the Class Period, the Exchange Act Defendants materially misled the investing public, thereby inflating the price of AMC common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the Exchange Act Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations, as alleged herein.

226.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, the Exchange Act Defendants made or caused to be made a series of materially false or misleading statements about AMC's operations, acquisitions and future financial prospects. These material misstatements and omissions had the cause and effect of creating an unrealistically positive assessment of AMC common stock and its business in the market, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  The Exchange Act Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

## IX.     SCIENTER ALLEGATIONS

227.     As alleged herein, the Exchange Act Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and

disseminated to the investing public in the name of the Company, or in their own names, during the Class Period were materially false and misleading.  The Exchange Act Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  The Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding AMC, and their control over and/or receipt and/or modification of AMC's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

228.    The Exchange Act Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including Aron and Ramsey.

229.    Aron and Ramsey, because of their positions with AMC, controlled the contents of AMC's public statements during the Class Period.  Aron and Ramsey were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, Aron and Ramsey knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were false and misleading.  As a result, each of the Exchange Act Defendants is responsible for the accuracy of AMC's corporate statements and is, therefore, responsible and liable for the representations contained therein.

230.    As alleged herein, the Exchange Act Defendants were motivated to engage in their fraudulent conduct to facilitate and maximize the amount of money the highly leveraged AMC could raise in the SPO.  AMC raised approximately $618 million in the SPO, a portion of which was used to repay outstanding bridge loans incurred in connection with AMC's acquisition of Carmike, with the remaining proceeds used to finance a portion of the Nordic acquisition.

231.    Aron and Ramsey were further motivated to issue the false and misleading statements at issue due to the lavish bonuses that they stood to gain for completing the acquisitions. In fact, in December 2016, Dalian Wanda Group Corp. ("Wanda"), the parent company to AMC, announced that certain officers, directors, and other personnel were eligible for a portion of a $10 million bonus "for extraordinary services rendered in connection with the merger and acquisition activity in 2016."  Aron received a bonus of $4.5 million of the total $10 million available, while Ramsey received $700,000.

232.    In addition, the scienter of the Exchange Act Defendants is underscored by the Sarbanes-Oxley mandated certifications of Aron and Ramsey, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about AMC was made known to them and that the Company's disclosure-related controls were operating effectively.

## X.    LOSS CAUSATION

233.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AMC common stock and operated as a fraud or deceit on Class Period purchasers of AMC common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were disclosed and

became apparent to the market, the price of AMC common stock declined significantly as the prior artificial inflation came out of the stock's price.

234.    As a result of their purchases of AMC common stock during the Class Period, Plaintiffs, including Lead Plaintiff, and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  The Exchange Act Defendants' false and misleading statements had the intended effect and caused AMC common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $35.45 per share on December 27, 2016.

235.    By concealing from investors the adverse, material facts detailed herein, the Exchange Act Defendants presented a misleading picture of AMC's business, risks and future financial prospects.  When the truth about the Company was revealed to the market, the price of AMC common stock fell significantly, removing the inflation therefrom and causing real economic loss to investors who had purchased AMC common stock during the Class Period.

236.    The decline in the price of AMC common stock after the corrective disclosures came to light was a direct result of the nature and extent of the Exchange Act Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price decline in AMC common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

237.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of AMC common stock and the subsequent significant declines in the value of

AMC common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

238.   Plaintiffs are entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine in that, among other things:

(a)   The Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   The misrepresentations were material;

(c)   The Company traded on an efficient market;

(d)   The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)   Plaintiffs and other members of the Class purchased AMC common stock between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

239.   At all relevant times, the market for AMC common stock was an efficient market for the following reasons, among others:

(a)   AMC common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)   as a regulated issuer, AMC filed periodic public reports with the SEC and the NYSE;

- 68 -

(c)     AMC regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     AMC was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

240.     As a result of the foregoing, the market for AMC common stock promptly digested current information regarding AMC from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of AMC common stock during the Class Period suffered similar injury through their purchases of AMC common stock at artificially inflated prices and a presumption of reliance applies.

241.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because, as set forth above, Plaintiffs' fraud claims are grounded in the Exchange Act Defendants' material omissions.  As this action involves the Exchange Act Defendants' failure to disclose material adverse information, including the severe problems associated with AMC's acquisition of Carmike – information the Exchange Act Defendants were obligated to disclose in light of their statements on these topics – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

## XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS-CAUTION DOCTRINE

242.   The statutory safe harbor or bespeaks caution applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements plead herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, the Exchange Act Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of AMC who knew that those statements were false when made.

### COUNT IV

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### Against the Exchange Act Defendants

243.   Plaintiffs incorporate by reference the previous averments of the Complaint as if fully set forth herein.

244.   During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations, omitted, or otherwise failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

245.    The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of AMC common stock during the Class Period.

246.    As a result of their making affirmative statements and reports to the investing public, the Exchange Act Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance, so that the market prices for AMC's publicly traded common stock would be based on truthful, complete, and accurate information.

247.    The Exchange Act Defendants made untrue statements of material fact and omitted to state materials facts necessary to make the statements made not misleading, which operated as a fraud and deceit upon the purchasers of AMC's common stock, in an effort to maintain artificially high market prices for AMC's common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

248.    The Exchange Act Defendants, directly and indirectly, by the use of means and instrumentalities of interstate commerce and the mails, made untrue statements of material facts

and omitted to state material facts necessary in order to make the statements made about the Company, in light of the circumstances under which they were made, not misleading, as set forth herein.

249.    The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The facts alleged herein set forth a strong inference that the Exchange Act Defendants each acted with scienter.

250.    As a result of the dissemination of the materially false and misleading information and the failure to disclose materials facts, as set forth above, the market price of AMC's common stock was artificially inflated throughout the Class Period.  In ignorance of the fact that the market price of AMC's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by the Exchange Act Defendants, or upon the integrity of the market in which such shares trade, and the truth of any representations made to appropriate agencies and to the investing public at the times at which statements were made, and on the absence of material adverse information that was known or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by these Defendants, Plaintiffs and the other members of the Class purchased AMC's common stock at artificially high prices, and were damaged when truthful information was disclosed or concealed risks materialized and the inflation of AMC's common stock's value was corrected.

251.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were unaware of their falsity, and believed the false statements to be true. Had Plaintiffs, the other members of the Class, and the marketplace known of the true nature of

the operations of AMC and the poor performance factors discussed above, which were not disclosed by the Exchange Act Defendants, Plaintiffs and the other members of the Class would not have purchased AMC's common stock, or, if they had purchased such common stock, they would not have done so at the artificially inflated prices they paid.

252.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of AMC were: (i) materially false and misleading; (ii) omitted material information; or (iii) would be issued or disseminated to the investing public, in violation of the federal securities laws.

253.    As alleged herein, the Exchange Act Defendants participated in the fraudulent scheme, by virtue of their receipt of information reflecting the true facts regarding AMC, their control over and receipt or modification of AMC's allegedly materially misleading misstatements and omissions, and their associations with AMC, which made them privy to confidential proprietary information concerning AMC.

254.    The Exchange Act Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent conduct alleged herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge or recklessness and complicity of the personnel at the highest level of the Company.

255.    The Exchange Act Defendants had the opportunity to perpetuate the fraudulent scheme and course of business described herein because Defendants Aron and Ramsey were the most senior executive officers of AMC, and they issued statements and press releases on behalf of AMC.  As illustrated by Defendants Aron's and Ramsey's positions with the Company, they had and used their influence and control to further the scheme alleged herein.

256.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of AMC common stock during the Class Period.

**COUNT V**

**Violation of §20(a) of the Exchange Act**
**Against the Exchange Act Defendants**

257.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258.    AMC committed a primary violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, by making the false and misleading statements and omissions of material facts, identified above, in connection with the purchase or sale of its common stock, which constituted a fraud on the market and were, therefore, presumed to have been relied upon by Plaintiffs and the Class.  At the time that it made these false and misleading statements and omissions, the Company either knew of, or recklessly disregarded, their falsity.

259.    During their employment by AMC, as AMC's most senior officers (and in Aron's case, a director), Aron and Ramsey exercised control over the general operations of AMC. Moreover, these Defendants had direct control and supervisory involvement in AMC's operations during the Class Period, and therefore had the power to control or influence the particular conduct giving rise to the violations of the Exchange Act by the Company as alleged herein, and exercised the same.

260.    By reason of their status as officers (and in Aron's case, a director) of AMC during the Class Period, Aron and Ramsey are "controlling persons" of AMC within the meaning of Section 20(a) of the Exchange Act because they had the power and influence to cause the Company

to engage in the unlawful conduct complained of herein.  Because of their positions of control, these Defendants were able to, and did, directly and indirectly, control the conduct of AMC's business, the information contained in its filings with the SEC, and public statements about its business.

261.    Each of the Defendants named in this Count participated in writing or reviewing the Company's corporate reports, press releases, and SEC filings alleged by Plaintiffs to be misleading before or shortly after these statements were issued, and thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

262.    As set forth above, Aron and Ramsey acted as controlling persons of AMC within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers of AMC (and in Aron's case, a director), Aron and Ramsey had the power and authority to cause AMC and its employees to engage in the wrongful conduct complained of herein. AMC controlled Aron and Ramsey and all of its employees. By reason of such conduct, the Exchange Act Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Determining that this consolidated action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

- 75 -

      D.      As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages as appropriate; and

      E.      Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

      Plaintiffs hereby demand a trial by jury.

DATED:  August 13, 2018           SHEPHERD, FINKELMAN, MILLER
                                          & SHAH, LLP

                                   /s/ Laurie Rubinow
                                   James E. Miller
                                   Laurie Rubinow (LR-6637)
                                   65 Main Street
                                   Chester, CT 06412
                                   Telephone: (860 526-1100
                                   Facimile: (866) 300-7367
                                   Email: jmiller@sfmslaw.com
                                               lrubinow@sfmslaw.com

                                   James C. Shah
                                   Jayne A. Goldstein
                                   Eric L. Young
                                   Bruce D. Parke
                                   Shepherd Finkelman Miller & Shah, LLP
                                   35 East State Street
                                   Media, PA  19063
                                   Telephone:  (610) 891-9880
                                   Facsimile:   (866) 300-7367
                                   Email: jshah@sfmslaw.com
                                               jgoldstein@sfmslaw.com
                                             eyoung@sfmslaw.com
                                             bparke@sfmslaw.com

                                 **Attorneys for Lead Plaintiff**

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:    (631) 367-1173
Email: srudman@rgrdlaw.com
         drosenfeld@rgrdlaw.com

Additional Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2018, I caused the foregoing Consolidated Amended Complaint to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

<u>/s/  Laurie Rubinow</u>
Laurie Rubinow
Shepherd Finkelman
Miller & Shah, LLP