**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAWAII STRUCTURAL IRONWORKERS PENSION TRUST FUND, Individually and on Behalf of All Others Similarly Situated, | Case 1:18-cv-00299-AJN <u>CLASS ACTION</u> |
| Plaintiff, | |
| vs. | |
| AMC ENTERTAINMENT HOLDINGS, INC., ADAM M.  ARON, CRAIG R.  RAMSEY, CHRIS A.  COX, LIN ZHANG, JACK Q. GAO, MAOJUN ZENG, ANTHONY J.  SAICH, LLOYD HILL, GARY F.  LOCKE, HOWARD W.  KOCH, JR., KATHLEEN M. PAWLUS, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS CAPITAL INC. and CREDIT SUISSE SECURITIES (USA) LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE AMC DEFENDANTS' MOTION TO DISMISS**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel:    (212) 310-8000

*Attorneys for Defendants AMC Entertainment Holdings, Inc., Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr. and Kathleen M. Pawlus*

October 12, 2018

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    The Parties ............................................................................................................3

    B.    Plaintiffs' Allegations ..........................................................................................4

ARGUMENT ..........................................................................................................................6

I.    PLAINTIFFS' SECTION 10(b), 11 AND 12(a)(2) CLAIMS MUST BE
    DISMISSED FOR FAILURE TO PLEAD A MISSTATEMENT OR OMISSION ........6

    A.    The Four Alleged Omissions Were Adequately Disclosed And, Thus, They
        Did Not Render Any Of The Challenged Statements Misleading ........................7

        1.    AMC Disclosed The Need To Renovate Carmike Theaters, Even
            Before The Acquisition Of Carmike ........................................................7

        2.    AMC Disclosed Carmike's Loss Of Market Share And The Risk That
            Customers Could Migrate To Renovated And Upgraded Theaters ..........9

        3.    AMC Increased The Number Of Carmike Customers In Its Loyalty
            Program, Disclosed How Many Carmike Customers Joined The
            Program Once It Had That Information, And Warned That Carmike
            Customers Might Not Join The Program .................................................11

        4.    AMC Disclosed The Seasonality Of Its Business And The Risk That
            Regional Differences Could Affect Performance ...................................13

    B.    AMC Was Not Required To Disclose The Four Alleged Omissions Under
        Applicable SEC Regulations ...............................................................................15

        1.    Plaintiffs Fail To Plead A Violation Of Item 101 Of Regulation S-K .....16

        2.    Plaintiffs Fail To Plead A Violation Of Item 303 Of Regulation S-K .....16

        3.    Plaintiffs Fail To Plead A Violation Of Instruction 11(a) Of Form S-3 ..17

    C.    Many of the Allegedly Misleading AMC Statements Are Non-Actionable
        Opinions And Statements of Puffery And Optimism, Or Forward-Looking
        Statements Protected By The PSLRA Safe Harbor ............................................18

        1.    The Statements Of Opinion Are Not Actionable ....................................18

        2.    The Statements Of Puffery And Optimism Are Not Actionable ............19

3.     The Forward-Looking Statements Are Not Actionable ...........................20

II.     PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD SCIENTER......................................................................................21

    A.     Plaintiffs' Motive And Opportunity Allegations Are Insufficient .......................22

    B.     Plaintiffs' Conscious Misbehavior And Recklessness Allegations Are Insufficient ..........................................................................................................24

    C.     Plaintiffs Fail To Plead Corporate Scienter.........................................................26

III.    PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION..................................................................26

IV.    PLAINTIFFS' SECTION 12(a)(2) CLAIM AGAINST MESSRS. ARON, RAMSEY AND COX AND THE UNDERWRITER DEFENDANTS MUST BE DISMISSED FOR LACK OF STANDING..................................................................28

V.    PLAINTIFFS' "CONTROL PERSON" CLAIMS FAIL..............................................29

    A.     Plaintiffs' Claim Under Section 20(a) Of The Exchange Act Fails....................29

    B.     Plaintiffs' Claim Under Section 15 Of The Securities Act Fails .........................30

CONCLUSION ....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acito v. IMCERA Grp., Inc.*,
  47 F. 3d 47 (2d. Cir. 1995) ...................................................................................... 12, 23

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp.
  Co.*, 604 F. 3d 758 (2d Cir. 2010) ................................................................................ 25

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018) ........................................................................... 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................................... 6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................................ 29

*Avon Pension Fund v. GlaxoSmithKline PLC*,
  343 F. App'x 671 (2d Cir. 2009) ................................................................................... 22

*Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y.
  2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir.
  2012) ............................................................................................................................ 4, 25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................................... 6

*Bettis v. Aixtron SE*,
  2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ................................................................. 9

*Boca Raton Firefighters and Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ..................................................................................... 19

*In re Canandaigua Sec. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996) .............................................................................. 16

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ........................................................................................... 19

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  928 F. Supp. 2d 705 (S.D.N.Y. 2013) ........................................................................... 29

*Cortina v. Anavex Life Scis. Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ............................................................22

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................3, 6, 26, 27

*ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) .................................................................22, 23, 24

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ..............................................................................................26

*In re Eros Int'l Sec. Litig.*,
  2017 WL 6405846 (S.D.N.Y. 2017) .....................................................................19

*Fed. Hous. Fin. Agency v. Morgan Stanley*,
  2012 WL 5868300 (S.D.N.Y. Nov. 19, 2012) ......................................................29

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  308 F. Supp. 2d 249 (S.D.N.Y. 2004) ...................................................................29

*Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*,
  615 F. Supp. 2d 218 (S.D.N.Y. 2009) ...................................................................19

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009) .........16

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...................................................................24

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ..................................................................................19

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ...................................................................28

*Int'l Ass'n of Heat & Frost Insulators v. IBM*
  205 F. Supp. 3d 527 (S.D.N.Y. 2016) ...................................................................24

*Janbay v. Canadian Solar, Inc.*,
  2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) .................................................23, 27

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..................................................................................23

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................................... 30

*Lattanzio v. Deloitte & Touche L.L.P.*,
    476 F.3d 147 (2d Cir. 2007) ...................................................................................... 26

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ...................................................................................... 27

*In re Limelight Networks, Inc. Sec. Litig.*,
    2008 WL 11339621 (D. Ariz. Aug. 8, 2008) ............................................................ 14

*Lin v. Interactive Brokers Grp., Inc.*,
    574 F. Supp. 2d 408 (S.D.N.Y. 2008) ...................................................................... 12

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ...................................................................................... 17

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................................... 28

*Monroe Cty. Emps.' Ret. Sys. v. YPF S.A.*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) .......................................................................... 7

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ................................................................................ 6, 28

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ................................................................ 22, 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................................................ 24, 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .............................................................................................. 18

*In re Orion Sec. Litig.*,
    2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009) ..................................................... 28, 29

*Pinter v. Dahl*,
    486 U.S. 622 (1988) .................................................................................................. 28

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010) ...................................................................... 15

*Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*,
   2017 WL 4082482 (S.D.N.Y. Aug. 24, 2017), *aff'd*, 735 F. App'x 11 (2d Cir.
   2018).........................................................................................................7, 8, 11, 13, 14, 15

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357
   F. App'x 393 (2d Cir. 2009).................................................................................................23

*Rapoport v. Asia Elecs. Holding Co.*,
   88 F. Supp. 2d 179 (S.D.N.Y. 2000) .....................................................................................6

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) ..................................................................................27

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004), *aff'd*, 2018 WL 3993415 (2d Cir. Aug. 20, 2018) ........................8

*Rudman v. CHC Grp. LTD.*,
   217 F. Supp. 3d 718 (S.D.N.Y. 2016) ..................................................................................17

*Schoenhaut v. Am. Sensors, Inc.*,
   986 F. Supp. 785 (S.D.N.Y. 1997) .......................................................................................12

*Shields v. Citytrust Bancorp*,
   25 F.3d 1124 (2d Cir. 1994) .................................................................................................19

*In re Sierra Wireless, Inc. Sec. Litig.*,
   482 F. Supp. 2d 365 (S.D.N.Y. 2007) ..................................................................................19

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ...........................................................................................20, 21

*Stadnick v. Vivint Solar, Inc.*,
   2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017) .....................17

*Steinberg v. Ericsson LM Tel. Co.*,
   2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008).......................................................................24

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018) ..................................................................................17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008)..................................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................6, 21, 22

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) ......................................................................30

*Zech Capital LLC v. Ernst & Young Hua Ming*,
    636 F. App'x 582 (2d Cir. 2016)..............................................................................14

**Statutes and Rules**

15 U.S.C. § 78u-4 ..................................................................................1, 6, 21, 26

15 U.S.C. § 78u-5 .................................................................................................20

Fed. R. Civ. P. 9 ...........................................................................................1, 6, 7

Fed. R. Civ. P. 12 .................................................................................................1

Defendants AMC Entertainment Holdings, Inc. ("AMC"), Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr. and Kathleen M. Pawlus (collectively, the "Individual Defendants," together with AMC, the "AMC Defendants," and together with all other defendants in this action, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss, in its entirety and with prejudice, the Amended Class Action Complaint (the "Complaint" or "Compl.") filed by Lead Plaintiff The International Union of Operating Engineers Pension Fund of Eastern Pennsylvania ("Operating Engineers") and additional named plaintiff Hawaii Iron Workers Pension Trust Fund ("Hawaii," and together with Operating Engineers, "Plaintiffs") under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this action on behalf of all purchasers or other acquirers of AMC common shares (i) between December 20, 2016 and August 1, 2017 (the alleged "Class Period") and (ii) pursuant or traceable to AMC's February 8, 2017 secondary public offering (the "SPO"), and assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Sections 11, 12(a)(2) and 15 of the Securities Act of 1933.[1] Plaintiffs generally allege that AMC's disclosures concerning three acquisitions -- of Carmike Cinemas, Inc. ("Carmike"), Odeon and UCI Cinemas Holdings Limited ("Odeon") and Nordic Cinema Group Holding AB ("Nordic") -- omitted (i) "matters with respect to the acquisition of Carmike that then were having a material adverse effect on AMC's capital resources and operating results;" and (ii) that the Odeon and Nordic businesses were not "seasonally stronger in the summer months, when . . . [they] ha[d] traditionally been slower during that period." *Id.* ¶¶ 11, 12. Plaintiffs claim that, as a result, "AMC's shares of

---

[1] The Exchange Act claims are asserted by both Plaintiffs; the Securities Act claims are asserted by just Hawaii. *See* Compl. ¶ 96.

common stock traded at artificially inflated prices during the Class Period." *Id.* ¶ 20.

As discussed below, however, there are simply no facts pled in the Complaint to substantiate Plaintiffs' allegations and no basis to infer that the AMC Defendants committed *any* wrongdoing, let alone fraud.  Several pleading deficiencies require the Complaint's dismissal.

*First*, all of Plaintiffs' claims must be dismissed for failure to plead a misstatement or omission.  Despite its length (78 pages and 262 paragraphs), the Complaint repeatedly trumpets the same four alleged omissions (the "Four Alleged Omissions"):  namely, AMC's alleged failure to disclose that (1) "Carmike's theatres had suffered from a protracted period of underinvestment;" (2) Carmike suffered "a significant loss in . . . market share when its patrons migrated to competitors that had renovated and upgraded their theatres;" (3) AMC was unable "to retain Carmike's loyalty program members after the acquisition" of Carmike; and (4) Odeon and Nordic have "seasonally slower summer months" than AMC's U.S. theaters. *Id.* ¶¶ 11, 100, 158, 167, 170, 180, 182, 186, 193, 210.  Yet, each of these alleged omissions was, in fact, adequately disclosed and, thus, did not render any statement by the AMC Defendants misleading.  Nor were the allegedly omitted "facts" required to be disclosed under applicable SEC regulations.  In addition, many of the statements that Plaintiffs claim are misleading are non-actionable opinions and statements of puffery and optimism, or forward-looking statements (accompanied by adequate risk disclosures) protected by the PSLRA safe harbor.  *See* Point I, *infra*.

*Second*, Plaintiffs' claim under Section 10(b) is independently subject to dismissal because the Complaint is devoid of particularized factual allegations sufficient to plead scienter.  For example, there are *no* allegations that *any* defendant sold stock during the alleged Class Period.  Mr. Aron, AMC's CEO, actually *purchased* AMC stock during the Class Period (which, under well-established law, negates any inference of scienter).  The sum total of the Complaint's scienter allegations are statements from low-level confidential witnesses ("CWs"), none of whom are

alleged to have had *any* interaction with *any* of the Individual Defendants, and vague and generalized allegations about capital raising, incentive compensation and regulatory certifications -- all of which have been routinely rejected.  *See* Point II, *infra*.

*Third*, Plaintiffs' claim under Section 10(b) is independently subject to dismissal because Plaintiffs have not, and cannot, allege "loss causation" -- *i.e.*, that the AMC Defendants' alleged misstatements and omissions directly "caused" Plaintiffs' alleged loss.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005).  The AMC stock drop upon which Plaintiffs' Exchange Act damages are allegedly premised occurred *days before* the supposed revelation of the alleged fraud, severing the requisite nexus.  *See* Point III, *infra*.

*Fourth*, Plaintiffs' claim under Section 12(a)(2), as asserted against Messrs. Aron and Ramsey and the "Underwriter Defendants" (defined below), independently fails for lack of standing.  None of these defendants are alleged to have been "statutory sellers" in connection with the SPO.  Plaintiffs do not allege facts showing that Hawaii purchased shares directly from any Defendant, that any Defendant directly solicited Hawaii's alleged purchases of shares, or that Hawaii stands in privity with any Defendant.  *See* Point IV, *infra*.

*Finally*, because Plaintiffs fail to allege a primary violation of the Exchange Act or the Securities Act, their "control person" claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act fail too.  They also fail because:  (i) there are no allegations of "control" beyond the Individual Defendants' mere status as AMC officers and/or directors, which allegations are insufficient as a matter of law; and (ii) Plaintiffs have not pled Messrs. Aron's and Ramsey's "culpable participation" in the alleged primary violation of the Exchange Act.  *See* Point V, *infra*.

## STATEMENT OF FACTS

### A.   The Parties

The AMC Defendants refer the Court to Paragraphs 25 and 26 of the Complaint for a

description of Plaintiffs and their securities transactions.

AMC is an operator of movie theaters "throughout the U.S. and Europe." Compl. ¶ 4. Mr. Aron is CEO and a director of AMC, and he signed the "Registration Statement" for the SPO.[2] *Id.* ¶ 28. Mr. Ramsey is CFO of AMC, and he signed the Registration Statement. *Id.* ¶ 29. Mr. Cox is Senior Vice President and CAO of AMC, and he signed the Registration Statement. *Id.* ¶ 30. Messrs. Zhang, Gao, Zeng, Saich, Hill, Locke and Koch and Ms. Pawlus "served as members of AMC's Board of Directors at the time of the SPO" and signed the Registration Statement. *Id.* ¶ 31. Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays Capital Inc. and Credit Suisse Securities (USA) LLC (collectively, the "Underwriter Defendants") served as four of the 14 underwriters of the SPO. *Id.* ¶ 32; *see also* February 9, 2017 Prospectus Supplement (Ex. A),[3] at S-91.

**B.**    **Plaintiffs' Allegations**

Plaintiffs' case centers on three acquisitions by AMC during the fourth quarter of 2016 and the first quarter of 2017. On November 30, 2016, AMC acquired Odeon, "which owned and operated movie theaters in seven European countries." Compl. ¶¶ 7, 56. On December 21, 2016, AMC acquired Carmike, "which owned and operated movie theaters throughout the United States." *Id.* ¶¶ 7, 54. And, on March 28, 2017, AMC acquired Nordic, which owned and operated movie theaters "in the Nordic and Baltic nations" of Europe. *Id.* ¶¶ 59, 60.

Plaintiffs assert the Complaint's Exchange Act claims against only AMC and Messrs. Aron

---

[2] Plaintiffs refer to AMC's Form S-3 filed with the U.S. Securities and Exchange Commission (the "SEC") on December 21, 2016 and Prospectus Supplements filed with the SEC on February 7, 2017 and February 9, 2017, collectively, as the "Registration Statement" for the SPO. Compl. ¶ 5.

[3] "Ex. __" refers to exhibits appended to the accompanying Declaration of Joshua S. Amsel, dated October 12, 2018. On this motion, the Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." *Bd. of Trs. of Ft. Lauderdale v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

and Ramsey (collectively, the "Exchange Act Defendants"). *Id.* ¶ 153. With respect to Carmike, Plaintiffs allege that the Exchange Act Defendants "knew," but failed to disclose, "that AMC's operating performance was being adversely impacted by the following factors: (i) a protracted period of underinvestment in Carmike's theaters; (ii) a significant loss in Carmike's market share when its patrons migrated to competitors that had renovated and upgraded their theaters; and (iii) AMC's inability to retain Carmike's loyalty program members after the acquisition." *Id.* ¶ 62. With respect to Odeon and Nordic, Plaintiffs allege that the Exchange Act Defendants "also knew," but failed to disclose, "that, contrary to its U.S. business operations, AMC's newly acquired international operations were slower during the summer season." *Id.* ¶ 88. These alleged non-disclosures, Plaintiffs claim, were "a deliberate attempt to inflate the price of the Company's stock in advance of the SPO, thereby maximizing the amount of money the highly-leveraged AMC could raise and minimizing the amount of cash consideration it needed to pay to acquire Carmike and Odeon." *Id.* ¶ 160.

Plaintiffs' Securities Act claims[4] are based on the same alleged non-disclosures. *Id.* ¶¶ 107–11. Among other things, Plaintiffs allege that by failing to make such disclosures in the Registration Statement (and the prior periodic disclosures incorporated therein), the AMC Defendants violated their disclosure obligations under: (i) Item 303 of SEC Regulation S-K (specifically, by failing "to identify and disclose known trends, events, demands, commitments and uncertainties that were known to management and were then having, and were reasonably likely to continue to have, a material adverse effect on AMC's operating performance," *id.* ¶ 107); (ii) Item 101 of SEC Regulation S-K (which, according to Plaintiffs, "required the Registration Statement to disclose the seasonal nature of each of [AMC's] business segments," *id.* ¶ 108); and (iii) Instruction 11(a) of Form S-3 (which Plaintiffs contend required disclosure of the three alleged omissions

---

[4] The Section 11 claim is asserted against all Defendants, while the Section 12(a)(2) claim is asserted against only AMC, Messrs. Aron, Ramsey and Cox, and the Underwriter Defendants. *See* Compl. ¶¶ 131, 141.

concerning Carmike, *id.* ¶¶ 110–1).

**ARGUMENT**

In deciding this motion, the Court must assume that well-pled factual allegations in the Complaint are true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). But the Court need not accept legal conclusions, naked assertions, mere conclusory statements or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (citing *Twombly*, 550 U.S. at 555). Nor is the Court required to accept as true any allegations that are contradicted by documents deemed to be part of the Complaint. *See, e.g., Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000). The claims must raise more than the "mere possibility of misconduct;" Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79. Plaintiffs fail to do so, much less satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.

## I.   PLAINTIFFS' SECTION 10(b), 11 AND 12(a)(2) CLAIMS MUST BE DISMISSED FOR FAILURE TO PLEAD A MISSTATEMENT OR OMISSION

In order to plead claims under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act, Plaintiffs must adequately allege a material misrepresentation or omission.[5] Plaintiffs' Section 10(b) claim also must satisfy the exacting pleading requirements of Rule 9(b) and the PSLRA. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007). Rule 9(b) requires that a plaintiff, "[i]n alleging fraud or mistake," "state *with particularity* the circumstances constituting fraud or mistake" (emphasis added), and the PLSRA requires that a plaintiff, among other things, "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b).

---

[5] To sustain a claim under Section 10(b), a plaintiff must adequately plead, among other things, a material misrepresentation or omission by a defendant. *See Dura Pharms.*, 544 U.S. at 341–42. Section 11 prohibits material misstatements or omissions in registration statements filed with the SEC, and Section 12(a)(2) prohibits the sale of securities using a prospectus that contains a material misstatement or omission. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010).

Plaintiffs' claims are predicated on alleged omissions.  With respect to their Section 10(b) claim, Plaintiffs identify nine different AMC statements, which they block quote, and allege that each was materially misleading because it failed to disclose one or more of the Four Alleged Omissions.  It is well-settled that this method of pleading fails to satisfy Rule 9(b) and the PSLRA, thus requiring the dismissal of Plaintiffs' claim under Section 10(b).[6]

In any event, an omission is actionable, under both the Exchange Act and the Securities Act, only if it is "in contravention of an affirmative legal disclosure obligation" or its disclosure "is necessary to prevent existing disclosures from being misleading." *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017) (Nathan, J.) (citations omitted), *aff'd*, 735 F. App'x 11 (2d Cir. 2018).  Here, each of the Four Alleged Omissions was, in fact, adequately disclosed and, thus, none of the allegedly misleading statements identified in the Complaint were or could have been misleading.  Moreover, the Four Alleged Omissions were not required to be disclosed under the SEC regulations on which Plaintiffs purport to base their Section 11 and 12(a)(2) claims.  Finally, a number of the allegedly misleading statements are non-actionable opinions and statements of puffery and optimism, or forward-looking statements (accompanied by adequate risk disclosures) protected by the PSLRA safe harbor. Plaintiffs' Sections 10(b), 11 and 12(a)(2) claims therefore must all be dismissed.

A.     **The Four Alleged Omissions Were Adequately Disclosed And, Thus, They Did Not Render Any Of The Challenged Statements Misleading**

1.     **AMC Disclosed The Need To Renovate Carmike Theaters, Even Before The Acquisition Of Carmike**

Contrary to Plaintiffs' allegation that AMC failed to disclose that "Carmike's theatres had

---

[6] *See, e.g.*, *Monroe Cty. Emps.' Ret. Sys. v. YPF S.A.*, 15 F. Supp. 3d 336, 354–55 (S.D.N.Y. 2014) (pulling "large block quotations" and then "alleg[ing] generally that *all* of the statements were misleading for the same four reasons" "fail[s] to state a claim for securities fraud with the requisite particularity").

suffered from a protracted period of underinvestment,"[7] AMC repeatedly disclosed, even before consummating the Carmike acquisition, that many of the Carmike theaters needed to and would be renovated.   Indeed, in the very first communication Plaintiffs challenge, a December 20, 2016 conference call in which Mr. Aron discussed AMC's then-*planned* acquisition of Carmike, Mr. Aron stated that "we're going to commit to renovate a significant number of Carmike theatres," and that "[w]e have identified that there are an easy 50 to 100 Carmike theatres that are capable of supporting an AMC-style renovation."  Compl. ¶¶ 164, 166.  It would be plain to any investor that these renovations, to theaters AMC was only just acquiring, would require investments that had not been made in the past.  *See, e.g.*, *La Quinta*, 2017 WL 4082482, at *5 ("[T]he Court should consider 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'") (quoting *Rombach v. Chang,* 355 F.3d 164, 172 n.7 (2d Cir. 2004).  What is more, Mr. Aron made clear on the same call that the renovations were likely to be "back-end loaded more in 2018 and 2019 than before, but [that] it's not inconceivable that we could get some theatres done at the end of 2017," Ex. B at 8, putting the market on notice of the expected timeline.

Moreover, disclosures of this nature continued throughout the alleged Class Period.  For example, in a February 28, 2017 earnings call (which Plaintiffs also challenge), Mr. Aron stated:  (i) "2017 will be a transition year for . . . Carmike theatres. . . .  There are start up and transition costs, additionally, since the recliner renovations deployments take on average six to 12 months to complete and although we have already begun, the lift in these investments won't be visible until very late in 2017 and well into 2018;" (ii) "[w]e will deploy some of our strategic growth initiatives at every Carmike Theater and many will be renovated full-blown with recliner seating;" and (iii) "you'll start to see Carmike Cinemas getting renovated in 2018 but, that's probably a[] . . . 2018, 2019, and 2020 renovation plan."  Compl. ¶¶ 181, 185.  Likewise, in the Registration Statement,

---

[7] *See* Compl. ¶¶ 155, 167, 170, 180, 182, 186, 189, 202, 204, 210.

AMC explained that:  "deploying powered recliners will be an integral strategy in the former Carmike . . . circuit[] going forward as we are targeting approximately 42% of our total screens to be comprised of screens with recliner seating by the end of 2021;" its "key strategic initiatives, including recliner seating, enhanced food and beverage and premium sight and sound, require significant capital expenditures to implement;" and "gross cash outflows for capital expenditures w[ould] be approximately $400.0 million" for 2016, in contrast to $333.4 million for 2015, $270.7 million for 2014, and $260.8 million for 2013.  Ex. A, at S-12, S-31.  And, in its March 10, 2017 Form 10-K, AMC stated that "deploying powered recliners will be an integral strategy in the former Carmike and Odeon circuits going forward."  Ex. C, at 11.  Finally, in the last disclosure Plaintiffs challenge, a May 8, 2017 earnings call, Mr. Aron provided an example of the nature and extent of the renovations, stating that "Carmike was not a company that really believed in recliner seats, they didn't counter some of that competitive activity [from surrounding theaters] by putting in re-seated theaters of their own.  Clearly, that's something that will change."  Compl. ¶ 209.

In sum, throughout the alleged Class Period, from the first to the last challenged disclosure, AMC repeatedly disclosed the need to renovate the Carmike theaters, including as a result of past underinvestment (*e.g.*, as compared to competitors).  Plaintiffs, therefore, have not adequately alleged (and cannot adequately allege) that AMC failed to disclose this information.  *See, e.g.*, *Bettis v. Aixtron SE*, 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) (dismissing Section 10(b) claim because "the information that [plaintiff] claims was omitted was public information").[8]

### 2.     AMC Disclosed Carmike's Loss Of Market Share And The Risk That Customers Could Migrate To Renovated And Upgraded Theaters

Plaintiffs allege that the AMC Defendants failed to disclose that Carmike suffered "a

---

[8] To the extent Plaintiffs attempt to argue that they have stated an actionable omission because AMC, for example, never used the word "underinvestment" to explain *why* the renovations would be undertaken, such a specific alleged omission would have been immaterial.  AMC repeatedly disclosed its intent to undertake the renovations, as well as the "effect" of those renovations on its "capital resources and operating results."  Compl. ¶ 157.  Further disclosure regarding the reasons why AMC decided to undertake the renovations would have been irrelevant to investors.

significant loss in . . . market share when its patrons migrated to competitors that had renovated and

upgraded their theatres," and that this truth was only revealed in an August 4, 2017 earnings call in

which Mr. Aron stated that "in 8 of the 12 months in '16, Carmike, as a circuit, had declining

market share, including . . . 3 of the 4 months between September and December."[9]   However, one

month before the start of the purported Class Period, Carmike disclosed in its November 9, 2016

Form 10-Q (incorporated by reference into the Registration Statement (Compl. ¶ 120)) that for the

nine months ended September 30, 2016, its box office revenue increased *less* than national box

office revenues over the same period, meaning that other theater operators were increasing their box

office revenues -- and, thus, market share -- at Carmike's expense.[10]   And AMC continually

disclosed, both before and during the Class Period, that market share is "based on box office

revenue."[11]   Similarly, on May 8, 2017, Mr. Aron stated during an earnings call that "revenue

weakness . . . had been prevalent at Carmike for eight of the twelve months and three of the last four

months of 2016."  Compl. ¶ 200.

Moreover, both AMC and Carmike disclosed the risk that movie patrons would migrate

away from older theaters -- like those owned by Carmike -- to renovated and upgraded theaters.  As

explained above, AMC consistently disclosed (throughout the alleged Class Period) that it planned

to renovate many of the Carmike theaters to install recliner seats.  AMC also disclosed that

moviegoers were migrating away from older theaters to renovated theaters with recliner seats.  For

example, AMC disclosed in the Registration Statement that:  (i) "[w]e believe the exhibition

business is in the early stages of a transition. . . .   After decades of economic models driven by

---

[9] Compl. ¶¶ 155, 167, 170, 180, 182, 186, 189, 202, 204, 210, 211.

[10] *See* Ex. D, at 21–22 ("[N]ational box office revenues for the . . . nine months ended September 30, 2016 were estimated to have increased by approximately . . . 4.2% . . . in comparison to the corresponding 2015 period," whereas "[Carmike] Admissions revenue increased 3.9% . . . for the nine months ended September 30, 2016" in comparison to the corresponding 2015 period.).

[11] *See* AMC's March 8, 2016 Form 10-K (Ex. E), at 13; AMC's February 9, 2017 Prospectus Supplement (Ex. A), at S-14; AMC's March 10, 2017 Form 10-K (Ex. C), at 16.

*quantity* (number of theatres, screens and seats), we believe it is the *quality* of the movie-going experience that will define future success," including "recliner seating;" and (ii) "[t]he competition for patrons is dependent upon factors such as . . . the comfort and quality of the theatres."  Ex. A, at S-17, S-32.  Likewise, during the February 28, 2017 earnings call, Mr. Aron stated that "renovated theaters are just killing in the market place," while "the non-renovated theaters are growing at single-digit growth," that "[c]onsumers are voting with their feet," and that "our way to handle that is to have more theaters that are renovated than anybody else. . . ."  Compl. ¶ 185.

Carmike, pre-acquisition, made similar disclosures.  For example, Carmike disclosed in its February 29, 2016 Form 10-K that:  (i) "[t]he opening of large multiplexes and theatres with stadium seating by us and certain of our competitors has tended to, and is expected to continue to, draw audiences away from certain older and smaller theatres, including theatres operated by us;" (ii) "competitors in certain areas in which we operate have installed luxury seating and other amenities which has adversely affected attendance at our theatres in such areas;" and (iii) "luxury seating initiatives . . . require significant capital expenditures," and "[t]he lack of available capital resources due to business performance or other financial commitments may prevent us from implementing these amenities at additional theatres and could limit our ability to compete with other exhibitors."  Ex. F, at 8, 15 (incorporated by reference in the Registration Statement (Compl. ¶ 120)); *see also La Quinta*, 2017 WL 4082482, at *7 ("Even if Plaintiff had identified a duty to disclose, or to the extent Plaintiff does identify a purportedly affirmative misstatement or misleading statement, the Court would nonetheless dismiss the renovations claims because the risks identified by Plaintiff were adequately disclosed.").

> **3.     AMC Increased The Number Of Carmike Customers In Its Loyalty Program, Disclosed How Many Carmike Customers Joined The Program Once It Had That Information, And Warned That Carmike Customers Might Not Join The Program**

Plaintiffs' allegations that AMC failed to disclose that it was unable to "retain Carmike's

loyalty program members after the acquisition," Compl. ¶¶ 11, 17, 62, 107, 155, 170, 180, 182, 186, 189, 193, 202, 206, 204, 210, 220, and that this "truth" was revealed by Mr. Aron during the August 4, 2017 earnings call, *id.* ¶ 222, are also contradicted by AMC's actual public disclosure.  What Mr. Aron *actually* said on that call was that "I'm happy to report that we're like at three-quarters of a million now, we now have more members of the loyalty club who enrolled in a Carmike theatre in whatever it is, six months, seven months than Carmike had in years and years of operation in its loyalty program. . . ."  Ex. G, at 9.  Thus, there was no "corrective" disclosure that should allegedly have been made earlier.  AMC's August 2017 statement disclosed that, far from being unable to retain Carmike's loyalty program members, *more* Carmike customers joined AMC's loyalty program in six months than Carmike was able to enroll in its entire existence as a standalone entity.

In addition, to the extent Plaintiffs' allegations are understood as a claim that AMC failed to adequately predict its post-acquisition retention of Carmike customers, that too would fail to plead a material misstatement or omission.  *See, e.g.*, *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 792 (S.D.N.Y. 1997) ("loose prophecies of future performance communicating only vague expectations" are "not material misrepresentations as a matter of law" under Sections 11 and 12(a)(2)).  Carmike customers were not even able to join AMC's loyalty program until the second quarter of 2017 (*i.e.*, several months after the SPO), and AMC disclosed in its March 10, 2017 Form 10-K that "[m]ovie-goers will be able to enroll in [AMC's loyalty program] and earn loyalty rewards at the former Carmike theatres as we convert former Carmike point of sale systems to AMC systems.  We expect those conversions to be completed during the second quarter of 2017."  Ex. C at 14.  Prior to that time, AMC did not know how many Carmike customers would join its loyalty program, and that "lack of clairvoyance simply does not constitute securities fraud."  *Acito v. IMCERA Grp., Inc.*, 47 F. 3d 47, 53 (2d. Cir. 1995); *Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (explaining that "[a] cognizable claim under Section 11 or 12 of

the 1933 Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering," and that "[t]he securities laws do not require clairvoyance in the preparation of offering documents") (internal quotations marks and citations omitted); *see also La Quinta*, 2017 WL 4082482, at *10 (disclosure was "sufficient to bar any claim of securities fraud" when defendants "disclosed the financial impact caused by the disruption in the reservation call center during the second quarter of 2015, which was the quarter immediately following when the disruption allegedly occurred").

Finally, with respect to the possibility that AMC might not be able to retain Carmike's customers post-acquisition, AMC continuously disclosed the risk that Carmike customers might not accept AMC marketing initiatives, such as its loyalty program.[12]  For example, two months before the start of the Class Period, AMC disclosed that "[a]ny acquisition, including AMC's pending acquisition of Carmike and Odeon/UCI will involve risks, such as . . . the possibility that AMC strategic initiatives are not accepted by moviegoers in those markets."  AMC's October 11, 2016 Form 424B3 (Ex. I), at 44.  AMC also disclosed that it "may not achieve the expected benefits and performance from [its] recent acquisitions," and that "[a]ny acquisition may involve operating risks, such as . . . [the] effective implementation and customer acceptance of [AMC's] marketing strategy."  AMC's February 9, 2017 Prospectus Supplement (Ex. A), at S-34.

### 4. AMC Disclosed The Seasonality Of Its Business And The Risk That Regional Differences Could Affect Performance

Plaintiffs contend that AMC's disclosure that "our business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons" was "materially false and misleading" because AMC failed to disclose that its "international business segment generally experienced lower attendance and revenues during the summer months."  Compl.

---

[12] AMC's loyalty program was one of its primary "marketing" initiatives.  *See* AMC's February 9, 2017 Prospectus Supplement (Ex. A), at S-9; March 10, 2017 Form 10-K (Ex. C), at 13; May 8, 2017 Form 10-Q (Ex. H), at 45.

¶¶ 190–91; *see also id.* ¶¶ 158, 172.[13] As disclosed in the Registration Statement, however, only "23% of [AMC's] revenues . . . are derived from countries outside the United States." Ex. A, at S-33. Therefore, AMC's statement that revenues generally occur in the summer and holiday seasons was accurate because it is true for assets accounting for 77 percent of AMC's revenue stream. *See La Quinta*, 2017 WL 4082482, at *7 ("representations that [La Quinta] was performing well overall were not inconsistent with the fact that the Texas market was suffering" because "La Quinta is a national hotel chain, with hotels located across the United States" and "Plaintiff never alleges that Defendants were lying when they asserted that La Quinta was doing well in other parts of the country").[14]

Moreover, AMC disclosed the risk that regional differences could affect performance at its international theaters. Specifically, AMC identified "the impact of regional or country-specific business cycles" as a business risk in the Registration Statement, and explained that: (i) the success

---

[13] With respect to the Complaint's Section 11 and 12(a)(2) claims, Plaintiffs' allegations regarding seasonality are based entirely on AMC's 2015 Form 10-K, which stated that AMC's business "is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday season." Compl. ¶ 124 (also alleging that the Registration Statement incorporates AMC's 2015 Form 10-K). AMC's European acquisitions occurred at the end of 2016 and in early 2017. Plaintiffs have not alleged, and cannot allege, how the seasonality-related statements in the 2015 Form 10-K were materially misleading as of the time they were made because of post-2015 acquisitions. And, according to Plaintiffs' own allegations, data that would have provided knowledge of the seasonal differences between AMC's international acquisitions and its domestic business was not "successfully mapped and integrated" into AMC's systems until December 31, 2016 -- 10 days *after* the filing of the Registration Statement. Compl. ¶¶ 89–90; *see In re Limelight Networks, Inc. Sec. Litig.*, 2008 WL 11339621, at *5 (D. Ariz. Aug. 8, 2008) (finding insufficient allegations that defendants should have identified seasonal fluctuations in May and disclosed them in a prospectus in June).

[14] Plaintiffs' allegation that the AMC Defendants violated GAAP "Accounting Standards Codification 270-10-45-11, *Interim Reporting*," because AMC's March 10, 2017 Form 10-K "failed to disclose that AMC's international business activities experience lower attendance and revenues during the summer months," Compl. ¶ 195, fails for the same reason. The GAAP standard to which Plaintiffs refer provides that:

> Revenues of certain entities are subject to material seasonal variations. To avoid the possibility that interim results with material seasonal variations may be taken as fairly indicative of the estimated results for a full fiscal year, such entities shall disclose the seasonal nature of their activities, and consider supplementing their interim reports with information for 12-month periods ended at the interim date for the current and preceding years.

Ex. J, at 4. As explained above, AMC, in fact, "disclose[d] the seasonal nature of [its] activities," stating that its "business is highly seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons," Compl. ¶ 190, which accurately described the seasonality of AMC's *overall* business. In any event, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Zech Capital LLC v. Ernst & Young Hua Ming*, 636 F. App'x 582, 584 (2d Cir. 2016).

of its acquisition of international theaters "is dependent upon [its] ability to operate a business in markets where [it has] limited experience and is subject to risks that are beyond [its] control;" and (ii) "[a]lthough [AMC has] a long history of successfully integrating acquisitions, any acquisition may involve operating risks," including "the risks of entering markets in which [AMC has] little or no experience."   Ex. A, at S-33, S-34.   Consequently, Plaintiffs' seasonality-related arguments would fail even if Plaintiffs had identified a duty to disclose or a misleading statement (they have not) "because the risks identified by Plaintiff[s] were adequately disclosed."   *La Quinta*, 2017 WL 4082482, at *7.[15]

### B.     AMC Was Not Required To Disclose The Four Alleged Omissions Under Applicable SEC Regulations

Plaintiffs claim that Sections 11 and 12(a)(2) of the Securities Act were violated because Items 101 and 303 of SEC Regulation S-K and Instruction 11(a) of Form S-3 required disclosure of the Four Alleged Omissions in the Registration Statement or the periodic AMC disclosures incorporated therein.   In addition to AMC's disclosure of each of the Four Alleged Omissions, which alone requires the Complaint's dismissal, Plaintiffs' reliance on these regulations is misplaced.   As explained below, Item 101 of Regulation S-K is only applicable to Forms 10-K, and Item 303 of Regulation S-K is only applicable to Forms 10-Q and 10-K.   Thus, because the AMC Forms 10-K and 10-Q that predated the Registration Statement (and, thus, were incorporated therein) also predated the Carmike, Odeon and Nordic acquisitions, there can be no dispute that Items 101 and 103 plainly did not require the disclosure of any of the Four Alleged Omissions.   And Instruction 11(a) of Form S-3 only required AMC to disclose in the Registration Statement material

---

[15] Because Plaintiffs fail to plead a disclosure violation, their claim that the AMC Defendants violated "Item 307 of [SEC] Regulation S-K" because they "falsely and misleadingly represented that AMC's disclosure controls were operating effectively when they were not," Compl. ¶ 197, also fails.   Regardless, "[a]llegations of a violation of . . . SEC regulations, without corresponding fraudulent intent" (which, as explained below (*see* Point II, *infra*), Plaintiffs have failed to plead) "are not sufficient to state a securities fraud claim."   *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 186 (S.D.N.Y. 2010).

changes to its affairs that had not already been disclosed.  Again, that was not the case for *any* of the Four Alleged Omissions.

### 1.        Plaintiffs Fail To Plead A Violation Of Item 101 Of Regulation S-K

Plaintiffs allege that although Item 101 required "the Registration Statement to disclose the seasonal natur[e] of each of [AMC's] business segments," the Registration Statement "negligently failed to disclose that AMC's international markets segment experienced lower sales during the summer months."  Compl. ¶¶ 108–09.  However, "Item 101 applies only to annual 10K reports," *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1209 n.3 (S.D.N.Y. 1996), and the *only* AMC Form 10-K incorporated into the Registration Statement was AMC's 2015 Form 10-K, filed on March 8, 2016.  Yet, AMC purchased its international segments, via its acquisitions of Odeon and Nordic, in November 2016 and March 2017, respectively.  Compl.  ¶¶ 56, 60.  AMC plainly was not required to disclose, in its *2015* Form 10-K, information about businesses that it did not acquire for another nine and twelve months thereafter.

### 2.        Plaintiffs Fail To Plead A Violation Of Item 303 Of Regulation S-K

Plaintiffs contend that the AMC Defendants violated Item 303 of Regulation S-K because the Registration Statement "failed to disclose" three of the Four Alleged Omissions, namely, that (1) Carmike's theatres had suffered from "a protracted period of underinvestment," (2) Carmike suffered "a significant loss in . . . market share when its patrons migrated to competitors that had renovated and upgraded their theatres," and (3) AMC was unable "to retain Carmike's loyalty program members after the acquisition."  Compl. ¶¶ 107, 111.

As Plaintiffs acknowledge, Item 303 only applies to Forms 10-Q and 10-K.  *Id.* ¶ 102; *see also Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008) ("Form S-3, a registration statement filed by certain issuers in connection with a secondary offering, permits an offeror to incorporate other periodic filings, such as Forms 10-K and 10-Q, by reference.  Item 303

of Regulation S-K provides guidance on what should be included in incorporated forms."),

*aff'd*, 347 F. App'x 665 (2d Cir. 2009).  The most recent AMC Form 10-Q or 10-K incorporated

into the Registration Statement was for the quarter ended September 30, 2016, which was filed on

November 9, 2016.  *See* Ex. K, at S-20.  Yet, AMC did not acquire Carmike until December 21,

2016, Compl. ¶ 54, and trends in a business AMC *had not yet acquired* plainly did not need to be

disclosed in its November 9, 2016 Form 10-Q (or any earlier Form 10-Q or 10-K).  *See, e.g.*, *In re*

*SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 466 (S.D.N.Y. 2018) ("To plausibly allege a

violation of Item 303, a plaintiff must identify a trend that 'was already known and existing. . . .'")

(quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011)).

### 3.   Plaintiffs Fail To Plead A Violation Of Instruction 11(a) Of Form S-3

Plaintiffs contend that the AMC Defendants violated Instruction 11(a) of Form S-3, which

requires a registrant to disclose "any and all material changes in the registrant's affairs which have

occurred since the end of the latest fiscal year for which certified financial statements were included

in the latest annual report to shareholders and which have not been described in a report on Form

10-Q or Form 8-K . . . ."  Compl. ¶ 110.  As demonstrated above, the Four Alleged Omissions -- the

only alleged disclosure issues Plaintiffs identify in the context of Instruction 11(a) -- were disclosed.

Thus, Plaintiffs fail to state a claim under Instruction 11(a).  *See, e.g.*, *Rudman v. CHC Grp. LTD.*,

217 F. Supp. 3d 718, 730 (S.D.N.Y. 2016) (dismissing Section 11 and 12(a)(2) claims based on

failure "to 'describe any and all material changes in the registrant's affairs' since the end of the

fiscal year encompassed by the prior filings" because alleged omissions were "disclose[d]").[16]

---

[16] Plaintiffs' allegation that the AMC Defendants violated Item 303 also fails for this reason.  *See Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *15 (S.D.N.Y. Dec. 10, 2015) (dismissing Section 11 and 12(a)(2) claims based on failure to disclose information required by Item 303 because the allegedly omitted information was public and, thus, already part of the "'total mix of information,'" which "'may include information already in the public domain and facts known or reasonably available to potential investors'"), *aff'd*, 861 F.3d 31 (2d Cir. 2017).

C.    **Many of the Allegedly Misleading AMC Statements Are Non-Actionable Opinions And Statements of Puffery And Optimism, Or Forward-Looking Statements Protected By The PSLRA Safe Harbor**

Even putting aside Plaintiffs' failure to allege a single omission, much less an omission that rendered any of AMC's statements misleading, many of the statements that Plaintiffs *claim* are misleading are, in any event, non-actionable opinions and statements of puffery and optimism, or forward-looking statements (with adequate risk disclosures) protected by the PSLRA safe harbor.

### 1.    The Statements Of Opinion Are Not Actionable

A number of the allegedly misleading statements are statements of opinion, such as:  (i) "we believe when combined with our innovative strategic initiatives that productivity will improve [at Carmike theatres];" (ii) "we believe [AMC's loyalty program] is one of the most popular loyalty programs in the industry;" and (iii) "[w]e think we have an A team in place here in Kansas City that has generated great results for AMC over the past year."  Compl. ¶¶ 188, 192, 209; *see also* Compl. ¶¶ 166, 169, 171, 178, 181, 183, 185, 200.

In order to allege an actionable opinion, a plaintiff must (1) plead particularized facts that call into question whether the speaker actually held the stated opinion; or (2) "identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1326–32 (2015).  "[W]hether an omission makes an expression of opinion misleading always depends on context," and meeting the standard under *Omnicare* "is no small task for an investor." *Id.* at 1330, 1332.  Here, the Complaint does not come close to meeting the *Omnicare* standard, as it is devoid of *any* allegation, much less any particularized allegation, demonstrating that any of the AMC Defendants subjectively believed the allegedly misleading statements of opinion to be untrue or lacked a basis to form the opinions.

18

### 2.     The Statements Of Puffery And Optimism Are Not Actionable

A number of the allegedly misleading statements constitute (i) non-actionable puffery, *i.e.*, statements that are "too open-ended and subjective to constitute a guarantee" "of some concrete fact," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185–6 (2d Cir. 2014), or (ii) indefinite expressions of optimism that provide no "long-term guarantee or assurance." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998). "General expressions of corporate optimism are too indefinite to be actionable under the securities laws." *In re Eros Int'l Sec. Litig.*, 2017 WL 6405846, at *6 (Nathan, J.) (S.D.N.Y. Sept. 22, 2017) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012)), *aff'd sub nom. Eisner v. Eros Int'l PLC*, 735 F. App'x 15 (2d Cir. 2018). These include the allegedly misleading statements that:  (i) "I like our new AMC Stubs loyalty program"; (ii) "renovated theaters are just killing in the marketplace"; (iii) "[o]ur marketing activity continues to amaze even us"; and (iv) "[w]e could not be more excited about our AMC Stubs loyalty program and the redesigned website and mobile apps."  Compl. ¶¶ 169, 185, 201, 205; *see also* Compl. ¶¶ 168, 176, 178, 179, 200, 203, 207.

Many of these statements are "soft . . . [and] immaterial on their face" and merely "place a positive spin on developments." *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 230 (S.D.N.Y. 2009); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018).  The securities laws "neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on . . . hindsight." *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007).  Rather, corporate officers are "expect[ed] to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1129–30 (2d Cir. 1994).  Thus, the AMC Defendants' positive future

19

outlook is non-actionable optimism.

### 3. The Forward-Looking Statements Are Not Actionable

A number of the challenged statements are archetypal forward-looking statements statutorily protected by the PSLRA safe harbor.  *See* 15 U.S.C. § 78u-5(i)(1).  These include the allegedly misleading statements that:  (i) "[w]e expect the number of member households [in AMC's loyalty program] to continue to increase over the next 24 to 36 months"; and (ii) "[a]s long as the financial returns stay as solid as they are now, we expect to renovate an additional 118 theaters."  Compl. ¶¶ 192, 203; *see also* Compl. ¶¶ 166, 175, 177, 178, 181, 188, 200, 208.

Because the safe harbor is written in the disjunctive, a party is not liable "if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  The AMC Defendants' statements are protected under one or more of these prongs.

First, the statements were all accompanied by meaningful cautionary language.  Specifically, AMC explicitly warned investors, in both the Registration Statement and in its periodic filings with the SEC, of risks arising out of AMC's "ability to achieve expected synergies and benefits and performance from our strategic theatre acquisitions and strategic initiatives, [and] execution risks related to our pending and completed acquisitions and other strategic initiatives."  AMC's December 21, 2016 Form S-3 at 4 (Ex. L).  AMC also explained that forward-looking statements including "statements regarding . . . the expected benefits of the acquisition on our future business, operations and financial performance and our ability to successfully integrate the recently acquired business . . . involve known . . . risks [and] uncertainties . . . which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements."  AMC's March 10, 2017

Form 10-K, p. 2–3 (Ex. C).  The "known . . . risks [and] uncertainties" that were identified included: "optimizing [AMC's] theatre circuit through construction and the transformation of our existing theatres may be subject to delay and unanticipated costs;" and "operating a business in markets AMC is unfamiliar with, including acceptance by movie-goers of AMC initiatives that are new to those markets."  *Id.*  There can be no serious dispute that this cautionary language warned of the very risks that Plaintiffs claim came to pass, but that AMC allegedly failed to disclose, including Carmike's "poor 2017 second quarter performance," and that "AMC was unable to retain Carmike loyalty program members."  Compl. ¶¶ 220–22.

Moreover, Plaintiffs do not come close to demonstrating actual knowledge, which, for purposes of forward-looking statements, is "stricter than for statements of current fact" and requires "proof of knowing falsity."  *Slayton*, 604 F.3d at 773 (citation omitted).  As discussed above (*see* Point I.A, *supra*), Plaintiffs have failed to plead facts demonstrating the falsity of *any* of the AMC Defendants' forward-looking statements.

## II.    PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD SCIENTER

Plaintiffs' Section 10(b) claim is independently subject to dismissal for failure to allege particularized facts sufficient to plead scienter.  Specifically, to sufficiently plead a Section 10(b) violation, the PSLRA requires that, for each alleged misrepresentation and omission, the complaint must "state with particularity facts giving rise to a strong inference" of scienter for each defendant. 15 U.S.C. § 78u-4(b)(2).  When it does not, "the court shall, on the motion of any defendant, dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).

In *Tellabs*, the Supreme Court clarified the meaning of a "strong inference" of scienter under the PSLRA.  "To qualify as 'strong,'" the inference of scienter "must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. at 314.  The analysis requires a "comparative evaluation," under

which courts consider "not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Id.* "A complaint will survive . . . only if a reasonable person *would*" -- not just "*could*" -- "deem the inference of scienter cogent and at least as compelling as any opposing inference [of nonfraudulent intent] one could draw from the facts alleged." *Id.* at 324 (emphasis added).

In addition, the U.S. Court of Appeals for the Second Circuit has held that a plaintiff pleads the requisite strong inference of scienter by alleging with particularity facts showing either (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citation omitted). Under both *Tellabs* and the Second Circuit test, Plaintiffs have not adequately pled a strong inference of scienter.

### A.  Plaintiffs' Motive And Opportunity Allegations Are Insufficient

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must allege that [the Exchange Act Defendants] 'benefited in some concrete and personal way from the purported fraud.'" *ECA*, 553 F.3d at 198 (citation omitted). Here, there are no stock sales by the Exchange Act Defendants to which Plaintiffs can point to establish motive and opportunity -- in fact, Mr. Aron, AMC's CEO, *purchased* AMC shares during the alleged Class Period and shortly after it,[17] which negates any inference of scienter. *See, e.g.*, *Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009) (that "[t]hree of the four individual defendants increased their net holdings . . . during the class period, and the fourth individual defendant did not sell any shares at all" rebuts any inference of scienter).[18] Instead, Plaintiffs'

---

[17] *See* June 2, 2017 Form 4 (Ex. M) (disclosing the purchase of 10,000 AMC Class A shares); Sept. 14, 2017 Form 4 (Ex. N) (disclosing the purchase of 35,000 AMC Class A shares).

[18] *See also Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *6 n.3 (S.D.N.Y. Dec. 29, 2016) (fact that CEO "*purchased* additional shares during the Class Period" "undermine[s] any plausible allegation of scienter"); *cf. In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("Defendants also contend (persuasively) that

motive and opportunity allegations are limited to vague and generalized references to corporate capital raising, incentive compensation and regulatory certifications -- none of which are sufficient.

First, Plaintiffs allege that the Exchange Act Defendants "were motivated to engage in their fraudulent conduct to facilitate and maximize the amount of money the highly leveraged AMC could raise in the SPO." Compl. ¶ 230.  But "efforts to complete a secondary public offering . . . do[ ] not entail concrete benefits sufficient to demonstrate motive." *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *10 (S.D.N.Y. Mar. 28, 2013).  "The alleged motivation of a corporation to raise money . . . is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

Second, Plaintiffs allege that Messrs. Aron and Ramsey "were further motivated to issue the false and misleading statements at issue due to the lavish bonuses that they stood to gain for completing the acquisitions." Compl. ¶ 231.  This allegation fails for similar reasons.  As the Second Circuit explained in *Kalnit v. Eichler*:

> Plaintiffs' allegation that defendants were motivated to defraud the public because [it] would increase their compensation is without merit.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. "[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated."

264 F.3d 131, 139-40 (2d Cir. 2001) (*quoting Acito*, 47 F.3d at 54); s*ee also ECA*, 553 F.3d at 201.

Finally, Plaintiffs allege that "the scienter of the Exchange Act Defendants is underscored by the Sarbanes-Oxley mandated certifications of [Messrs.] Aron and Ramsey." Compl. ¶ 232.  But "'required certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus'

---

Plaintiffs cannot present 'strong circumstantial evidence of conscious misbehavior or recklessness' where, as here, 'the Individual Defendants did not sell a single share of stock during the Class Period.'").

because 'allowing Sarbanes-Oxley certifications to create an inference of scienter . . . would eviscerate the pleading requirements for scienter set forth in the PSLRA.'" *Int'l Ass'n of Heat & Frost Insulators v. IBM*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016).

### B.   Plaintiffs' Conscious Misbehavior And Recklessness Allegations Are Insufficient

Where, as here, a plaintiff cannot allege motive, its allegations of conscious misbehavior or recklessness must be "'correspondingly greater.'" *ECA*, 553 F.3d at 199 (citation omitted). To plead conscious misbehavior, a plaintiff must allege with particularity that the defendant engaged in "deliberate illegal behavior." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). The bar for pleading recklessness is equally high and requires "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id*. (citation omitted). Recklessness cannot be "merely enhanced negligence." *Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *12 (S.D.N.Y. Dec. 10, 2008).

The sum total of Plaintiffs' conscious misbehavior and recklessness allegations are the uncorroborated statements of three CWs. *See* Compl. ¶¶ 74–90.[19] However, CW allegations, as a general matter, "must be discounted" because "'[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how [the Court] could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.'" *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (citation omitted). Further, it is well-settled that CW allegations "cannot be used to 'merely parrot [] . . . conclusory allegations contained in the complaint.'" *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011) (citation omitted). Instead, CW allegations must "show that [the]

---

[19] Of course, because the Four Alleged Omissions were all, in fact, disclosed by AMC, Plaintiffs' CW allegations are irrelevant. In any event, the statements attributed to the CWs include nothing about the alleged omissions regarding AMC's ability to retain Carmike loyalty members and the seasonality of the Nordic business.

individual defendants actually possessed the knowledge highlighting the falsity of public statements," *id.* at 591, and, thus, "allegations based on confidential sources [are] insufficient to establish scienter where there [are] no facts to establish that the confidential sources would have known what information was communicated to senior executives." *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010).

Whether considered separately or together, Plaintiffs' CW allegations lack the requisite particularity to support an inference of scienter. Specifically, the allegations, even if accepted as true, fail to establish that *any* of the CWs had *any* contact with Messrs. Aron or Ramsey, nor link Messrs. Aron or Ramsey to contemporaneous information demonstrating the falsity of the challenged statements. The Court may only "rely on information from confidential witnesses in resolving a motion to dismiss under the PSLRA" where the CWs "'are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Mechel OAO*, 811 F. Supp. 2d at 880 (*quoting Novak*, 216 F.3d at 314). Plaintiffs have plainly failed to satisfy this requirement. They claim that the statements of CWs 1 and 2 support their allegation that the Exchange Act Defendants were aware of, but failed to disclose, the purported "underinvestment" in Carmike. Compl. ¶¶ 76, 79. But there is no reason to believe that CW-1, a "systems administrator" focused on "information technology ('IT')," *id.* ¶¶ 74–76, would know anything about that issue. Similarly, CW-2 is alleged only to have been "responsible for overseeing about 10% of Carmike theatres" in a specific part of the country, *id.* ¶ 80, so there is no reason to believe that he or she was aware of the investment in Carmike theaters generally, much less its overall "revenue" trends. *See id.* ¶¶ 81, 86. Lastly, although Plaintiffs claim that the statements of CW-3 support its seasonality-related allegations, *id.* ¶ 88, CW-3 is alleged to have worked on only one part of AMC's international segment, the Odeon circuit. *Id.* ¶

25

89.   CW-3 is not alleged to have known anything about the other part of AMC's international segment, the Nordic circuit, and, thus, there is no reason to believe that he or she would be knowledgeable about the *overall* seasonality of AMC's international operations.[20]

### C.   Plaintiffs Fail To Plead Corporate Scienter

For the reasons set forth above, Plaintiffs have failed to adequately allege scienter on the part of any AMC employee that could be attributed to AMC.  *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.").  Nor have Plaintiffs alleged statements so "dramatic[ally]" false that the statements raise a strong inference of corporate scienter.  *See id.* at 195–96 (citation omitted).

### III.   PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4); *see also Dura*, 544 U.S. at 345 (securities fraud actions are not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause").  Thus, Plaintiffs must establish a "'causal connection between the [alleged] material [omissions] and the [economic] loss.'"  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808 (2011) (quoting *Dura*, 544 U.S. at 342).  A failure to plead loss causation requires dismissal.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157–58 (2d Cir. 2007).

To adequately plead loss causation, "'a plaintiff must allege . . . that the subject of the

---

[20] Furthermore, CW-3 is alleged to have stated that AMC was only able to obtain "granular" information "to understand monthly and seasonal financial performance trends in Odeon's business" by "December 31, 2016," *id.* ¶ 90, which was *after* several of the challenged disclosures had already been made.

26

fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (citation omitted). But "the logical link between the inflated share purchase price and any later economic loss is not invariably strong . . . [because] that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 342–43. That is precisely the case here.

According to the Complaint, on August 1, 2017, AMC released its preliminary financial results for the second quarter of 2017, in which it reported: (i) "a net loss in the range of $178.5 to $174.5 million;" and (ii) an "expected . . . 2017 net loss . . . [of] between $150 and $125 million." Compl. ¶ 212. Plaintiffs do not identify *anything* that was revealed to the market on August 1 regarding *any* of the Four Alleged Omissions -- that is, no "corrective" disclosure is alleged. *See, e.g.*, *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("[T]he loss causation requirement is satisfied only if the public disclosure causing injury addressed the specific fact allegedly concealed. Disclosure of financial losses generally -- even if those financial losses are a result of the specific concealed fact -- is not sufficient."); *Canadian Solar*, 2012 WL 1080306, at *14 ("An alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements cannot establish loss causation, a pleading failure that 'is fatal under Second Circuit precedent.'") (quoting *Lentell*, 396 F.3d at 175).[21] Instead, Plaintiffs allege that "[i]n

---

[21] Moreover, although "a failure to meet earnings forecasts has a negative effect on stock prices," it does not have a "*corrective* effect" because

> [s]uch a failure does not imply that defendants concealed a scheme to depress earnings estimates and drive up prices. It does not disclose the scheme; therefore, it cannot correct the artificial inflation caused by the scheme. . . . If downturns in stock prices based on such mundane events as failures to

response to these much worse-than-expected results," AMC's share price "plummeted nearly 27%, on very heavy trading, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017." *Id.* ¶ 213. Indeed, it was not until several days later, on August 4, 2017, after the stock drop upon which Plaintiffs' Section 10(b) damages are allegedly premised, that AMC "highlighted several reasons for the Company's poor [quarterly] results," including issues relating to Carmike. *Id.* ¶¶ 214–23. Yet, there is *no* stock drop alleged to have been associated with AMC's August 4 disclosures, which is fatal to Plaintiffs' ability to plead loss causation.[22]

## IV. PLAINTIFFS' SECTION 12(a)(2) CLAIM AGAINST MESSRS. ARON, RAMSEY AND COX AND THE UNDERWRITER DEFENDANTS MUST BE DISMISSED FOR LACK OF STANDING

Plaintiffs may only bring a Section 12(a)(2) claim against "'statutory seller[s]'" who either "(1) 'pass[] title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit the purchase [of a security]'" through the use of a prospectus containing material misstatements or omissions. *Morgan Stanley*, 592 F.3d at 359 (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). Plaintiffs' conclusory allegations fail to show that Messrs. Aron, Ramsey or Cox or any of the Underwriter Defendants are "statutory sellers" under either prong of that test. With respect to the first prong, Plaintiffs do not allege that Messrs. Aron, Ramsey or Cox sold *any* AMC stock, much less that Plaintiffs purchased AMC stock from any of them. Nor do Plaintiffs allege that they purchased stock from any of the four Underwriter Defendants, who were among 14 underwriters of the SPO. Compl. ¶ 31; February 9, 2017 Prospectus Supplement (Ex. A at S-91); *see also, e.g., In*

---

meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses. That would effectively convert the securities laws into an insurance policy for investors.

*In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266–67 (S.D.N.Y. 2005).

[22] Plaintiffs' Section 11 and 12(a)(2) claims are subject to dismissal for the same reason, as "it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses." *In re Merill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253–54 (S.D.N.Y. 2003). Price declines, as here, that "occurred *before* public disclosure of the allegedly concealed information . . . may not be charged to Defendants under Section 11 or Section 12(a)(2)." *Id.* at 255 (citation omitted).

*re Orion Sec. Litig.*, 2009 WL 2601952, at *2 (S.D.N.Y. Aug. 20, 2009) (dismissing Section 12(a)(2) claim where plaintiff "has not alleged that [he] directly purchased Orion securities from the Underwriter Defendants").

With respect to the second prong, Plaintiffs allege that "[t]hese Defendants' actions of solicitation included participating in the preparation of the false and inaccurate Registration Statement and participating in road shows to market the SPO to investors."  Compl. ¶ 143.  Neither activity, however, creates liability under Section 12(a)(2).  *See, e.g.*, *Fed. Hous. Fin. Agency v. Morgan Stanley*, 2012 WL 5868300, at *4 (S.D.N.Y. Nov. 19, 2012) ("fact that a defendant assisted in preparing and filing a registration statement" is not enough "to impose solicitation liability under Section 12(a)(2)"); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013) ("allegedly ma[king] material misrepresentations directly to investors at a corporate investor day" does not render someone a "'statutory seller[]' [under] 12(a)(2)").

## V.      PLAINTIFFS' "CONTROL PERSON" CLAIMS FAIL

### A.      Plaintiffs' Claim Under Section 20(a) Of The Exchange Act Fails

Plaintiffs allege that Messrs. Aron and Ramsey are also "liable pursuant to Section 20(a) of the Exchange Act" because they "acted as controlling persons of AMC . . . [b]y reason of their positions as officers of AMC (and in [Mr.] Aron's case, a director)."  Compl. ¶ 262.  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Because Plaintiffs "fail[] to allege any primary violation," they "cannot establish control person liability."  *Id.*

Moreover, "control" allegations, as here, based simply on individual defendants' status as officers and/or directors are routinely rejected.  *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec.*

*Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004).  And because Plaintiffs have not adequately pled that the Exchange Act Defendants acted with scienter, they have failed to plead the requisite "culpable participation" in the alleged fraud.  *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246, 248 n.10 (S.D.N.Y. 2006).

### B.  Plaintiffs' Claim Under Section 15 Of The Securities Act Fails

Plaintiffs allege that the Individual Defendants are liable under Section 15 "[b]y reason of their ownership interest, senior management positions and/or directorships at the Company." Compl. ¶¶ 150–51.  "[T]he control analysis is the same for Section 15 as it is for Section 20," *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016), and, thus, Plaintiffs' Section 15 claim fails for the same reasons.

### CONCLUSION

For the above reasons, the Complaint should be dismissed in its entirety and with prejudice.


Dated:  New York, New York
       October 12, 2018

/s/ John A. Neuwirth
John A. Neuwirth
Joshua S. Amsel
Matthew S. Connors
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel:   (212) 310-8000
Fax:   (212) 310-8007

*Attorneys for Defendants AMC Entertainment Holdings, Inc., Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr. and Kathleen M. Pawlus*