UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 3 2019

Hawaii Structural Ironworkers Pension Trust Fund
*et al.*,

Plaintiff,

—v—

AMC Entertainment Holdings, Inc. *et al.*,

Defendant.

18-cv-00299 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Two pension funds bring this federal securities class action on behalf of themselves and a putative class of all other persons who purchased or acquired stock in Defendant AMC Entertainment Holdings, Inc. ("AMC") pursuant to a secondary public offering ("SPO") from December 20, 2016 to August 1, 2017. Plaintiffs also bring suit against a number of AMC officers and board members, as well as several financial institutions that underwrote the SPO. Defendants have now moved to dismiss all of Plaintiffs' claims. For the reasons given below, Defendants' motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The following facts are drawn from the allegations in Plaintiffs' Second Amended Class Action Complaint (the "Complaint"), Dkt. No. 116, which are taken as true at this stage of the litigation. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010). The Court also considers "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed

with the SEC, and (4) facts of which judicial notice properly may be taken." *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). For the purposes of this motion, the parties do not dispute that this includes the following documents on which the Court may rely: AMC's February 9, 2017 Prospectus Statement, Dkt. No. 126, Ex. A; Carmike's November 9, 2016 Form 10-Q, Dkt. 126. Ex. B; AMC's March 2017 Form 10-K, Dkt. 126, Ex. D; Carmike's February 29, 2016 Form 10-K, Dkt. 126. Ex. F; the transcript of an August 4, 2017 conference call, Dkt. No. 126, Ex. G; AMC's October 11, 2016, Form 424B3, Dkt. No. 126, Ex. I.

### A.    The Parties

The International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("Engineers Fund") is the Lead Plaintiff in this putative class action. The Engineers Fund is joined by the Hawaii Iron Workers Pension Trust Fund ("Iron Worker's Fund"). The Engineers Fund is a Taft-Hartley fund, providing healthcare and retirement benefits to around 5,000 participants. Compl. ¶ 31. On May 30, 2018, this Court appointed the Engineers Fund as Lead Plaintiff in this case. Dkt. No. 88.

Defendant AMC is a Delaware corporation that owns, operates, or has interests in movie theaters in both the United States and Europe. *Id.* ¶ 33. Plaintiffs also bring claims against a number of individuals, referred to collectively as the "Individual Defendants." During the relevant times, these individuals held a variety of positions in AMC. Adam M. Aron was President and CEO of AMC, as well as a member of its Board of Directors. *Id.* ¶ 34. Craig R. Ramsey was Executive Vice President and Chief Financial Officer of AMC. *Id.* ¶ 35. Chris A. Cox was Senior Vice President and Chief Accounting Officer of AMC. *Id.* ¶ 36. Defendants Lin Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W.

Koch, Jr. and Kathleen M. Pawlus were each members of the AMC Board at the time of the secondary public offering at issue in this case. *Id.* ¶ 38.

Finally, Plaintiffs also sue a group of financial institutions that are referred to collectively as the "Underwriter Defendants." These Defendants, Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Inc., Barclays Capital Inc., and Credit Suisse Securities (USA) LLC, "served as joint book-running underwriters" for the SPO at issue here. Compl. ¶ 39.

### B.     AMC Upgrades its Theaters and Acquires Carmike and Odeon

In 2011, AMC began an initiative to replace existing seating in many of its theaters with more luxurious electric recliners. *Id.* ¶ 51. This initiative also involved upgrading the food and beverage offerings at theaters, including dining-in options and alcoholic beverages. *Id.* ¶ 52. These initiatives were quite successful at increasing revenue. *Id.* ¶ 53.

In 2016, after Defendant Aron began as the CEO of AMC, the company undertook an ambitious project of expansion. *Id.* ¶¶ 58-59. On March 3, 2016, AMC announced its intention to acquire Carmike Cinemas. *Id.* ¶ 61. Unlike AMC's theaters, which are primarily in affluent, metropolitan areas, Carmike served primarily mid-size, non-urban markets. *Id.* ¶¶ 10-11, 67. Part of AMC's plan for Carmike was to outfit a percentage of its theaters with recliner seats and other luxury amenities. *Id.* ¶¶ 67-68. AMC's acquisition of Carmike was subject to approval by the Department of Justice and the Security and Exchange Commission's "declaring effective a Form S-4 registration statement with respect to additional AMC common stock to be issued in connection with the proposed merger." *Id.* ¶ 70. On October 11, 2016, the SEC declared that the relevant Form S-4 was effective. *Id.* ¶ 73. On December 20, 2016, which marks the beginning of the Class Period, AMC announced that the DOJ antitrust review was complete, and the next day AMC completed the acquisition of Carmike. *Id.* ¶¶ 74-75.

AMC also undertook international expansion during this period. On July 12, 2016, AMC

3

announced that it would acquire the outstanding equity in Odeon and UCI Cinemas Holdings Limited, the largest theater company in Europe. *Id.* ¶ 77. On November 30, 2016, AMC announced that the acquisition of Odeon was complete. *Id.* ¶ 78. On January 23, 2017, AMC announced an agreement to acquire Nordic Cinema Group Holding AB, a large theater company in Scandinavia and the Nordic and Baltic regions. Compl. ¶ 80. The acquisition of Nordic was completed in March 28, 2017. Compl. ¶ 82.

### C. AMC's Secondary Public Offering

In an effort to deleverage AMC of the debt it had acquired during this expansion, the company undertook a secondary public offering. *Id.* ¶¶ 93-94. On December 21, 2016, AMC filed its Form S-3 Registration Statement and prospectus for the SPO. *Id.* ¶ 98. AMC subsequently filed SEC prospectus supplements for the SPO on February 7, 2017 and February 9, 2017. *Id.* These documents incorporated by reference a number of previous SEC filings by both AMC and Carmike. *Id.* Plaintiff refers to all of these documents collectively as the "Registration Statement." *Id.* On or about February 8, 2017, AMC offered 21,904,761 shares of common stock at a price of about $31.50 per share. *Id.* ¶ 97. Plaintiffs purchased common shares pursuant to the SPO. *Id.* ¶ 2. In total, the SPO raised approximately $618 million. *Id.* ¶ 94.

### D. AMC's Disappointing 2017 Q2, Fall in Share Price, and August Conference Call

On August 1, 2017, AMC announced its preliminary financial results for the second quarter of 2017. *Id.* ¶ 249. AMC reported a net loss for the quarter of between approximately $174 and $179 million and that its expected net loss for the year would be between $125 and $150 million. *Id.* These results were much worse than expected. *Id.* ¶ 250. In response, the price of AMC common stock fell 27% on August 2, 2017, which was down 57% from its high

point during the Class Period. *Id.*

On August 4, 2017, AMC held a conference call (the "August 2017 Call"), on which Aron explained that the second quarter was "simply a bust" and offered several reasons for AMC's poor performance. *Id.* ¶ 109. One of these reasons was the poor performance of Carmike theaters, which had experienced a revenue decline of 11.3% during Q2 of 2017. *Id.* ¶ 110. As is relevant here, Aron identified three reasons for Carmike's poor performance: (1) that Carmike "didn't do very much" to "modernize its circuit after it put itself under contract to be sold . . .. And so the circuit essentially went on dead stop around April-ish of '16," *id.* ¶ 112; (2) that Carmike's market share had declined "in 8 of the 12 months in '16," ¶ 113; and (3) that "[w]hen Carmike was handed over to [AMC] on December 21, only 200,000 individuals from their loyalty program joined our loyalty program . . . so we've had to start the loyalty program essentially over from scratch," *id.* ¶ 114.

Additionally, while discussing the weakness of the domestic box office generally in Q2 of 2017, Aron said that "we're pleased that our European box office was roaring . . . in Q2 up a double-digit percentage," but explained that this did not do much to offset poor revenue in the domestic market since while this "was a big percentage" it was "smaller dollars, because Q2 is seasonally—is often the smallest quarter of the year in Europe." *Id.* at 3.

### E. Plaintiffs' Securities Act Claims

The Iron Workers' Fund, on behalf of the Class, bring claims against all Defendants under Sections 11, 12, and 15 of the Securities Act of 1933. *See* 15 U.S.C. §77k, § 77l(a)(2), § 77o. Compl. ¶¶ 135-61. These claims focus on the Registration Statement for the February 8, 2017 SPO. Plaintiffs allege that the Registration Statement was "negligently prepared and contained inaccurate statements of material fact and omitted material information required to be disclosed therein." Compl. ¶ 99. Specifically, Plaintiffs allege that the Registration Statement

negligently failed to disclose that: (1) Carmike had underinvested in its theaters such that they were in "a state of significant disrepair"; (2) Carmike had lost significant market share to competitors who had upgraded their theaters with recliners; (3) AMC had been unable to retain or convert members of Carmike's loyalty program post-acquisition; and (4) AMC's newly acquired international theaters typically had lower sales during the second quarter. Compl. ¶¶ 107, 128. The Court will refer to these as the Four Alleged Omissions.

Plaintiffs allege that as a result of the Four Alleged Omissions, the Iron Worker's Fund and the Class "suffered substantial damages in connection with their purchases of AMC common stock during the Class Period pursuant and/or traceable to the SPO." *Id.* ¶ 143. Plaintiffs' Section 11 claim is brought against all Defendants. *Id.* ¶ 136. Plaintiffs' Section 12(a) claim is brought against AMC, Aron, Ramsey, Cox, and the Underwriter Defendants. *Id.* ¶ 146. And Plaintiffs' Section 15 claim is brought against the Individual Defendants. *Id.* ¶ 155.

### F.     Plaintiffs' Exchange Act Claims

Plaintiffs also bring a claim under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulations, 17 C.F.R. § 240.10b–5, against Defendants AMC, Aron, and Ramsey (the "Exchange Act Defendants") and a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Aron and Ramsey. Compl. ¶¶ 294-313. The Section 10(b) claim is based not only on the Registration Statement but also a number of allegedly misleading statements made by the Exchange Defendants over the course of the Class Period. *Id.* ¶¶ 294-307. Plaintiffs allege that these misleading statements also caused the damages suffered by the Class. *Id.* As to the Section 20(a) claim, Plaintiffs allege that Aron and Ramsay are liable because they exercised control over AMC during its violations of Section 10(b) and were participants in AMC's fraud. *Id.* ¶¶ 308-13.

### G. Procedural History

Plaintiffs filed this case on January 12, 2018. Dkt. No. 1. After Defendants filed a first motion to dismiss, Dkt. No. 106, on November 27, 2018, Plaintiffs filed their Second Amended Class Action Complaint, which is the operative pleading here, Dkt. No. 117. Defendants again moved to dismiss on January 22, 2019. Dkt. No. 125. The Underwriter Defendants joined this motion. Dkt. No. 127. On March 6, 2019, this motion was fully briefed.

There are also two related cases currently before this Court. A separate securities class action against AMC, the Underwriter Defendants, and various of the Individual Defendants was filed by Warren Nichols on January 19, 2018. 18-cv-510, Dkt. No. 1. On May 30, 2018, the Court consolidated the actions and appointed the Engineers Fund as Lead Plaintiff. Dkt. No. 88. On May 21, 2018, Naranbold Gantulga filed a shareholder derivative suit against AMC and several of the Individual Defendants in this case in the District of Kansas. 18-cv-10007, Dkt. No. 1. After Gantulga's suit was transferred to this District, it was accepted as related by this Court and stayed pending the resolution of this matter. 18-cv-10007, Dkt. No. 46.

## II. LEGAL STANDARD

On a motion dismiss under Rule 12(b)(6), a court must "accept[ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). However, the court should not accept legal conclusions as true: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

As to Plaintiffs' claims under Section 10(b), these must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Additionally, "the Private Securities Litigation Reform Act ('PSLRA') requires a complaint to 'specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (alterations in original) (quoting 15 U.S.C. § 78u-4(b)(1)).

## III.    ANALYSIS

Defendants move to dismiss Plaintiffs' claims in whole or in part for six principal reasons. First, Defendants move to dismiss Plaintiffs' claims under Sections 10(b), 11, and 12(a)(2) on the grounds that AMC failed to plead any material misstatements or omissions at all as to the Four Alleged Omissions. Second, Defendants argue that many of the allegedly misleading statements in Plaintiffs' Section 10(b) claim were either protected statements of

opinion, non-actionable puffery, or fall into the PSLRA's "safe harbor" for forward-looking statements. Third, Defendants move to dismiss Plaintiffs' Section 10(b) claim for failure to plead scienter. Fourth, Defendants contend that Plaintiffs have failed to sufficiently plead loss causation under Sections 10(b), 11, and 12(a)(2). Fifth, Defendants argue that Plaintiffs have insufficiently alleged standing as to their Section 12(a)(2) claim. And finally, Defendants contend that Plaintiffs have failed to sufficiently allege that the relevant Defendants are "control persons" under Sections 15 and 20(a). The Court address each of these grounds in turn.

### A. Plaintiffs Failed to Sufficiently Allege Material Misrepresentation or Omission as to One of the Four Alleged Omissions

Defendants move to dismiss Plaintiffs' claims under Sections 10(b), 11, and 12 for failure to adequately allege a material omission. "[A]ll three of these claims require that Plaintiff[s] plausibly allege 'a material misrepresentation or omission by the defendant[s].'" *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, No. 16-cv-3068 (AJN), 2017 WL 4082482, at *4 (S.D.N.Y. Aug. 24, 2017), *aff'd sub nom. Police & Fire Ret. Sys. of City of Detroit v. La Quinta Holdings, Inc.*, 735 F. App'x 11 (2d Cir. 2018) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Furthermore, the standard for determining "whether a defendant made a material misstatement or omission is essentially the same under Section 10(b), Section 11, and Section 12." *Id.* (citing *Rombach v. Chang,* 355 F.3d 164, 172 n.7 (2d Cir. 2004)). As is relevant here, two kinds of omissions can be actionable under this standard: first "a material omission in contravention of an affirmative legal disclosure obligation," and second "a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., LP,* 634 F.3d 706, 715-16 (2d Cir. 2011). To determine whether such an omission has occurred, the Court should consider "whether the defendants' representations, taken together and in context, would

have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7 (quoting *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). The Court examines whether Plaintiffs' allegations regarding the Four Alleged Omissions meet this standard omission-by-omission.

### 1. Plaintiffs Sufficiently Allege that AMC Omitted Material Information Regarding Carmike's Underinvestment in its Theaters

As to the first omission, Plaintiffs allege that AMC failed to disclose that Carmike had significantly underinvested in its theaters. Compl. ¶¶ 16, 23, 112, 119-120, 191-192, 196-197, 209-210, 213-214, 216-217, 228-229, 237-238, 240-241, 245-248. This was revealed for the first time, Plaintiffs allege, on the August 2017 Call. Compl. ¶¶ 17, 116, 257-58. While Plaintiffs initially characterize the Carmike theaters as being in "a state of significant disrepair," *id.* ¶ 16, in response to Defendants' arguments, they narrow their claim to the allegation that "Carmike did not make any capital investments to *improve* its theaters and keep them competitive." Dkt. No. 131 at 9. Plaintiffs maintain that omitting this information misrepresented the "immediate challenges, as well as the time, work, and capital investment necessary to realize the represented potential of the Carmike acquisition." *Id.* Defendants move to dismiss on the grounds that: (a) Plaintiffs never alleged that Carmike did not *improve* its theaters, (b) Plaintiffs fail to plead that this information was omitted, as AMC repeatedly disclosed that it "needed and intended" to renovate Carmike's theaters, and (c) AMC was not required to disclose the information at issue. Dkt. No. 133 at 3.

Defendants' first argument is easily rejected. Drawing all reasonable inferences in Plaintiffs' favor, they plausibly allege that Carmike's underinvestment included the failure to "modernize" or improve its theaters. *See* Compl. ¶¶ 112-13, 173-79, 197.

Defendants' second argument also fails. It is true that "[e]ven at the pleading stage,

dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014) (quoting *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003)). Here, however, drawing all reasonable inferences in their favor, Plaintiffs have plausibly alleged that AMC did not disclose Carmike's significant underinvestment in the improvement and modernization of its theaters. On the August 2017 Call, Aron described Carmike's investments in modernizing its theaters as having been on "dead stop" since around the time it contracted to be sold to AMC. Compl. ¶ 112. Plaintiffs allege that the situation was even more dire, as Carmike had actually pursued "an extremely slow pace of making renovations" for at least three to four years previously. Compl. ¶¶ 173-79. This included not just a failure to add luxury amenities or reclining seats, but failure to make "needed updates to [Carmike's] physical equipment, including theater wiring, as well as hardware, such as projectors." *Id.* For the period prior to a May 2017 conference call ("May 2017 Call"), Defendants do not argue there was any specific disclosure on this point, but instead point to statements that AMC planned to renovate a number of Carmike theaters as evidence that this underinvestment was disclosed. Compl. ¶¶ 190-91. However, a plan to renovate some Carmike theaters in the future is not the same thing as Carmike's significant underinvestment in improvements and upgrades. Thus, drawing all available inferences in their favor, Plaintiffs have plausibly alleged that AMC initially failed to disclose this information prior to the SPO.

Defendants also argue that that AMC made certain partial disclosures of the lack of improvement of Carmike's theaters prior to the end of the Class Period, but this is insufficient at this stage to dismiss Plaintiffs' claims. On the May 2017 Call, Aron reported that "Carmike was not a company that really believed in recliner seats, they didn't counter some of that competitive

activity [from surrounding theaters] by putting in re-seated theaters of their own. Clearly, that's something that will change." Compl. ¶ 246. Aron also disclosed that in terms of installing recliners, the Carmike theaters "were off to a very slow start under prior ownership." *Id.* ¶ 240. While these do point to some concerns about Carmike's investment in recliners particularly, they do not mention other alleged failures to modernize or upgrade wiring or projectors. Coml. ¶¶ 173-79. At this stage, drawing all reasonable inferences in Plaintiffs favor, it is plausible that these partial disclosures were insufficient to inform a reasonable investor of Carmike's systematic underinvestment.

Finally, AMC had an affirmative duty to disclose information relating to Carmike's underinvestment. Item 303 of Regulation S-K, requires, *inter alia*, a description of "registrant's material commitments for capital expenditures as of the end of the latest fiscal period." 17 C.F.R. § 229.303(a)(2)(i). In a 1989 Interpretive Release, the SEC explained that under this provision, "disclosure is required if material planned capital expenditures result from a known demand, as where the expenditures are necessary to a continuation of the registrant's current growth trend" and that "[d]isclosure of planned material expenditures is also required . . . when such expenditures are necessary to support a new, publicly announced product or line of business." Compl. ¶ 104. Defendants do not dispute that Item 303 would require disclosure of Carmike's capital underinvestment. Instead, Defendants contend that there was no requirement to disclose because Item 303 applies only to Forms 10-K and 10-Q, and the Forms 10-K and 10-Q incorporated into the Registration Statement predate AMC's formal acquisition of Carmike by around three months. Dkt. No. 125 at 17. Yet it is plausibly alleged AMC had a duty to "promptly" provide updates on any "[m]aterial changes" in its position pursuant to Item 11 of Form S-3. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 811 (7th Cir. 2001) ("the issuer must

file and distribute an addendum to [the 10-K report] bringing matters up to date. See Form S–3, Item 11."). Defendants attempt to elude this duty to update by referring to its other arguments that there was no material omission to correct. This is unavailing, as the Court rejected these arguments for the reasons above. Accordingly, AMC was required to disclose this information, at the very least, subsequently to the formal completion of the acquisition of Carmike, which occurred prior to the SPO.

Accordingly, Defendants' motion to dismiss these claims for failing to sufficiently allege a material omission is DENIED.

### 2. Plaintiffs Fail to Plausibly Allege that AMC Omitted Material Information Regarding Carmike's Declining Market Share

Turning now to the second alleged omission, Plaintiffs allege that AMC failed to disclose that Carmike's market share was declining significantly because its customers were leaving for competitors who had renovated and upgraded their theaters with amenities like luxury seating. Compl. ¶¶ 16, 23, 107, 113, 120, 164, 217, 241, 257, 258. Defendants move to dismiss on the grounds that AMC had already disclosed the risk that this was happening and would continue to happen. The Court agrees with the Defendants.

Even drawing all reasonable inferences in Plaintiffs' favor, AMC and Carmike had disclosed sufficient information to adequately inform investors that Carmike had been losing market share relative to its competitors who had upgraded and risked continuing to lose market share. Even on a motion to dismiss, "a securities fraud claim for misrepresentations or omissions does not lie when the company 'disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled." *La Quinta*, 2017 WL 4082482, at \*5 (quoting *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011)). "The overarching inquiry is whether 'the 'total mix' of information made available' to investors sufficiently disclosed the purported risk."

*Id.* (quoting *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009)). In its February 29, 2016 Form 10-K—which Plaintiffs do not dispute was incorporated by reference in the Registration Statement, Dkt. No. 125, at 12—Carmike disclosed that: "[t]he opening of large multiplexes and theatres with stadium seating by us and certain of our competitors has tended to, and is expected to continue to, draw audiences away from certain older and smaller theatres, including theatres operated by us;" "competitors in certain areas in which we operate have installed luxury seating and other amenities which has adversely affected attendance at our theatres in such areas;" and "luxury seating initiatives . . . require significant capital expenditures," and "[t]he lack of available capital resources due to business performance or other financial commitments may prevent us from implementing these amenities at additional theatres and could limit our ability to compete with other exhibitors." Dkt. 126. Ex. F at 8, 15.

Plaintiffs characterize these disclosures as too general. But they are similar to disclosures that this Court found sufficient to justify dismissal in *La Quinta*. In that case, this Court held that the defendant had sufficiently disclosed the risk associated with its failure to renovate its hotels by disclosing that "[o]ur business is capital intensive and our failure . . . to make necessary investments could adversely affect the quality and reputation of our brand" and that "delays or increased expense relating to our efforts to develop, redevelop or renovate our hotels" were a risk factor. 2017 WL 4082482 at *7. If anything, Carmike's disclosures here—that failure to provide luxury seating and other amenities had been and risked continuing to harm its market share—were more specific. Dkt. 126. Ex. F at 8, 15. Plaintiffs further argue that simply disclosing a risk is insufficient once that risk has materialized. Dkt. No. 131 at 11. However, Carmike's disclosure was not simply forward-looking, but disclosed that this risk had already begun to materialize in various areas. Dkt. 126. Ex. F at 8, 15.

Nor was this the only warning of the risk that Carmike had been and could continue losing market share. In Carmike's November 9, 2016 Form 10-Q, incorporated in the Registration Statement, it disclosed that its box office revenue was increasing slightly less than the nationwide box office during that same period, indicating to a reasonable investor that it was losing market share. Dkt. 126, Ex. B, at 21-22. Additionally, AMC's February 9, 2017 Prospectus Supplement stated in several places that competition for theater-goers was increasingly focused on the quality of theaters, including the installation of recliner seating, further informing investors of the risks to Carmike from recliner-equipped competitors. Dkt. No. 126, Ex. A, at S-17, S-32.

Plaintiffs argue that these warnings of risk were insufficient in the context of other statements by AMC. AMC represented in the Registration Statement that Carmike's theaters were "located primarily in smaller, suburban and rural markets" and that such markets "tend to have lower competition," Compl. ¶¶ 124, 216. However, AMC was entitled to "rely on a reasonable belief that the other party already has access to the facts [to] excuse him from new disclosures which reasonably appear to be repetitive." *Dingee v. Wayfair Inc.*, No. 15-cv-6941 (DLC), 2016 WL 3017401, at *5 (S.D.N.Y. May 24, 2016) (quoting *Koppel v. 4987 Corp.*, 167 F.3d 125, 132 (2d Cir. 1999)). Accordingly, AMC was not required to continually repeat the warnings identified above, especially since Carmike's February 2016 10-K was incorporated in the Registration Statement. Even drawing all reasonable inferences in Plaintiffs' favor, the "total mix" of information made available adequately disclosed to a reasonable investor the risk that Carmike theaters had been losing market share to upgraded competitors and might continue to do so.

For the reasons above, the Court GRANTS Defendants' motion to dismiss Plaintiffs'

claims related to the omission of information about Carmike's shrinking market share.

### 3. Plaintiffs Plausibly Allege that AMC Omitted Material Information Regarding the Carmike Loyalty Program

Plaintiffs' third alleged omission is that AMC failed to disclose that it had not been able "to retain or convert Carmike's loyalty program members." Compl. ¶¶ 16, 23, 107, 164, 210, 227, 239, 241, 243, 248. Defendants move to dismiss this claim on the grounds that: (a) this allegation is contradicted by other allegations in Plaintiffs' complaint; (b) the failure to convert or retain customers in Carmike's loyalty program had not yet occurred at the time of the Registration Statement; (c) AMC sufficiently disclosed the risk that this would happen in its public filings; and (d) AMC had no affirmative duty to disclose struggles it was having converting or retaining Carmike loyalty program customers. None of these arguments are sufficient to warrant dismissal at this stage of the litigation.

Plaintiffs' allegations regarding conversion and retention of customers in Carmike's loyalty program are not necessarily contradictory. On the August 2017 Call, Aron gave as a reason for Carmike's weak performance that "[w]hen Carmike was handed over to us on December 21, only 200,000 individuals from their loyalty program joined our loyalty program" and accordingly "we've had to start the loyalty program essentially over from scratch." Dkt. No. 126-7, at 9. Aron then went on to sound a more optimistic note, saying "I'm happy to report that we're like at three-quarters of a million now, we now have more members of the loyalty club who enrolled in a Carmike theatre in whatever it is, six months, seven months than Carmike had in years and years of operation in its loyalty program." *Id.* It is not inherently contradictory that AMC had to start "over from scratch," causing initial weak performance, but that it ultimately was able to do so sign up more customers than before.

Nor do Defendants' arguments that these difficulties were unknowable at the time of the

SPO warrant dismissal. It is true that "[a] cognizable claim under Section 11 or 12 of the 1933

Act requires plaintiffs to, at a minimum, plead facts to demonstrate that allegedly omitted facts

both existed, and were known or knowable, at the time of the offering." *Lin v. Interactive

Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 421 (S.D.N.Y. 2008) (internal quotation marks

omitted); *see also Acito v. IMCERA Grp., Inc.*, 47 F. 3d 47, 53 (2d. Cir. 1995) ("[L]ack of

clairvoyance simply does not constitute securities fraud."). Defendants contend that AMC's

March 10, 2017 Form 10-K shows that Carmike customers could not have begun to join AMC's

loyalty program until the second quarter of 2017, several months after the SPO, and thus that

difficulties about the loyalty program were unknowable at the time. Dkt. No. 125 at 12-13. Yet

the March 2017 10-K is less clear than Defendants maintain, stating only that "Movie-goers will

be able to enroll in [AMC's loyalty program] and earn loyalty rewards at the former Carmike

theatres as we convert former Carmike point of sale systems to AMC systems. We expect those

conversions to be completed during the second quarter of 2017." Dkt. 126, Ex. D, at 14.

Drawing all available inferences in Plaintiffs' favor, this does not show that Carmike customers

"were not even able to join AMC's loyalty program until the second quarter of 2017." Dkt. No.

125 at 12. Furthermore, on the August 2017 Call, Aron described the failure of Carmike

customers to switch over as occurring "[w]hen Carmike was handed over to us on December

21." Dkt. No. 126-7, at 9. Thus, drawing all reasonable inferences in Plaintiffs' favor, the

failure to convert or retain Carmike loyalty program members was plausibly knowable prior to

the SPO.

Defendants are also incorrect that AMC's warnings were sufficient to disclose the risk

that Carmike loyalty program members would not be retained or converted. As noted above,

disclosure a risk can warrant dismissal of a claim that a material omission has occurred. *La*

*Quinta*, 2017 WL 4082482, at *5. On the other hand, "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). Defendants point to two warnings. First, on October 11, 2016, AMC stated on its Form 424B3 that "[a]ny acquisition, including AMC's pending acquisition of Carmike and Odeon/UCI will involve risks, such as . . . the possibility that AMC strategic initiatives are not accepted by moviegoers in those markets." Dkt. No. 126, Ex. I, at 44. Second, AMC's February 9, 2017 Prospectus Supplement states that it "may not achieve the expected benefits and performance from [its] recent acquisitions," and that "[a]ny acquisition may involve operating risks, such as . . . [the] effective implementation and customer acceptance of [AMC's] marketing strategy." Dkt. No. 126, Ex. A, at S-34. Defendants also point to various forms indicating that the AMC loyalty program is a primary part of its marketing strategy. Dkt. No. 125 at 13. Yet these general warnings that "moviegoers in those markets" or "customer[s]" may not accept AMC's strategies writ large are not sufficient in light of Plaintiffs' plausible allegations that, prior to the SPO AMC was already having significant problems retaining or converting Carmike loyalty program members. *See Meyer*, 761 F.3d at 251. Drawing all available inferences in Plaintiffs' favor regarding the timing of the alleged difficulties, they have plausibly alleged that Defendants did not sufficiently warn of this risk.

Finally, Defendants renew their same arguments that AMC did not have an affirmative duty to disclose its difficulties with Carmike loyalty program members under Item 303 because the regulation only applies to Forms 10-Q and 10-K, which AMC had filed before it acquired Carmike. Dkt. No. 125, at 16-7. Because of the duty to update, these arguments fail for the

same reasons as above. *See Gallagher*, 269 F.3d at 811.

The Court therefore DENIES Defendants' motion to dismiss for failure to plausibly allege that AMC materially omitted information about difficulties integrating Carmike's loyalty program.

### 4. Plaintiffs' Plausibly Allege that AMC Omitted Material Information Regarding the Seasonality of its European Business

Turning to the fourth alleged omission, Plaintiffs allege that AMC failed to disclose that its new "international business segment generally experienced lower attendance and revenues during the summer months." Compl. ¶¶ 218-19. Defendants move to dismiss this claim on the grounds that: (a) AMC's statement regarding seasonality was not misleading; (b) AMC did not have an affirmative obligation to disclose that Q2 was traditionally the weakest quarter in Europe; and (c) AMC sufficiently disclosed this risk.

Even drawing all available inferences in Plaintiffs' favor, AMC is correct that its prior statement regarding seasonality generally was not misleading. AMC's 2016 Form 10-K states that "our business is highly seasonal, with higher attendance and revenues *generally* occurring during the summer months and holiday seasons." Compl. ¶ 218 (emphasis added). AMC disclosed in its Registration Statement that only "23% of [AMC's] revenues . . . are derived from countries outside the United States." Dkt. No. 126, Ex. A, at S-33. Plaintiffs do not allege otherwise and do not allege that AMC's domestic business is not generally better in summer. Accordingly, even drawing all reasonable inferences in Plaintiffs' favor, AMC's statement about its general seasonal patterns is still accurate even if Q2 is traditionally a weak period in Europe. *See La Quinta*, 2017 WL 4082482, at *7 (nationwide hotel chain's "representations that it was performing well overall were not inconsistent with the fact that the Texas market was suffering"). Therefore, even drawing all reasonable inferences in Plaintiffs' favor, it is not

plausible that AMC's prior statement was inaccurate.

This does not resolve the issue, however, since a material omission can also occur when material information is omitted "in contravention of an affirmative legal disclosure obligation." *La Quinta*, 2017 WL 4082482, at \*5. Plaintiffs plausibly allege that this has happened here. Under Item 101(c)(1) of Regulation S-K, a registrant is required to "[d]escribe the business done and intended to be done by the registrant . . ., focusing upon the registrant's dominant segment or each reportable segment about which financial information is presented in the financial statements." 17 C.F.R. § 229.101(c)(1). This includes disclosing, "[t]o the extent material to an understanding of the registrant's business taken as a whole . . . The extent to which the business of the segment is or may be seasonal." *Id.* § 229.101(c)(1) & (c)(1)(v). Plaintiffs allege that after the Odeon acquisition, "AMC began operating its business via two reportable segments: the U.S. markets segment and the International markets segment," the latter of which included Odeon and Nordic. Compl. ¶ 83. Accordingly, Item 101(c)(1)(v) required disclosure of the seasonality of AMC's international business.

Defendants seek to avoid this straightforward conclusion by arguing that European seasonal trends are not material to an understanding of AMC's business as a whole. This argument is unavailing at this stage of the litigation. In raising this argument on a Rule 12(b)(6) motion, Defendants face an uphill battle, as "[m]ateriality is an 'inherently fact-specific finding.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716–18 (2d Cir. 2011) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 236 (1988)). Materiality is sufficiently pled "when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Id.* at 717 (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161–62 (2d Cir.2000)). On a motion to dismiss under Rule 12(b)(6), "a complaint may not

properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted). Here, Plaintiffs allege that AMC's failure to disclose the seasonality of its European market "caused Wall Street analysts to 'mismodel' AMC's post-SPO earnings." Compl. ¶¶ 168, 254. Additionally, the fact that AMC's business is only 23% international certainly does not make facts about that segment of the business so obviously unimportant that reasonable minds could not differ. To the contrary, the Second Circuit has indicated that a numerical threshold of five percent of a business's assets "is a good starting place for assessing the materiality of the alleged misstatement." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009). Thus, drawing all reasonable inferences in Plaintiffs' favor, they have sufficiently alleged that this information was material and AMC was required to disclose it under Item 101(c)(1)(v).

Finally, Defendants fail to identify any relevant warnings that would warrant dismissal. In its Registration Statement, AMC generally identified as a risk "the impact of regional or country-specific business cycles," adding that "[a]lthough [AMC has] a long history of successfully integrating acquisitions, any acquisition may involve operating risks." Dkt. No. 126, Ex. A, at S-34. Drawing all available inferences in Plaintiffs' favor, these generic warnings about "regional or country-specific business cycles" were plausibly insufficient to warn a reasonable investor that European performance in Q2 was traditionally weaker. *See Meyer*, 761 F.3d at 251.

In sum, for the reasons given above, the Court DENIES Defendants' motion to dismiss this claim for failing to plausibly allege that AMC materially omitted information about

seasonality in the European market.

**B.    Several of the Statements Plaintiffs Identify as Misleading are Non-Actionable**

As to Plaintiffs' Section 10(b) claim specifically, in addition to the alleged omissions in the Registration Statement, Plaintiffs allege that a number of the statements made by the Exchange Act Defendants (Aron, Ramsay, and AMC) during the course of the Class Period were misleading under Section 10(b) and Rule 10b-5(b).  Defendants contend that many of the statements Plaintiffs identify as misleading are protected as either (1) non-actionable opinions, (2) statement of puffery and optimism, or (3) forward-looking statements that fall into the PSLRA safe harbor.  As the Court concludes below that Plaintiffs have failed to sufficiently allege scienter on their Section 10(b) claims relating to AMC's loyalty program and the seasonality of its international operations, *see infra* Section III(C), it is unnecessary to determine whether statements relating to those claims are protected.  As to the remaining statements relating to Carmike's alleged underinvestment in its facilities, the Court examines whether these statements fall into any of the three categories mentioned above.

**1.    Statements of Opinion**

Looking first to the statements Defendants assert are protected opinion, for the reasons given below, even drawing all reasonable inferences in Plaintiffs' favor, some of these statements are protected opinion.

To sufficiently allege that a statement of opinion was misleading, a Plaintiff must allege that "(1) the speaker d[oes] not hold the belief . . . professed; (2) the fact[s] [ ] supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable investor." *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 217 (S.D.N.Y. 2018) (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)).  Meeting this standard "is no small task for an investor." *Tongue*, 816

F.3d at 210 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015)).  As to statements that are allegedly misleading by omission, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329).  On the other hand, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts, and . . . [a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* (internal quotation marks omitted).  Above all, the "core inquiry" is whether the omitted facts would "conflict with what a reasonable investor would take from the statement itself." *Id.*

First, even drawing all available inferences in Plaintiffs' favor, two of the statements they identify regarding AMC's general prospects and faith in its team are protected opinion.  Aron stated on the May 2017 Call that "[w]e think we have an A team in place in Kansas City that has generated great results for AMC over the past year." Compl. ¶ 246.  Plaintiffs do not single out this statement as misleading, nor do they allege that AMC's results generally over the past year were sufficiently poor to make this statement misleading in either of the three relevant ways. *See Frankfurt-Tr.*, 336 F. Supp. 3d at 217.  Similarly, AMC states in its 2016 Form 10-K that "we believe when combined with our innovative strategic initiatives that [Carmike's] productivity will improve." Compl. ¶ 216.  Plaintiffs do not plausibly allege that AMC did not, in fact, plan to introduce its "innovative strategic initiatives" to Carmike theaters, or that over time AMC expected productivity to improve as a result. *Id.* ¶ 217.  While Carmike's alleged underinvestment increased the capital required for certain initiatives, even drawing all reasonable inferences in Plaintiffs' favor this omission would not "conflict with what a reasonable investor

would take from the statement itself." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). It is true that AMC justified its belief in the potential for improved productivity partly by the fact that "in general, theaters located in smaller suburban and rural markets tend to have less competition." Compl. ¶¶ 124-25, 216-17. Nonetheless, for the reasons given above, even drawing all reasonable inferences in Plaintiffs' favor, Carmike had adequately disclosed the specific risk that Carmike had been and would continue to lose out in certain markets against renovated competitors.

Second, Plaintiffs have plausibly alleged that statements of opinion relating to AMC's plans to renovate a significant number of Carmike theaters were misleading by omission. For example, on the December 2016 Call, Aron stated that "[w]e think the fact that we're going to commit to renovate . . . *a significant number* of Carmike theaters . . . is going to cause attendance at those theaters to increase," that "there are plenty of Carmike theaters that are substantial enough in their visitation or locales to graduate, so to speak, into the AMC brand," and that "[w]e have identified that there are an *easy* 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation." Compl. ¶¶ 190-91 (emphases added). Over the course of the Class period, Aron continued to describe plans to renovate Carmike theaters. *Id.* ¶¶ 209-10, 213-14, 228-29, 240-41. Viewed in context, Plaintiffs have plausibly alleged that an investor could have reasonably inferred from these statements that there were no substantial, systemic obstacles to renovations. The omission of Carmike's underinvestment would thus "conflict with what a reasonable investor would take from the statement itself." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). Accordingly, drawing all inferences in their favor, Plaintiffs have plausibly alleged that these statements were misleading by omission.

Third, Plaintiffs have plausibly alleged that other statements of opinion about Carmike's

integration into AMC were misleading by omission. On a January 23, 2017 conference call, Aron said that "our efforts as best we can tell, surrounding integration planning and integration execution have been flawless." Compl. ¶¶ 196-97. On the May 2017 Call, as Q2 was underway, Aron described the integration process as having been "done quickly;" "very smooth;" "running very smoothly;" that "great progress" had been made "with the conversion of acquired theaters;" and that "[t]here have literally been no operational snafus of any note to report to you." *Id.* ¶¶ 236-37, 244. A reasonable investor would expect that such statements would "fairly align[] with the information in the issuer's possession at a time." *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). It is plausible that an investor would reasonably infer that these statements indicated that Aron had information showing that there were no significant or systemic obstacles to Carmike's integration. This could be misleading, in light of the Carmike's underinvestment and difficulties transferring over Carmike loyalty program members. Compl. ¶¶ 238. Accordingly, drawing all inferences in their favor, Plaintiffs have sufficiently alleged that these statements were misleading by omission.

## 2. Statements of Puffery or Optimism

Turning to the second type of protected statements, Defendants contend that a number of the statements in the Complaint are non-actionable puffery or optimism. Here the Court considers only statements identified by Defendants that it did not conclude were protected opinions.

Statements are non-actionable if they are "puffery" that is "too general to cause a reasonable investor to rely upon them," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), or "general expressions of corporate optimism" that are "too indefinite to be actionable under the securities laws," *In re Eros Int'l Sec. Litig.*, 2017

WL 6405846, at *6 (S.D.N.Y. Sept. 22, 2017), *aff'd sub nom. Eisner v. Eros Int'l PLC*, 735 F.

App'x 15 (2d Cir. 2018) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*,

506 F. App'x 32, 38 (2d Cir. 2012)).  For example, statements that a strategic move has been "a

success," that a company is "moving well forward," that "things are going well," or that

operations are "successful," will typically be considered puffery unless "the statements addressed

concrete and measurable areas of the defendant company's performance." *Oklahoma*

*Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd*

*sub nom. Arkansas Pub. Employees Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)

(citing cases).   In making this determination, "there is no definitive test to determine how vague

a statement must be to qualify as puffery," but "courts have focused on the imprecision of

statements and whether such statements relate to future expectations." *Nguyen v. New Link*

*Genetics Corp.*, 297 F. Supp. 3d 472, 488-89 (S.D.N.Y. 2018) (citing cases).  Nonetheless,

courts will not insulate relatively general positive statements from liability if they are

"misrepresentations of existing facts." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)

(statements that defendants' inventory was "in good shape" and "under control" were not puffery

because "they allegedly knew that the contrary was true"); *see also Nguyen*, 297 F. Supp. 3d at

488 ("pollyannaish statements couched as rosy corporate-speak may be actionable if they

contradict facts known to a defendant"); *Sec. & Exch. Comm'n v. Rio Tinto plc*, No. 17-cv-7994

(AT), 2019 WL 1244933, at *11 (S.D.N.Y. Mar. 18, 2019) (statement that project had significant

future potential was not puffery as it was sufficiently alleged that the speaker had reason to

believe the project had no potential).

     First, several of Aron's statements are plainly puffery.  These statements relate to the "big

pop" that a company gets when it renovates theaters, Compl. ¶ 213, and AMC's intention to "be

laser-like in our pursuit of cost synergies . . . turning over every rock to get those synergies that are out there for the taking," *id.* ¶ 69. These statements are quite general, delivered in corporate jargon, and relate to future expectations. *See Nguyen*, 297 F. Supp. 3d at 488–89. Accordingly, they are non-actionable puffery.

Second, drawing all reasonable inferences in Plaintiffs' favor, several statements relating to the integration of Carmike are plausibly not puffery. These include Aron's statements that: "[w]e have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation," Compl. ¶ 190; that integration efforts had been "flawless," *id.* ¶ 196; and that "[t]here have literally been no operational snafus of any note," ¶ 244. A reasonable investor could plausibly rely on a specific number of theaters, as such a number is concrete and measurable. *See Oklahoma Firefighters*, 300 F. Supp. 3d at 570. Similarly, another one of the statements identified by Defendants is replete with concrete predictions about upgrades to theaters. Compl. ¶ 240. As to the other statements, drawing all available inferences in Plaintiffs' favor, it is plausible that a reasonable investor would have relied on this statements that integration was "flawless" and there had been "no . . . snafus of note" to mean the more "concrete and measurable" fact that zero significant obstacles had occurred. *Id.* This could be deemed misleading in light of Carmike's alleged underinvestment in its theaters. Furthermore, this statement does not relate to future expectations, but past performance. *See Nguyen*, 297 F. Supp. 3d at 488–89. And, as in *Novaks,* 216 F.3d at 315, Plaintiffs plausibly allege that at the time these statements were made they were knowingly or recklessly false. *See infra* Section III(C)(2). Accordingly, drawing all available inferences in Plaintiffs' favor, they have plausibly alleged that these statements are "misrepresentation[] of existing facts," albeit couched in "rosy corporate-speak." *Nguyen*, 297 F. Supp. 3d at 488–89

(citing *Novak*, 216 F.3d at 315).

However, even drawing all reasonable inferences in Plaintiffs' favor, others of Aron's statements relating to Carmike's integration were puffery. On the May 2017 Call, Aron characterized the integration as "quick[]," "very smooth," and showing "great progress." Compl. ¶¶ 236-37, 244. On this same call Aron also disclosed that under former management Carmike had been "off to a very slow start" when it came to installing recliners and that Carmike had shown "revenue weakness" throughout 2016. Compl. ¶¶ 240, 245. Even drawing all reasonable inferences in favor of Plaintiffs, even though they relate to past performance, "quick," "very smooth" and "great progress" are so vague and ill-suited to concrete measurement that they constitute puffery. *See, e.g.*, *Oklahoma Firefighters*, 300 F. Supp. 3d at 570. Furthermore, the disclosure on the same call of some issues with Carmike's past revenue weaknesses and failures to add recliners further buttresses this conclusion. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (reasonable investors would be less likely to rely on puffery where facts undercutting it were simultaneously disclosed). Accordingly, even drawing all available inferences in Plaintiff's favor, these statements are protected puffery.

Finally, Aron's statement that Wall Street estimates of AMC's earnings "seem[ed] to be in the right ballpark" is non-actionable puffery. Comp. ¶ 211.[1] "Relatively subdued general comments" such as that a company "should deliver income growth customers consistent with its historically superior performance" or that the company was "optimistic about 1993" will "lack the sort of definite positive projections that might require later correction." *San Leandro*, 75 F.3d at 811 (internal quotation marks omitted). Even drawing all reasonable inferences in

---

[1] Defendants identify this as a protected statement of opinion, however as the Court concludes that it is puffery, it is not necessary to reach that question.

Plaintiffs favor, this vague statement that the Wall Street estimates were "in the right ballpark" is simply "too general to cause a reasonable investor to rely upon [it]." *ECA, Local 134 IBEW*, 553 F.3d at 206. And even if this statement were not puffery, Plaintiffs have not plausibly alleged that a reasonable investor would be misled if she had relied on this statement, as Wall Street had estimated AMC's Q2 total earnings as around $1.3 billion, Compl. ¶ 211, while the actual total earnings in Q2 were around $1.2 billion. Dkt. No. 126, Ex. G, at 3.

### 3. Forward-Looking Statements

Finally, Defendants assert that a number of statements relating to the renovation of Carmike's theaters, Compl. ¶ 191, 209, 228, 240, and the outlook of Carmike's integration generally, ¶ 236, 245, are protected by the PLSRA "safe harbor." The PLSRA provides a safe harbor for forward-looking statements that are "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or [iii] the plaintiff fails to prove that the forward-looking statement" was made by a person with "actual knowledge by that person that the statement was false or misleading" or made or approved by an officer with actual knowledge of the same. 15 U.S.C. § 78u-5(i)(1). Defendants argue that several of the statements identified by Plaintiffs fall into this safe harbor under the first and third prongs.

Drawing all available inferences in Plaintiffs' favor, the cautionary statements identified by Defendants are insufficiently meaningful to satisfy the first prong. "As courts in the Second Circuit have advised, '[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 736 (S.D.N.Y. 2015) (quoting *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)).

Defendants point to general warnings in AMC's SEC forms, about "execution risks" relating to AMC's acquisitions, unspecified "known . . . risks [and] uncertainties," and more specifically to the risk that "optimizing [AMC's] theater circuit through construction and the transformation of our existing theaters may be subject to delay and unanticipated costs." Dkt. No. 125 at 20-21. As to the first two warnings, these may be too general to constitute "meaningful cautionary statements" about the specific risks associated with Carmike's underinvestment in its theaters. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010) (cautionary language is not meaningful if it is "boilerplate," "general," and "vague"). And as to the third, more specific, warning, it was made in AMC's March 2017 10-K. The reasonable inference is available from Plaintiffs' allegations that by this time, AMC plausibly "possessed information" that the risks associated with Carmike's underinvestment had already materialized. *See In re BioScrip*, 95 F. Supp. 3d at 736. Accordingly, "the inference is available that Defendants' cautionary statements were, if anything, misleading in light of the fact that they bespoke caution" concerning a risk that had already begun to occur. *Id.*; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("It would be perverse indeed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language."). Accordingly, drawing all available inferences in Plaintiffs' favor, the warnings identified by Defendants are insufficient at this stage of the litigation to conclude that these statements fall into the first prong of the PSLRA safe harbor.

As to the third prong, Defendants argue in passing that Plaintiffs have not sufficiently pled the requisite actual knowledge that the statement was "false or misleading." 15 U.S.C. § 78u-5(i)(1). However, in support of this Defendants simply point to their arguments discussed in Section III(A) *supra* for the proposition that "Plaintiffs have failed to plead facts demonstrating

the falsity of any of the AMC Defendants' forward-looking statements." Dkt. No. 125, at 21.
Defendants not only leave out the term "misleading" from the statute, but this circular argument
is unavailing for the reasons described above in Section III(A).

Accordingly, Defendants' motion to dismiss Plaintiffs' Section 10(b) claim is
GRANTED as it relates to statements described in the Complaint at ¶¶ 69, 211, 216, 236-37. As
to the other statements identified by Defendants, this motion is DENIED.

### C. As to Their Section 10(b) Claim, Plaintiffs Have Failed to Sufficiently Plead Scienter in Part

Having determined that material omissions took place, Plaintiff's claim under Section
10(b) of the Exchange Act and Rule 10b-5(b) must also allege scienter as to the Exchange
Defendants—Aron, Ramsey, and AMC.[2] Defendants move to dismiss on the ground that
Plaintiffs have failed to do so. For the reasons given below, the Court GRANTS IN PART and
DENIES IN PART Defendants' motion.

The standard to plead scienter under Section 10(b) is higher than the familiar plausibility
standard. "To adequately plead scienter under § 10(b) and Rule 10b–5, a plaintiff must 'plead
the factual basis which gives rise to a strong inference of fraudulent intent.'" *In re BioScrip*, 95
F. Supp. 3d at 732 (quoting *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 Fed. Appx. 26, 27 (2d Cir.
2014)). This strong inference of fraudulent intent can be established by alleging with sufficient
particularity (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong
circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW*, 553
F.3d at 198. This requires a "comparative evaluation," in which a court "must consider not only
inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the

---

[2] Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act expressly disclaim any allegations
of scienter and proceed under theories of strict liability and negligence. Compl. ¶ 96.

facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Accordingly, "an inference of scienter must be more than merely plausible or reasonable—it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

*Id.* This inquiry is to be conducted holistically, looking to "all the facts alleged, taken together."

*Id.* at 323.

### 1. Plaintiffs Have Failed to Allege a Strong Inference of Scienter Based on Motive and Opportunity

As to the first prong, "[i]n order to raise a strong inference of scienter through 'motive

and opportunity' to defraud, Plaintiffs must allege that" the defendants "benefited in some

concrete and personal way from the purported fraud." *ECA, Local 134 IBEW*, 553 F.3d at 198.

"Motives that are common to most corporate officers, such as the desire for the corporation to

appear profitable and the desire to keep stock prices high to increase officer compensation, do

not constitute "motive" for purposes of this inquiry." *Id.* (citing *Novak*, 216 F.3d at 307–08).

Instead, "the 'motive' showing is generally met when corporate insiders allegedly make a

misrepresentation in order to sell their own shares at a profit." *Id.* (citing *Novak,* 216 F.3d at

308). Plaintiffs allege that Aron and Ramsey were motivated to complete a successful SPO and

motivated by potential bonuses. Dkt. No. 131 at 29. Even taking these allegations as true, they

fall short of meeting this standard.

First, a desire to complete a successful public offering is not a "concrete benefit[]

sufficient to demonstrate motive." *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *10

(S.D.N.Y. Mar. 28, 2013) *aff'd* (Dec. 20, 2013) (citing cases); *see also In re PXRE Grp., Ltd.,*

*Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009) ("The alleged motivation of a corporation

to raise money is far too generalized (and generalizable) to allege the proper 'concrete and

personal' benefit required by the Second Circuit."), *aff'd sub nom. Condra v. PXRE Grp. Ltd.,*

357 F. App'x 393 (2d Cir. 2009) (internal ellipses omitted). Nor are Plaintiffs' allegations that

Aron and Ramsay believed a successful SPO was necessary to protect AMC from insolvency

sufficient. To the contrary, the "need to attract investors in order to pay down debt accruing . . .

is insufficient to demonstrate scienter because it is common to most for-profit companies."

*Janbay*, 2013 WL 1287326, at \*10 (quoting *Bd. Of Trustees of City of Ft. Lauderdale Gen.*

*Employees Ret. Sys. v. Mechel OAO*, 811 F.Supp.2d 853, 867 (S.D.N.Y. 2011)); *see also In re*

*Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) (since "[a]ny corporation

would be motivated . . . to avoid bankruptcy," such "allegations do not support an inference of

scienter"). Thus, these alleged motives alone are insufficient to support a strong inference of

scienter.

Second, Plaintiffs' allegations regarding potential executive compensation are also

insufficient. As the Second Circuit has explained, "the existence, without more, of executive

compensation dependent upon stock value does not give rise to a strong inference of scienter."

*Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001); *see also Greene v. Hanover Direct, Inc.*, No.

06-cv-13308, 2007 WL 4224372, at \*4 (S.D.N.Y. Nov.19, 2007) (the "prospect of maximizing

[executives'] year-end bonuses" was insufficient to allege scienter). Thus, Plaintiffs' allegations

that Aron and Ramsey were motivated by "the lavish bonuses that they stood to gain for

completing the acquisitions," Compl. ¶ 279, do not give rise to a strong inference of scienter.

In sum, even taken as true and viewed holistically, Plaintiffs' allegations regarding

motive are far from sufficient to give rise to a sufficiently strong inference of scienter.

### 2. Plaintiffs Have Failed to Allege a Strong Inference of Scienter Based on Circumstantial Evidence as to Some of their Section 10(b) Claims

Turning now to the second prong, the Second Circuit has identified two instances in

which circumstantial evidence "may give rise to a strong inference of the requisite scienter."

*ECA, Local 134 IBEW*, 553 F.3d at 199. First, "where the complaint sufficiently alleges that the defendants . . . 'knew facts or had access to information suggesting that their public statements were not accurate,'" and second, if it is sufficiently alleged that defendants "failed to check information they had a duty to monitor." *Id.* (quoting *Novak*, 216 F.3d at 311). In order to "plead recklessness through circumstantial evidence, [a plaintiff] would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation marks omitted). Finally, Plaintiffs have failed to allege motive and thus "the strength of the circumstantial allegations must be correspondingly greater." *Id.* (internal quotation marks omitted). Plaintiffs argue that they have sufficiently plead a strong inference of scienter based on the following alleged circumstantial evidence: (1) Aron's statements about Carmike and its integration; (2) statements by confidential witnesses; (3) the importance of the relevant areas to AMC's operations; and (4) failure to check information that there was a duty to monitor. Dkt. No. 131 at 24-28. Before turning to this alleged circumstantial evidence, the Court notes that circumstantial evidence relating to one alleged omission, such as Carmike's underinvestment in its theaters, may be irrelevant as to another alleged omission, such as the seasonality of European markets. Accordingly, in its analysis, the Court will address how this evidence relates to the three remaining alleged omissions in turn: omission of information as to Carmike's underinvestment in its theaters, omission of information as to the Carmike loyalty program, and omission of information as to the seasonality of AMC's European market.

### a. Public Statements

Various alleged public statements by Aron support an inference of scienter as to the underinvestment omission, but not the other two.

34

First, several public statements by Aron support the inference that he "knew facts or had access to information suggesting that" his "public statements" regarding Carmike theaters "were not accurate." *ECA, Local 134 IBEW*, 553 F.3d at 199. On a December 2016 conference call ("December 2016 Call"), Aron stated that "we announced the transaction in March—it's now December—so we've had plenty of time to look at the Carmike circuit." Compl. ¶ 271. To underscore the thoroughness of the due diligence performed, Aron pointed to the fact AMC had "spen[t] eight months with the Justice Department of the United States." *Id.*; *see also* ¶¶ 269-277 (describing comprehensive DOJ review). As to what was learned over the course of this due diligence, Aron stated that, "[w] have identified that there are an easy 50 to 100 Carmike theaters that are capable of supporting an AMC-style renovation." Compl. ¶ 190. Aron also added that "we're going to commit to renovate . . . a significant number of Carmike theaters" and that these determinations were made "one at a time, theater by theater." Compl. ¶ 191. "In order to speak so knowledgeably regarding the state of" Carmike's theaters, Aron "must have educated himself regarding" the condition of these theaters presumably by reviewing data given to him by Carmike and "by performing his own due diligence." *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012). These statements thus support the inference that Aron was aware of Carmike's underinvestment in its theaters or had access to this information as of December 2016.

Second, as to the public statements on seasonality, these are much more general. Plaintiffs only point to various statements touting AMC's experience in the international market. Compl. ¶¶ 222-24. These do little to support the more specific inference that Aron or Ramsay knew or recklessly disregarded that Q2 was traditionally the weakest quarter in the European market.

Finally, Plaintiffs do not point to any public statements about transfer of Carmike loyalty program customers from which an inference of actual knowledge or reckless disregard could be drawn.

### b. Confidential Witnesses

Plaintiffs' Complaint cites four confidential witnesses to support Plaintiffs' scienter allegations. For the reasons given below, these witnesses provide further support for the inference that Aron and Ramsey knew or had access to information about Carmike's underinvestment, but little support of the same as to the Carmike loyalty program or European seasonality.

The Second Circuit has held that a plaintiff may rely on confidential witnesses so long as allegations in the complaint are sufficient to "provide an adequate basis for believing that the defendants' statements were false." *Novak,* 216 F.3d at 314. These sources must also be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 300. Additionally, a plaintiff must also allege that "the confidential sources would have known what information was communicated to senior executives." *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010). Defendants cite a ruling in this District casting doubt on whether confidential witnesses can be used at all after the Supreme Court's decision in *Tellabs*, on the grounds that such witnesses may be lying or have been fabricated by the plaintiff. *See In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir.2007)). However, the weight of the caselaw points in the other direction, as "several district courts in this circuit have considered allegations based on confidential sources after *Tellabs* without discounting them." *In re Am. Express Co.*

*Sec. Litig.*, No. 02-cv-5533 (WHP), 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Exp. Co.*, 604 F.3d 758 (2d Cir. 2010) (citing cases). The Court finds the latter cases more persuasive, in part because Rule 11's requirement of good faith safeguards against dangers of the kind described in *In re MRU Holdings. See, e.g., Boyce-Idlett v. Verizon Corp. Servs. Corp.*, No. 06-cv-975 (DAB), 2007 WL 3355497, at *4 (S.D.N.Y. Nov. 6, 2007) (describing the certification requirements of Rule 11).

First, as to Carmike's underinvestment, two of the confidential witnesses, identified as CW-1 and CW-2, lend further support to an inference of scienter. As an initial matter, Plaintiffs have "described [these witnesses] in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.2d at 300. CW-1 was a systems administrator at AMC up through December 2017, which makes it probable that they would know about Carmike's information technology infrastructure. Compl. ¶¶ 171-75. CW-2 was one of twelve Carmike district managers, which makes it probable that they would have information about the state of Carmike's theaters. Compl. ¶¶ 176-79.

Plaintiffs also sufficiently allege that CW-1 and CW-2 were aware of "what information was communicated to senior executives." *See In re Am. Express Co.*, 2008 WL 4501928, at *8. CW-2 alleges that AMC had effectively unfettered access to Carmike's data for months during the due diligence process. Compl. ¶ 180-82. While this on its own might not support an inference of knowledge, it does so in light of Aron's statements about the level of due diligence performed, specifically the evaluation of dozens of theaters for renovations. Compl. ¶¶ 190-91, 271. Similarly, CW-1 alleges that AMC's executive leadership was already aware of issues with Carmike's infrastructure as far back as 2014, when AMC had previously considered acquiring

Carmike. Compl. ¶ 172. It is a reasonable inference that this information would have been passed on or at least been made available to AMC's executives when they decided to acquire Carmike in 2016 and considered during the due diligence process. *See In re Gen. Elec.*, 857 F. Supp. 2d at 295-96. Finally, CW-2 and CW-1's testimony about the extent of underinvestment offers some further support to this inference that this information would have been passed along to senior executives. Compl. ¶¶ 173-78. The allegations regarding CW-1 and CW-2 thus provide some further support for an inference of scienter as to Carmike's underinvestment.

Second, as to seasonality, Plaintiff's confidential witness CW-3 provides less basis on which on inference of scienter could be drawn. CW-3 testifies that by December 31, 2016, the financial data from Odeon would have been "successfully mapped and integrated" into AMC's financial management system, and that this information was detailed enough to determine monthly and seasonal trends. Compl. ¶ 186-87. While this indicates that information about performance in Q2 was available, none of CW-3's testimony provides an inference that this information was communicated to executives like Aron and Ramsey. *See In re Am. Express Co.*, 2008 WL 4501928, at *8.

Third, as to the Carmike loyalty program, confidential witness CW-4 testifies only that it was too expensive to auto-enroll Carmike members in the AMC loyalty program, such that AMC had to rely on customers signing up themselves. Compl. ¶ 188. This is insufficient to support a strong inference that this information about auto-enrollment—much less the information the loyalty program was struggling—was communicated to Aron or Ramsay.

### c. Core Operations Doctrine

Plaintiffs also point to the alleged importance of the acquisition and upgrading of Carmike theaters, the AMC loyalty program, and AMC's European expansion as further circumstantial evidence that the Exchange Defendants would have been aware of the difficulties

with each. While the Court agrees for the reasons below these were areas that were significant to AMC's operations, on its own, this is insufficient to allege a strong inference of scienter.

Under the "core operations" doctrine, "a court may infer 'that a company and its senior executives have knowledge of information concerning the core operations of a business,' such as 'events affecting a significant source of income.'" *In re Supercom Inc. Sec. Litig.*, No. 15-cv-9650 (PGG), 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (quoting *In re Express Scripts Holding Co. Sec. Litig.*, No. 16-cv-3338 (ER), 2017 WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017)). Many courts in this District have "expressed doubts as to the [core operations] doctrine's continuing import" after the passage of the PSLRA. *See id.* (citing cases). The Second Circuit has so far declined to address directly whether this doctrine survives. *See Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012). However, "the Second Circuit [has] commented," albeit in an unpublished opinion, "that the doctrine can 'provide supplemental support for allegations of scienter, even if [it] cannot establish scienter independently.'" *In re Pretium Res. Inc. Sec. Litig.*, No. 13-CV-7552 (VSB), 256 F.Supp.3d 459, 474, 2017 WL 2560005, at *7 (S.D.N.Y. June 13, 2017) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed.Appx. 10, 14 n.3 (2d Cir. 2011)). And a number of courts in this District have adopted this approach. *See Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017); *In re Supercom*, 2018 WL 4926442, at *31; *Rockwell Med.*, 2018 WL 1725553; *Express Scripts Holding*, 2017 WL 3278930, at *18; *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 595 (S.D.N.Y. 2011). Given that the importance of an issue to a corporation supports an inference that an executive would be aware of it, this Court agrees with these other courts that this doctrine continues to be valid in its narrowed form.

First, Plaintiffs allege that the acquisition of Carmike and the renovating of its theaters was a core operation of AMC's business during the relevant time period. Plaintiffs allege that this acquisition was the biggest part of AMC's ambitious growth strategy, which was spearheaded by Aron himself. Compl. ¶¶ 58-61. Accordingly, these theaters would constitute a "significant source of income." *In re Supercom*, 2018 WL 4926442, at *31 (internal quotation marks omitted). Plaintiffs also allege that renovating Carmike theaters was to be a significant part of AMC's vision for the Carmike acquisition. Compl. ¶¶ 190-91, 209-10, 213-14, 228-29, 240-41. This is sufficient to allege that the acquisition and renovation of Carmike theaters was a core operation, and one that would have been affected by Carmike's alleged underinvestment. This further supports an inference of scienter.

Second, Plaintiffs also allege that the AMC loyalty program was a significant source of income and a central focus of AMC's, Compl. ¶¶ 198-99, 207-08, 226-27, 242. This is sufficient to allege that the loyalty program was a core operation, *In re Supercom*, 2018 WL 4926442, at *31, but not to support a strong inference of scienter on its own.

Third, Plaintiffs allege that AMC's international operation would constitute 23% of its revenues. Dkt. No. 126, Ex. A, at S-33. Seasonal trends in these revenues would plausibly affect a significant source of income. *See In re Supercom*, 2018 WL 4926442, at *31. This is sufficient to allege that such a seasonal trend would affect a core operation, but again, not enough to support a strong inference of scienter.

### d. Duty to Monitor

Finally, Plaintiffs argue that the AMC Defendants were reckless in failing to monitor information relating to the three remaining omissions. Yet as the source of this duty to monitor, Plaintiffs only identify Item 307 of Regulation S-K, which they contend required disclosure of "the conclusions that Aron and Ramsey had reached about the effectiveness of AMC's disclosure

controls and procedures." Dkt. No. 131 at 28-29. Yet Plaintiffs fail to connect this general requirement regarding review of disclosure procedures with actual knowledge of the specific facts relevant to the three remaining omissions. Nor do Plaintiffs cite any caselaw for the proposition that Item 307 supports of finding of scienter. Accordingly, this argument is unavailing.

Similarly, as to AMC's alleged failure to follow GAAP accounting standards, this general failure would be insufficient to support an inference of scienter as to these three specific omissions, and Plaintiffs again point to no caselaw indicating otherwise.

### e. Scienter Conclusion

Considering the above, the inference as to Carmike's underinvestment in its theaters is less compelling than the inference that Aron "knew facts or had access to information suggesting that [his] public statements were not accurate." *ECA, Local 134 IBEW*, 553 F.3d at 199. At the very least, there is a strong inference that Aron's "conduct [was] highly unreasonable" and "represent[ed] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* However, while there are a number of public statements by Aron supporting this inference, Plaintiffs do not provide any similar statements by Ramsey. Accordingly, Plaintiffs have failed to allege a sufficiently compelling inference of scienter as to Ramsey.

As to the alleged omissions relating to both the loyalty program and the seasonality of AMC's international wing, as detailed above, little of the alleged circumstantial evidence supports an inference of scienter as to either Aron or Ramsey. Accordingly, there is not an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

As to corporate scienter, this is satisfied by Plaintiffs sufficiently pleading scienter as to

41

Aron, an individual whose intent could be imputed to AMC. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008). The corporate scienter allegations based on seasonality and the loyalty program fail for analogous reasons, since they rely on a finding of scienter as to either Aron and Ramsey.

In sum, Defendants' motion to dismiss Plaintiffs' Section 10(b) claims relating to the Carmike loyalty program and seasonality of AMC's European operations is GRANTED. Defendants' motion is also GRANTED as to Plaintiffs' Section 10(b) claims against Ramsey. Defendants' motion to dismiss for failure to sufficiently allege scienter is otherwise DENIED.

### D.     Plaintiffs Have Sufficiently Pled Loss Causation

Having determined that Plaintiffs have sufficiently alleged material omissions, the Court now turns to the question of whether these omissions caused Plaintiffs' alleged loss. Loss causation is relevant to Plaintiffs' claims under Sections 10(b), 11, and 12(a)(2), though the standards differ on a motion to dismiss. For Section 10(b), Plaintiffs must plausibly allege a "causal connection between the material misrepresentations and the economic loss suffered by investors." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808 (2011) (internal quotation marks and brackets omitted). Failure to sufficiently allege loss causation warrants dismissal of a Section 10(b) claim. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). As to Sections 11 and 12(a)(2), however, absence of loss causation is an affirmative defense that only warrants dismissal if it is "apparent from the face of the complaint." *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 253–54 (S.D.N.Y. 2003). Defendants move to dismiss Plaintiffs' claims under Sections 10(b), 11, and 12(a)(2) under the two relevant standards. For the reasons given below, Defendants' arguments fail under even the more demanding 10(b) standard and accordingly it is unnecessary to discuss loss causation as an affirmative defense.

"To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). A plaintiff "may do so either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In re BioScrip*, 95 F. Supp. 3d at 733 (quoting *Carpenters Pension*, 750 F.3d at 232-33). Here Plaintiffs proceed under the second prong.

Drawing all reasonable inferences in their favor, Plaintiffs plausibly allege that the sharp drop in the price of AMC's common stock on August 1, 2017 was directly caused by the subjects of the omissions they have identified. A "loss is foreseeable if it is 'within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor.'" *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728 (CM), 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (quoting *In re Flag Telecomm. Holdings, Ltd. Sec. Litig*, 574 F.3d 29, 40 (2d Cir. 2009)). This is similar to the torts-law concept of proximate cause, and it is satisfied if "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 260–61 (2d Cir. 2016) (quoting *Lentell*, 396 F.3d at 174). Here, the stock price drop occurred immediately after the release of AMC's disappointing Q2 earnings report. Compl. ¶¶ 133, 168, 249-250, 254-259. Drawing all inferences in their favor, Plaintiffs plausible allege that Carmike's underinvestment in its theaters was partly responsible and point to Aron's own statements on the August 2017 Call that this was a cause of the poor Q2 performance. *Id.* ¶¶

112, 114.[3]  Furthermore, it is also plausibly foreseeable that disappointing earnings would

precipitate a fall in stock price.  Accordingly, the drop in price was "within the zone of risk

concealed by the misrepresentations and omissions alleged.'" *In re Signet Jewelers*, 2018 WL

6167889, at *16.

In response, Defendants unconvincingly assert that since Aron only disclosed the causes

for AMC's poor performance on August 3, 2017, these causes could not have resulted in the drop

in AMC's stock prices two days earlier.  Dkt. No. 125 at 21-24.  Yet the fact that these causes

were only expressly disclosed after the close of the Class Period "is immaterial where, as here,

the risk allegedly concealed by defendants materialized during [the Class Period] and arguably

caused the decline in shareholder … value." *Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307

(S.D.N.Y. 2005); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202

(S.D.N.Y. 2010) ("risk allegedly concealed by defendants which materialized and arguably

caused the decline in shareholder value suffices" is sufficient to plead loss causation); *Heller v.

Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 623–24 (S.D.N.Y. 2008) ("Where the

alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's

loss, a plaintiff may plead that it is 'the materialization of the undisclosed condition or event that

causes the loss." (internal quotation marks omitted)).  Defendants' citations to the contrary do

not support their arguments.  Several of these cases explicitly relate to corrective disclosures.

Dkt. No. 125, at 22-23.  Another of these cases explicitly distinguished the facts before it from

cases alleging a "sharp drop[s]" in share price. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527,

546 (S.D.N.Y. 2007).  Finally, *Waters v. Gen. Elec. Co.*, on which Defendants rely heavily,

---

[3] While the Court dismissed Plaintiffs' Section 10(b) claim relating to the alleged omission of information
about difficulties integrating Carmike's loyalty program and the seasonality of the European market, those alleged
omissions are still relevant to Plaintiffs' Section 11 and Section 12(a)(2) claims, and further buttress the Court's
conclusion as to loss causation on those claims.

merely stands for the proposition that the materialized risk must bear a relationship to the information omitted. No. 08-cv-8484 (RJS), 2010 WL 3910303, at *8 n.6 (S.D.N.Y. Sept. 29, 2010), *aff'd sub nom. GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011). Drawing all available inferences in Plaintiffs' favor, this was plausibly the case here: the information was related to the risk of weak earnings for AMC, which was reflected in AMC's Q2 earnings statement that triggered the sell-off.

Finally, while the allegations in the Complaint do indicate that Aron made some partial disclosures of Carmike's underinvestment on the May 2017 Call, Compl. ¶¶ 240, 246, the degree of impact that these partial disclosures had on the market is properly reserved for a later stage in the litigation. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728 (CM), 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018).

For the reasons given above, Defendants' motion to dismiss for failure to plausibly allege loss causation is DENIED.

### E.     Plaintiffs Have Sufficiently Pled Standing

Defendants' next ground for dismissal relates solely to Plaintiffs' 12(a)(2) claim. For Plaintiffs to have standing to bring their 12(a)(2) claims against AMC, Aron, Ramsey, Cox, and the Underwriter Defendants, these Defendants must qualify as "statutory seller[s]." *See Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir. 1988). A "statutory seller" is defined as either "the person who (1) passes title to the plaintiff, or (2) solicits such security purchases for his financial gain." *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (citing *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988)). Plaintiffs are required to meet only the standard Rule 8 pleading standards on this claim. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). Defendants move to dismiss on the grounds that Plaintiffs have failed to adequately allege that these Defendants qualify under either prong.

First, drawing all available inferences in their favor, Plaintiffs have sufficiently alleged that Underwriter Defendants are statutory sellers under the first prong. Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter*, 486 U.S. at 644 n. 21. And "a plaintiff may only bring a claim against a 'statutory seller' from which it 'purchased' a security 'pursuant to' the pertinent offering documents. *In re BioScrip*, 95 F. Supp. 3d at 744 (citing *In re MF Global Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 323 (S.D.N.Y. 2013)). In sum, to satisfy this prong, "Plaintiffs must allege that they made a direct purchase of a security from a statutory seller as part of a public offering." *Id.* Plaintiffs allege that they purchased shares pursuant to the SPO underwritten by the Underwriter Defendants. Compl. ¶¶ 2, 31. At this stage in the litigation, "Plaintiffs are not required to precisely identify which underwriter sold the securities at issue." *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11-cv-2484 (KMW), 2013 WL 944777, at *8 (S.D.N.Y. Mar. 12, 2013) (citing *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 374 (S.D.N.Y. 2011). Defendants maintain that Plaintiffs' allegations are insufficient to support an inference that the shares were purchase form the Underwriter Defendants, as they were only four of fourteen underwriters for the SPO. Dkt. No. 125, at 30 (citing Dkt. No. 126, Ex. A, at S-91). But under the Prospectus Supplement cited by Defendants, which is incorporated by reference in the Complaint, the Underwriter Defendants accounted for almost ninety percent of the shares in the SPO. Dkt. No. 126, Ex. A, at S-91. It is reasonable to infer from Plaintiff's allegations that they purchased shares from an SPO in which the Underwriter Defendants were responsible for nearly ninety percent of those shares that the shares were purchased from those defendants. Accordingly, Plaintiffs have sufficiently alleged standing as to the Underwriter Defendants.

Second, drawing all available inferences in their favor, Plaintiffs have sufficiently alleged that AMC, Aron, Ramsey, and Cox qualify as statutory sellers under the second prong. Defendants challenge that Plaintiffs have insufficiently alleged that these defendants engaged in solicitation. Courts in this District have differed on what is sufficient to allege solicitation. A few courts have indicated that signature of a registration statement in addition to one presentation at a corporate investor day were insufficient to allege that a defendant was a seller, *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013) (citing *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010)), while others have held that no more than a signature of the registration statement is sufficient, *see, e.g.*, *Briarwood Investments Inc. v. Care Inv. Tr. Inc.*, No. 07-cv-8159LLS, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009) (citing cases). The Court finds the most persuasive rule is in the middle and that "an allegation that the defendant participated in the preparation of the registration statement and in road shows promoting the IPO, while motivated by the prospect for financial gain, is sufficient to constitute the active solicitation of securities." *See In re OPUS360 Corp. Sec. Litig.*, No. 01-cv-2938 (JGK), 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002) (citing cases); *see also eFed. Hous. Fin. Agency v. Stanley*, No. 11-cv-6739 (DLC), 2012 WL 5868300, at *4 (S.D.N.Y. Nov. 19, 2012) (in addition to signing a registration statement, "allegations that a defendant engaged in marketing efforts, such as participation in 'road show' meetings, are sufficient to give a defendant fair notice of the basis for the plaintiff's claim that the defendant solicited the plaintiff's purchase") (citing *In re WorldCom, Inc. Secs. Litig.*, 294 F.Supp.2d 392, 423 (S.D.N.Y. 2003)). Here, Plaintiffs have alleged that these Defendants participated in the preparation of the Registration Statement and participated in marketing "road shows" to investors. Compl. ¶ 148. Accordingly, drawing all reasonable inferences in their

favor, Plaintiffs have plausibly alleged that these Defendants solicited purchase of stocks through the SPO.

For the reasons above, Plaintiffs have sufficiently alleged standing as to their Section 12(a) claims. Defendants' motion to dismiss Plaintiffs' 12(a)(2) claim for lack of standing is therefore DENIED.

## F.  Plaintiffs Have Sufficiently Pled Their Control Person Claims

Defendants' final ground for dismissal relates only to Plaintiffs' claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. Plaintiffs' Section 20(a) claim is leveled only against Aron and Ramsay, while the Section 15 claim applies to all the Individual Defendants—Aron, Ramsey, Cox, Zhang, Gao, Zeng, Saich, Hill, Locke, Koch, and Pawlus. Each of these claims is based on primary violations of other statutory sections by AMC, for which the relevant Defendants are liable based on their exercise of control over AMC. Defendants move to dismiss these two claims on the ground that Plaintiffs have failed to plausibly allege that the relevant defendants are "control persons." The Court addresses the two claims in turn.

### 1.  Plaintiff Sufficiently Alleges that Aron and Ramsey are Control Persons under Section 20(a)

Plaintiffs have sufficiently pled that Aron and Ramsay are control persons under Section 20(a). Under Section 20(a), "[t]o establish a *prima facie* case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Defendants contend that Plaintiffs have not sufficiently alleged primary liability and that allegations based on status as an officer or director are insufficient to plead

"control." Neither of these arguments are persuasive.

First, for the reasons given above, the Court has already concluded that Plaintiffs have sufficiently pled a primary violation of Section 10(b) by AMC. Second, as this Court has previously held, "corporate officers usually are presumed to possess the ability to control the actions of their employees and directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents." *In re BioScrip*, 95 F. Supp. 3d at 741 (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F.Supp.2d 705, 721 (S.D.N.Y. 2013) (internal brackets omitted)). Because Plaintiffs allege that both Aron and Ramsey signed the Registration Statement and other SEC filings, Compl. ¶¶ 34-35, 140, 215, 248, this is sufficient to allege that they are "control persons" with the meaning of Section 20(a).

### 2. Plaintiffs Sufficiently Allege that the Individual Defendants are Control Persons under Section 15

As to Plaintiffs' Section 15 claims, "the control analysis is the same for Section 15 as it is for Section 20." *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016). Defendants again contend that Plaintiffs have not sufficiently alleged primary liability and that allegations based on status as an officer or director are insufficient to plead "control." Again, these arguments fail.

First, Plaintiffs have sufficiently alleged a primary violation under Sections 11 and 12 of the Securities Act. Second, Plaintiffs allege that all of the Individual Defendants either "signed the registration statement personally or through an attorney-in-fact." Compl. ¶ 140. For the same reasons as above, this is sufficient. *See In re BioScrip*, 95 F. Supp. 3d at 741.

Accordingly, Defendants' motion to dismiss Plaintiffs' claims under Sections 15 and 20(a) for failure to allege that the relevant Defendants are "control persons" is hereby DENIED.

### G. Leave to Amend

Plaintiffs request that they be granted leave to amend if Defendants' motion is granted in any respect. This request is denied.

The Court dismisses some of Plaintiffs' claims under Rule 12(b)(6) and some under Rule 9(b). Even in the context of a Rule 9(b) dismissal, where leave to amend is typically more freely granted, such leave is not necessary if the claimant "has had a prior opportunity to amend its complaint." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 581 (2d Cir. 2005) (internal quotation marks omitted). Here, Plaintiffs have had the chance to amend twice before, once in the face of very similar arguments raised on Defendants' first motion to dismiss. Dkt. No. 107. Furthermore, Plaintiffs have not presented anything to suggest that they "could amend the complaint to adequately plead" their claims. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (leaving "unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility"). Accordingly, Plaintiffs' request to amend is DENIED and any dismissals are with prejudice.

## IV. CONCLUSION

For the reasons given above, Defendants' motion is GRANTED in part and DENIED in part. As to Plaintiff's Securities Act claims, Defendants' motion to dismiss Counts I, II, and III is GRANTED as to Plaintiff's claim that Defendants omitted material information regarding Carmike's declining market share. Defendants' motion to dismiss Counts I, II, and III is otherwise DENIED. As to Plaintiffs' Exchange Act claims, Defendants' motion to dismiss Counts IV and V is GRANTED as to Plaintiff's claims relating to the seasonality of the European market and Carmike's loyalty program, as well as the statements described in the Complaint at ¶¶ 69, 211, 216, 236-37. Defendants' motion to dismiss Count IV is also

GRANTED as to Defendant Ramsey. Defendants' motion to dismiss Counts IV and V is otherwise DENIED. All of the above dismissals are with prejudice. As oral argument is not necessary to the resolution of this motion, that request is DENIED. This resolves docket item number 124. An initial pretrial conference in this matter will be scheduled by separate order.

SO ORDERED.

Dated: September 2 0, 2019
       New York, New York

ALISON J. NATHAN
United States District Judge