## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

HAWAII STRUCTURAL IRONWORKERS : Case No. 1:18-cv-00299-AJN-SLC
PENSION TRUST FUND, Individually and on :
Behalf of All Others Similarly Situated, : <u>CLASS ACTION</u>
                                         :
                  Plaintiff,             :
                                         :
        vs.                              :
                                         :
AMC ENTERTAINMENT HOLDINGS, INC., :
ADAM M. ARON, CRAIG R. RAMSEY, :
CHRIS A. COX, LINCOLN ZHANG, JACK :
Q. GAO, MAOJUN ZENG, ANTHONY J. :
SAICH, LLOYD HILL, GARY F. LOCKE, :
HOWARD W. KOCH, JR., KATHLEEN M. :
PAWLUS, CITIGROUP GLOBAL :
MARKETS INC., MERRILL LYNCH, :
PIERCE, FENNER & SMITH :
INCORPORATED, BARCLAYS CAPITAL :
INC. and CREDIT SUISSE SECURITIES :
(USA) LLC, :
                                         :
                  Defendants.            :
                                         :
—————————————————————— X

———————————————————————

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

———————————————————————

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................3

    A.  The Parties.............................................................................................................3

    B.  The Acquisitions, SPO, and AMC's False and Misleading Statements and Omissions......3

    C.  The Truth is Revealed ..........................................................................................5

PROCEDURAL HISTORY.....................................................................................................5

ARGUMENT ..........................................................................................................................6

I.   THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23................................................................................................................6

    A.  The Rule 23(a) Requirements are Satisfied ...........................................................7

        1.  The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable......................................................................................................7

        2.  Questions of Law or Fact Are Common to the Class .................................................8

        3.  Plaintiffs' Claims Are Typical of the Class ..............................................................9

        4.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ...................10

    B.  The Requirements of Rule 23(b)(3) Are Satisfied ...........................................................11

        1.  Common Questions of Law and Fact Predominate with Respect to the Securities Act Claims ........................................................................................................12

        2.  Common Questions of Law and Fact Predominate with Respect to the Exchange Act Claims ........................................................................................................13

            a.  The *Affiliated Ute* Presumption of Reliance Applies...........................................13

            b.  The *Basic* Presumption of Reliance Applies, to the Extent the Court Finds Plaintiffs' Claims to be Based on Misrepresentations .........................................15

                i.  The Five *Cammer* Factors Confirm Market Efficiency...................................15

                ii.  The *Krogman* Factors Further Support a Finding of Market Efficiency.........21

            c.  Damages Will be Calculated Using a Common Methodology and Mechanical Damage Tabulations for Individual Class Members Will Not Defeat Predominance..................................................................................................22

3. A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy............................................................................23

II. SFMS SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL.........................................................................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005)...................................................................... 16

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).................................................................................. 13, 14

*Amchem Products, Inc. v. Windsor*,
    117 S. Ct. 223 (1997)......................................................................... 6, 12, 23, 24

*Amgen v. Conn. Ret. Plans and Trust Funds*,
    133 S. Ct. 1184 (2013)............................................................................ 6, 12, 13

*Basic Inc. v. Levinson*,
    108 S. Ct. 978 (1988).......................................................................................... 15

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................... 15, 16, 17, 18, 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................ 16, 20

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)............................................................................... 7

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995).................................................................................. 7

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)................................................................................. 23

*Dura Pharmaceuticals, Inc. v. Broudo*,
    125 S. Ct. 1627 (2005).................................................................................. 13

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*,
    563 U.S. 804 (2011)............................................................................. *passim*

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017)................................................................................ 22

*Fogarazzo v. Lehman Bros. Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ..................................................................... 8, 14

iv

*Green v. Wolf. Corp.*,
   406 F.2d 291 (2d Cir. 1968).......................................................................... 2

*Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"),
   573 U.S. 258 (2014).............................................................................. 12, 15

*In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ............................................................... 7, 9

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) .................................................................... 22

*In re Beacon Assoc. Litig.*,
   282 F.R.D. 315 (S.D.N.Y. 2012) ................................................................. 13

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. Jul. 27, 2007) ................................................. 9

*In re Facebook, Inc., IPO Sec. and Deriv. Litig.*,
   312 F.R.D. 332 (S.D.N.Y 2015) ................................................................... 22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.* ("*Flag Telecom II*"),
   574 F.3d 29 (2d Cir. 2009)....................................................................... 9, 10

*In re Indep. Energy Holdings PLC, Sec. Litig.*,
   210 F.R.D. 476  (S.D.N.Y. 2002) .................................................................. 2

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   286 F.R.D. 226 (S.D.N.Y. 2012) ........................................................... 12, 13

*In re MF Global Holdings Ltd. Inv. Litigation*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ......................................................... 2, 6, 23

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ..................................................................... 8

*In re Oxford Health Plan, Inc.*,
   191 F.R.D. 369 (S.D.N.Y.) ........................................................................... 9

*In re Petrobas Sec.*,
   862 F.3d 250 (2d Cir. 2017) ................................................................... 2, 12

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ......................................................... 24

*In re Signet Jewlers Limited Sec. Litig.*,
  2019 WL 3001084 (S.D.N.Y. July 10, 2019) ......................................................... 15

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ............................................................................ 14

*In re SunEdison, Inc. Securities Litigation*,
  329 F.R.D. 124 (S.D.N.Y. 2019) .......................................................................... 12

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................................................... 7, 10

*In re Vivendi Universal, S.A.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ........................................................................... 7, 8

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) .......................................................................... 24

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................................... 21, 22

*Lapin v. Goldman Sachs & Co*.,
  245 F.R.D. 168 (S.D.N.Y. 2008) .......................................................................... 16

*Lumen v. Anderson*,
  280 F.R.D. 451 (W.D. Mo. 2012) ......................................................................... 16

*Maywalt v. Parker & Parsley Petroleum Co.*,
  147 F.R.D. 51 (S.D.N.Y. 1993) .............................................................................. 2

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ...................................................................... 8

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  446 F. Supp 2d 163 (S.D.N.Y. 2006) ................................................................... 13

*Phillips Petroleum Co. v. Shutts*,
  105 S. Ct. 2965 (1985) ........................................................................................... 2

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) .......................................................................... 22, 23

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008) ................................................................................ 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) .................................................................................................... 24

*United States v. Schiff*,
   602 F.3d 152 (3d Cir. 2010) ............................................................................................ 20

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ..................................................................................... 17

*Waggoner v. Barclays PLC*,
   875 F.3d 9 (2d Cir. 2017) .................................................................................... 2, 13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ...................................................................................................... 6

## <u>Statutes</u>

15 U.S.C. §§ 77, 77l(a)(2), and 77o ........................................................................................ 5

15 U.S.C. §§ 78j(b) and 78t(a) ............................................................................................... 5

## <u>Rules</u>

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

## <u>Regulations</u>

17 C.F.R. § 240.10b-5 ............................................................................................................. 6

## <u>Other Authorities</u>

SEC Securities Act Release No. 6331 (August 18, 1981) ...................................................... 19, 22

Lead Plaintiff, the International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware ("Operating Engineers" or "Lead Plaintiff"), and Additional Plaintiff, Hawaii Iron Workers Pension Trust Fund ("Hawaii Fund" or "Plaintiff" and, together with Lead Plaintiff, "Plaintiffs"), respectfully submit this Memorandum of Law in support of their Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification of the following, proposed class (the "Class"):

> All persons and entities who purchased or otherwise acquired: (i) the common stock of AMC Entertainment Holdings, Inc. ("AMC" or the "Company") pursuant to its secondary public offering (the "SPO") on or about February 8, 2017; and (ii) all persons and entities who purchased or acquired the publicly-traded common stock of AMC between December 20, 2016 and August 1, 2017, inclusive ("Class Period"), excluding Defendants, members of the immediate family of any Defendant, any subsidiaries and/or affiliates of any Defendant, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

## PRELIMINARY STATEMENT

This securities action (the "Action") is a paradigmatic case calling for certification as a class action. Plaintiffs assert claims under the federal securities laws arising out of Defendants' common course of misconduct – namely, Defendants' issuance of false and misleading statements and material omissions concerning AMC Entertainment Holdings, Inc.'s ("AMC" or the "Company') acquisition of three major theater chains. The truth about these misstatements and omissions was revealed through a series of disclosures in early August 2017, which caused AMC's stock price to decline precipitously, thereby damaging investors. On September 23, 2019, the Court issued an Opinion and Order ("Opinion on Motion to Dismiss") denying in significant part Defendants' Motion to Dismiss the Second Amended Complaint ("SAC"), the operative pleading in the Action. Dkt. 137. The parties are currently engaged in fact discovery,

1

and Defendants are scheduled to substantially complete their document production by June 20, 2020.  Dkt. 144.  Plaintiffs now request certification of this Action as class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

The use of the class action procedure to adjudicate claims under the federal securities laws is well-established and has been favorably upheld by the Supreme Court and the Second Circuit.  *See, e.g.*, *Phillips Petroleum Co. v. Shutts*, 105 S. Ct. 2965, 2973 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available"); *In re MF Global Holdings Ltd. Inv. Litigation*, 310 F.R.D. 230, 235 (S.D.N.Y. 2015) (citing *Green v. Wolf. Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) ("The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions."); *In re Indep. Energy Holdings PLC, Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims and courts should err in favor of certifying a class).  "[T]he Second Circuit has . . . explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993).  Moreover, the Second Circuit has in recent years reaffirmed that securities actions readily satisfy the requirements of Rule 23.  *See Waggoner v. Barclays PLC*, 875 F.3d 9, 97 (2d Cir. 2017) (finding that the burden to establish market efficiency "is not an onerous one"); *In re Petrobas Sec.*, 862 F.3d 250, 278 (2d Cir. 2017).

As discussed below, this Action satisfies all the requirements for class certification under Rules 23(a) and 23(b)(3).[1]  Class certification is proper in this Action and a class action provides

---

[1]References to "Rule(s)" are to the Federal Rules of Civil Procedure.

2

the optimal vehicle for according relief to injured investors.  Accordingly, Plaintiffs respectfully request that the Court certify the Class.

## STATEMENT OF FACTS

The facts of this case are recited in detail in the SAC and Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint.  *See* Dkts. 117, 131.  Accordingly, this Memorandum will only restate facts relevant to Plaintiffs' instant Motion.

### A.    The Parties

Defendant, AMC, is principally involved in the theatrical exhibition business and owns, operates, or has interests in theaters located throughout the United States and Europe.  SAC, ¶¶ 31, 48.  The SAC names as Defendants a number of officers and directors of AMC (the "Individual Defendants").[2] SAC, ¶¶ 34-38.  The SAC also names as defendants (collectively, the "Underwriter Defendants"),[3] several financial institutions that served as joint book-running underwriters for AMC's February 2017 secondary public offering (the "SPO").  SAC, ¶ 39.

### B.    The Acquisitions, SPO, and AMC's False and Misleading Statements and Omissions

In August 2012, AMC was acquired by a private Chinese conglomerate, Dalian Wanda Group Corp. ("Wanda"), in a deal valued at approximately $2.6 billion.  SAC, ¶ 55.  Defendant, Adam M. Aron ("Aron"), was named CEO of AMC on December 15, 2015, and immediately set in motion a series of substantial acquisitions by AMC.  SAC, ¶ 58.

---

[2]The Individual Defendants are Adam M. Aron, Craig R. Ramsey, Chris A. Cox, Lincoln Zhang, Jack Q. Gao, Maojun Zeng, Anthony J. Saich, Lloyd Hill, Gary F. Locke, Howard W. Koch, Jr., and Kathleen M. Pawlus.
[3]The Underwriter Defendants are Citigroup Global Markets, Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Barclays Capital Inc.; and Credit Suisse Securities (USA) LLC.

The hallmarks of Aron's shopping spree were AMC's acquisitions of Carmike Cinemas, Inc. ("Carmike") and Odeon and UCI Cinemas Holdings Limited in the fourth quarter of 2016, and Nordic Cinema Group Holding AB in the first quarter of 2017 (collectively, the "Acquisitions").  SAC, ¶ 59.  The Acquisitions would make AMC, and thus, Wanda, the largest movie exhibitor in the world.  SAC, ¶ 48.  AMC financed the Acquisitions, in large part, by a series of bridge loans from lenders, including certain of the Underwriter Defendants.  SAC, ¶¶ 62-63, 71-72, 75, 80, 91.

After completing the Acquisitions, AMC undertook the SPO to help deleverage the Company, which had incurred significant debt as a result of the Acquisitions.  SAC, ¶¶ 89-94.  To facilitate the SPO, between December 21, 2016 and February 9, 2017, AMC filed with the SEC a Form S-3 registration statement, a prospectus, and prospectus supplements, which incorporated by reference certain SEC filings that AMC and Carmike made pursuant to their periodic reporting requirements under the securities laws (collectively, "Registration Statement").  SAC, ¶ 98.  Unbeknownst to investors, the Registration Statement contained inaccurate statements of material fact and omitted material information required to be disclosed therein by the regulations governing its preparation.  SAC, ¶¶ 99, 107, 128.

Indeed, throughout the Class Period, Defendants made positive statements to investors about the enhancement of AMC's growth potential by joining forces with Carmike, as well as migrating Carmike's loyalty program members to AMC Stubs and member growth in AMC Stubs.  SAC, ¶¶ 165-169.  In reality, AMC knew, but failed to disclose to investors, that, during the Class Period, AMC's operating performance was being adversely impacted by factors including a protracted period of underinvestment in Carmike's theaters and AMC's inability to retain or convert Carmike's loyalty program members into the AMC Stubs program after the

acquisition.  SAC, ¶ 164.  Additionally, AMC knew but failed to disclose that AMC's international markets segment experienced lower sales during the summer months.  SAC, ¶¶ 126-128.

### C.    The Truth is Revealed

On August 1, 2017, after the close of the market, AMC issued a press release announcing its preliminary financial results for the second quarter of 2017; the results were far worse-than-expected.  SAC, ¶¶ 249-250.  In response to the unexpected and disappointing results, the price of AMC common stock plummeted nearly *27%*, on very heavy trading volume, falling from $20.80 per share on August 1, 2017 to $15.20 per share on August 2, 2017, or *57%* from its Class Period high of $35.45.  SAC, ¶ 250.

Thereafter, on August 4, 2017, AMC held a conference call with investors and securities analysts (the "August 2017 Conference Call") to discuss AMC's reported operating results for the quarter ended June 30, 2017.  SAC, ¶¶ 109, 251.  During the August 2017 Conference Call, Aron told investors that "the quarter was simply a bust," citing the performance of Carmike, Carmike's protracted underinvestment in its theaters, AMC's inability to retain Carmike loyalty members, and seasonality of its international business, among reasons for the abysmal results. SAC, ¶¶ 109, 112-114, 251-260.  None of these trends, events, and uncertainties, associated with Carmike and AMC's international business, and known to AMC, were previously disclosed to investors, despite contrary disclosure requirements.  SAC, ¶¶ 116-120.

### PROCEDURAL HISTORY

Plaintiff, Hawaii Fund, filed a class action complaint on January 12, 2018, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77, 771(a)(2), and 77o) ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange

Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) ("Exchange Act") and Rule 10b-5 promulgated

thereunder (17 C.F.R. § 240.10b-5).  Dkt. 1.  On May 30, 2018, this Court issued an Order

appointing Operating Engineers as Lead Plaintiff.  Dkt. 88.

On November 26, 2018, Plaintiffs filed the SAC.  Dkt. 117.  On January 22, 2019, the

AMC Defendants moved to dismiss the SAC, in which motion the Underwriter Defendants

joined with respect to the claims asserted against them.  Dkts. 124, 127.  On September 23, 2019,

the Court issued an Opinion and Order, granting in part and denying in part Defendants' Motion.

Dkt. 137.

## ARGUMENT

## I.     THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether the putative class meets the

four threshold requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and

(4) adequacy of representation.  *See Amchem Products, Inc. v. Windsor*, 117 S. Ct. 223, 2245

(1997).  Additionally, a putative class must meet the requirements of at least one of Rule 23(b)'s

subsections.  *See* Fed. R. Civ. P. 23; *see id.*  The requirements of Rule 23 should be interpreted

liberally, with doubts resolved in favor of granting class certification.  *See In re MF Global

Holdings*, 310 F.R.D. at 235.

While courts must conduct a "rigorous analysis" to determine whether the elements of

Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule

23 is not a "license to engage in free-ranging merits inquiries at the class certification stage."

*Amgen v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  Rather, merits

issues "may be considered to the extent – but only to the extent – that they are relevant to

determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* at 1195;

6

*see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("[A]
motion for class certification is not an occasion for examination of the merits of the case.")
(internal citation omitted).   Therefore, while courts may consider whether a securities market
was efficient to the extent that it is relevant to support a presumption of reliance, it is not
appropriate for courts to inquire into merits issues such as scienter, materiality, or loss causation.
*See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, ("*Halliburton I*") 563 U.S. 804, 812-813
(2011).

### A.      The Rule 23(a) Requirements are Satisfied

#### 1.      The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

The numerosity requirement of Rule 23 dictates that the putative class must be "so
numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).
Impracticability does not equate to impossibility, but merely means that the difficulty of joining
all class members makes the use of the class action device appropriate.  *See Central States Se. &
Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-
45 (2d Cir. 2007).  "Numerosity may be presumed when a class consists of forty or more
[members]."  *In re Bank of Am. Corp. Sec., Derivative & Emp. Ret. Income Sec. Act (ERISA)
Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47
F.3d 473, 483 (2d Cir. 1995)).  "[I]n securities fraud class actions relating to publicly owned and
nationally listed corporations, the numerosity requirement may be satisfied by a showing that a
large number of shares were outstanding and traded during the relevant period."  *In re Vivendi
Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases); *see also In re Bank of Am.
Corp.*, 281 F.R.D. at 138 (same).

During the Class Period, the common stock of AMC was listed on the New York Stock Exchange ("NYSE"), trading under the ticker symbol "AMC."  *See* Declaration of Laurie Rubinow ("Rubinow Decl."), Ex. A, Expert Report of Zachary Nye, Ph.D. ("Nye Report"), ¶¶ 10, 19.  The number of AMC shares issued and outstanding during the Class Period ranged from 34.3 million to 55.1 million.  *Id.* at ¶ 25.  Additionally, during the Class Period, more than 230 million shares of AMC common stock were purchased and sold on U.S. markets.  Nye Report, Exhibit 4.  While Plaintiffs have not, to date, ascertained the precise number of members of the Class, there are, upon belief, many thousands of geographically dispersed members of the Class, whose identities can be readily ascertained through discovery.  Accordingly, the proposed Class clearly consists of a sufficient number of individuals as to make joinder impracticable, satisfying the numerosity requirement.

## 2.   Questions of Law or Fact Are Common to the Class

The commonality prerequisite requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The requirement has routinely been characterized by courts in this Circuit as a "low hurdle."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014); *see also Vivendi*, 242 F.R.D. at 84 ("The commonality requirement has been applied permissively in securities fraud litigation.") (internal quotation omitted).  "Even a single common legal or factual question will suffice."  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009).  Where, as here, putative class members have been injured by the same material misrepresentations and omissions, "the commonality requirement is satisfied."  *Fogarazzo v. Lehman Bros. Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).

Virtually all of the questions of law and fact are common to Plaintiffs and Class members, including: (i) whether Defendants' statements were materially false and misleading;

(ii) whether Defendants omitted to state material facts required to make their statements not misleading; (iii) whether, with regard to the Exchange Act claims, the underlying misrepresentations and omissions were made with scienter; (iv) whether the price of AMC's stock was artificially inflated during the Class Period; and (v) whether, with regard to the Exchange Act claims, Defendants' misrepresentations and omissions caused Class members to suffer economic loss.  Courts routinely find these issues to satisfy Rule 23's commonality requirement.  *See, e.g. In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 158 (S.D.N.Y. 2007) (commonality satisfied where common issues include whether defendants violated federal securities laws, issued false and misleading statements in the IPO prospectus and elsewhere, acted with scienter, and whether price of securities was artificially inflated); *Halliburton I,* 563 U.S. at 813 (materiality and loss causation present common questions).

### 3.      Plaintiffs' Claims Are Typical of the Class

The typicality prerequisite mandates that the claims of the representative plaintiffs be typical of the claims of the class.  *See* Fed. R. Civ. P. 23(a)(3).  "Typicality does not require that the situations of the named representatives and the class members be identical."  *In re Oxford Health Plan, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y.) (citation omitted); *see also In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *13 (S.D.N.Y. Jul. 27, 2007) (acknowledging that Courts in this District "have emphasized that the typicality requirement is not demanding.").  Moreover, typicality is satisfied where plaintiffs demonstrate that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.* ("*Flag Telecom II*"), 574 F.3d 29, 35 (2d Cir. 2009); *see also Bank of Am.*, 281 F.R.D. at 139 ("In a securities class action, when plaintiffs will necessarily seek to develop facts relating to . . .

the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement.") (quotations omitted).

Plaintiffs easily satisfy Rule 23's typicality requirement because their claims – indeed, the claims of all Class members – arise out of the same misrepresentations and omissions. Plaintiffs each purchased AMC common stock during the same time period as members of the proposed Class. *See* Dkts. 1 (Certification), 44-3, 44-4. Accordingly, Plaintiffs' claims are typical of those of the Class.

### 4.     Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

The representative plaintiff must also show that it will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy prerequisite is met where: (1) the proposed class representative's interests are to vigorously pursue the claims of the class and are not antagonistic to the interests of other class members; and (2) proposed class counsel are qualified, experienced, and able to conduct the litigation. *See Flag Telecom II*, 574 F.3d at 35. The conflict inquiry is a searching one, as "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted).

Here, Plaintiffs' interests are tightly aligned with the interests of absent Class members and no conflicts exist between Plaintiffs and the Class. Plaintiffs and all members of the Class have suffered losses from the purchase of AMC securities at artificially inflated prices; in other words, they have all been injured by the *very same* wrongful underlying misrepresentations and omissions of Defendants. Plaintiffs understand their duties as Class representatives and are

willing and able to serve as representative parties on behalf of the Class.  Plaintiffs have actively

supervised and monitored the progress of this litigation and will continue to actively participate

in its prosecution and take all necessary steps to ensure that they fulfill their fiduciary obligations

as class representatives.

Further, Plaintiffs have engaged qualified and capable counsel.  Lead Plaintiff is

represented by Shepherd, Finkelman, Miller & Shah, LLP ("SFMS" or "Proposed Class

Counsel"), a firm with significant experience litigating complex class actions, including

securities fraud actions, and which has the ability and resources to prosecute this Action

vigorously.  Rubinow Decl., Ex. B.  The Hawaii Fund, which purchased shares of AMC pursuant

to the SPO and on the open market, is represented by Robbins Geller Rudman & Dowd LLP

("Robbins Geller"), a nationwide firm that regularly practices complex securities litigation.[4]

Proposed Class Counsel, together with Robbins Geller, has vigorously pursued and protected the

interests of the Class, as evidenced by their advancement of this case including, *inter alia*, the

filing of detailed, comprehensive pleadings, successful defense of the SAC against Defendants'

motion to dismiss, and substantial discovery efforts.  SFMS satisfies Rule 23(g) and should be

appointed as Class Counsel.  *See* Section II, *infra*.

**B.      The Requirements of Rule 23(b)(3) Are Satisfied**

The proposed Class satisfies Rule 23(b)(3)'s requirements that common questions of law

or fact predominate over individual questions and that a class action is superior to other methods

of adjudication.

---

[4]For a detailed description of Robbins Geller's track record, resources, and attorneys, please *see*
https://www.rgrdlaw.com/.  A hard copy of the Firm's resume is available upon the Court's
request, if preferred.

The predominance requirement is satisfied if: "(1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'"  *In re Petrobas Sec. Litig.*, 862 F.3d 250, 270 (2d Cir. 2017).  "Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ."  *Amchem Products, Inc.*, 117 S. Ct. at 2250.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*").  Here, issues of both law and fact predominate over any individual issues.

> **1.      Common Questions of Law and Fact Predominate with Respect to the Securities Act Claims**

The Hawaii Fund's Securities Act claims will not require any analysis of scienter, reliance, or loss causation.  *See In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 236-37 (S.D.N.Y. 2012) (providing elements of Securities Act claims).  Instead, analysis of the Securities Act claims will focus on the existence and materiality of the misstatements and omissions made in connection with the SPO, which are issues susceptible to generalized proof. *See id.* at 235 (noting that materiality is gauged according to an objective standard).  As the Supreme Court affirmed in *Amgen*, these elements present common questions of law and fact. *See* 568 U.S. at 460.  "In no event will the individual circumstances of particular class members bear on the inquiry."  *Id.*

The factual and legal questions central to Plaintiff's Securities Act claims are common to all Class members and "each proposed class member's claims will rise or fall on common proof related to the offering documents."  *In re SunEdison, Inc. Securities Litigation*, 329 F.R.D. 124, 142 (S.D.N.Y. 2019).  Additionally, damages for the Securities Act claims are "based on a

straightforward statutory formula common to all Class members." *IndyMac*, 286 F.R.D. at 235; Nye Report, ¶¶ 61-62.

The Securities Act claims raise questions common to the Class and will be answered with common proof; accordingly, the Securities Act claims satisfy the predominance requirement of Rule 23(b).

### 2.    Common Questions of Law and Fact Predominate with Respect to the Exchange Act Claims

Plaintiffs will prove, on a common basis, the elements of their Exchange Act claims.[5] The Supreme Court in *Amgen* held that falsity, materiality, and loss causation are common issues that need not be adjudicated before a class is certified. *See* 568 U.S. at 474-75. Consequently, in claims under the Exchange Act, whether common questions of law or fact predominate often turns on the element of reliance. *See Halliburton I*, 563 U.S. at 810. Here, the reliance element of Plaintiffs' Exchange Act claims is a predominating common issue because Plaintiffs and the Class are entitled to a presumption of reliance.

### a.    The *Affiliated Ute* Presumption of Reliance Applies

As Plaintiffs alleged in the SAC, a presumption of reliance is appropriate here under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' fraud claims are grounded in Defendants' material omissions. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017); SAC, ¶ 291. To invoke the

---

[5]The elements of a Section 10(b) claim are: (1) a material omission or misrepresentation; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005). The elements of a Section 20(a) claim are: (1) an underlying Section 10(b) violation by a controlled entity; and (2) control of the primary violator by the defendant. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp 2d 163, 190 (S.D.N.Y. 2006). Control can be proven on a class-wide basis. *See, e.g., In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

*Affiliated Ute* presumption, "positive proof of reliance is not a prerequisite to recovery."
*Affiliated Ute*, 406 U.S. at 153; *Waggoner*, 875 F.3d at 95.  Rather, "[a]ll that is necessary is that
the facts withheld be material in the sense that a reasonable investor might have considered them
important in the making of [their] investment decisions."  *Affiliated Ute*, 406 U.S. at 153.   This
Court has explained, "[w]hen a defendant's fraud consists primarily of omissions, "[r]equiring a
plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material
information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff."
*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (describing the
*Affiliated Ute* doctrine as a "pragmatic one.").[6]

Plaintiffs alleged in the SAC, and this Court recognized, that the claims at issue are
grounded in Defendants' material omissions.  Opinion on Motion to Dismiss at 5-6.  Defendants
failed to disclose that, *inter alia*, Carmike had underinvested in its theaters such that they were in
"a state of significant disrepair."  Opinion on Motion to Dismiss at 5-6 (finding that Plaintiffs
sufficiently alleged that Defendants omitted material information).  Accordingly, Plaintiffs are
entitled to rely on the *Affiliated Ute* presumption to establish reliance.

To the extent Defendants argue that Plaintiffs' claims are based on affirmative
misstatements, Plaintiffs also can still easily demonstrate their entitlement to a presumption of
reliance.  *See Halliburton I,* 563 U.S. at 810.

---

[6]The *Affiliated Ute* presumption "is not undermined simply because a defendant makes
misstatements at the same time it omits material information."  *Fogarazzo v. Lehman Bros., Inc.*,
232 F.R.D. 176, 185 (S.D.N.Y. 2005).

b.     The *Basic* Presumption of Reliance Applies, to the Extent the
       Court Finds Plaintiffs' Claims to be Based on
       Misrepresentations

To the extent that the Court determines that Plaintiffs' Exchange Act claims are based on

false and misleading statements and not omissions, reliance can be established on a class-wide

basis under the "fraud-on-the-market" theory, as enunciated in *Basic Inc. v. Levinson*, 108 S. Ct.

978 (1988) and reaffirmed in *Halliburton II*:

> "[P]laintiffs [can] satisfy the reliance element of a Rule 10b-5 cause of action by
> invoking a presumption that a public, material misrepresentation will distort the
> price of stock traded in an efficient market, and that anyone who purchases the
> stock at the market price may be considered to have done so in reliance on the
> misrepresentation."

*Halliburton II*, 573 U.S. at 283-84.  To invoke this presumption, Plaintiffs must establish that (1)

the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3)

the relevant transaction took place between the time the misrepresentations were made and the

time the truth was revealed.  *See Hallilburton I*, 563 U.S. at 811.  As explained below, Plaintiffs

have made such a showing here and, accordingly, their Exchange Act claims meet the

predominance requirement of Rule 23(b).

i.     The Five *Cammer* Factors Confirm Market
       Efficiency

To aid in their determination of market efficiency, courts in this Circuit generally

consider a series of factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J.

1989).  *See In re Signet Jewlers Limited Sec. Litig.*, 2019 WL 3001084, at *11 n.5 (S.D.N.Y.

July 10, 2019) (quoting *In re Petrobras*, 862 F.3d at 276) ("[The Second Circuit] (as well as

various district courts in this Circuit) have used the *Cammer* factors to assess market

efficiency.").  The *Cammer* factors are as follows:

15

(1) whether there existed an average weekly trading volume during the class period in excess of a certain number of shares; (2) whether a significant number of securities analysts followed and reported on the company's stock during the class period; (3) whether the stock had numerous market makers; (4) whether the company was entitled to file an S-3 Registration Statement in connection with public offerings; and (5) whether empirical facts exist showing cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

*See id.* at 1286-87.  The *Cammer* factors are non-exclusive and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency.  *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (citing *Cammer*, 711 F. Supp. At 1287) ("The vast majority of courts have used the *Cammer* factors as 'an analytical tool rather than a checklist.'").  "If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient."  *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006), *aff'd sub nom. Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008).[7]

   **Factor One – Weekly Trading Volume.**  During the Class Period, the average weekly trading volume of AMC stock on the NYSE was 14.1% of shares outstanding.  *See* Nye Report, ¶ 25.  "[T]urnover measured by an average weekly trading of 2% or more of the outstanding

---

[7]During the Class Period, AMC's shares were listed and traded on one of the most-well developed securities markets in the world – the NYSE.  *See* Nye Report, ¶ 19.  There has been broad judicial recognition that the NYSE is presumptively efficient.  *See Cammer*, 711 F. Supp. at 1292 ("[C]ertain markets are developed and efficient for virtually all securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."); *Lapin v. Goldman Sachs & Co.*, 245 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument can be made that the [NYSE] is not an efficient market."); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (cases "too numerous to cite . . . establish the NYSE and NASDAQ are at least entitled to a *presumption* of efficiency.") (emphasis in original).

shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293.  As the Nye Report indicates, the average weekly reported trading volume for AMC stock is more than ***seven times*** the 2% "strong presumption" of market efficiency recognized by the *Cammer* Court.  *See* Nye Report, ¶ 25.  Accordingly, the average weekly trading volume of AMC stock during the Class Period strongly supports a finding of market efficiency.

  ***Factor Two – Analyst Coverage.***  During the Class Period, at least 18 well-known investment firms followed and issued reports on AMC, and a number of additional firms participated in the Company's conference calls.  *See* Nye Report, ¶ 29.  Moreover, in excess of 190 analyst reports pertaining to AMC were issued during the Class Period.  *Id.*  AMC was also the subject of extensive popular and financial media coverage, and information about the Company was disseminated at investor conferences and in trade magazines, Company presentations, and SEC filings.  *Id.* at ¶ 30.  AMC's filings with the SEC were publicly available online during the Class Period at no cost.  *Id.* at ¶ 31.  The coverage of AMC by securities analysts and the amount of public reporting on the Company further support a finding of market efficiency.

  ***Factor Three – Market Markers and the Potential for Arbitrage.***  The NYSE uses a single designated market-maker ("DMM"), formerly known as a specialist, to maintain a competitive and efficient market for the securities assigned to the firm.  *See* Nye Report, ¶ 34. The presence of a DMM supports a finding of market efficiency.  *See Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 573 (C.D. Cal. 2012) (finding that the existence of a DMM satisfies *Cammer* Factor 3).  AMC also traded on other national securities markets as well as Alternative Trading Systems ("ATS") in the United States during the Class Period, including the NASDAQ. Nye Report, ¶ 35.  In addition to the NYSE DMM, during the Class Period, NASDAQ market

maker activity indicates that there were 90 active market makers that traded AMC stock. *Id.* at ¶ 36. These indicia support a finding of market efficiency.

The existence of arbitrageurs is also supportive of *Cammer* Factor 3. Arbitrageurs are sophisticated investors who act rapidly to take advantage of securities pricing discrepancies, with the effect of ensuring that market prices reflect public information. *See* Nye Report, ¶ 37. The Nye Report indicates that arbitrageurs were not constrained in their ability to short shares of AMC stock, one of the principal means by which arbitrageurs can exploit mispricing in the market. *Id.* at ¶¶ 38-39. The average short interest for AMC stock during the Class Period was 8.90% of its outstanding shares, and 8.98% of its public float, compared with average short interest as a percentage of float for the total U.S. market of 3.81%. *Id.* at ¶ 39. Additionally, during the Class Period, institutions held over 99% of the public float of AMC stock and more than 200 institutional investors held AMC stock. *Id.* at ¶ 41. Institutional investors have ready access to minute-to-minute financial news and analyst reporting, as well as significant resources with which to analyze information pertinent to the securities in which they invest. *Id.* at ¶ 40. Indeed, institutional holdings were, on average, more than 11 times the level of short interest in AMC stock during the Class Period, indicating that short selling was not constrained. *Id.* at ¶ 41. Finally, during the Class Period, the average and median bid/ask spreads on AMC stock were comparable to those of randomly sampled stocks listed on the NYSE, indicating low transaction costs, which enables arbitrage activity. *Id.* at ¶ 42.

The fact that trading in AMC stock was facilitated by a designated market maker on the NYSE and arbitrage opportunities could have been exploited strongly support a finding of market efficiency. *Id.* at ¶¶ 37-43.

18

*Factor Four – Eligibility to File Form S-3.*  Form S-3 is a simplified registration form available only to companies that have already disseminated significant information to the market and which, in the view of the United States Securities and Exchange Commission ("SEC" or "Commission"), trade on a market that operates efficiently for them.  *See* Nye Report, ¶¶ 45-46 (citing SEC Securities Act Release No. 6331 (August 18, 1981), at 5-6).  A company is eligible to file Form S-3 only if it (1) has been subject to the Exchange Act reporting requirements for more than one year, (2) has filed all required documents in a timely manner during the prior twelve months, (3) has not, since the last audited statements, failed to pay required dividends or sinking installments on preferred stock, or defaulted on debts or material leases, and (4) meets certain minimum stock requirements.  *Id.* at ¶ 45.  At all times during the Class Period, AMC was eligible to file Form S-3 and, indeed, filed a Form S-3 on the second day of the Class Period, supporting a finding of market efficiency.  *Id.* at ¶ 47.

*Factor Five – Cause and Effect Relationship of Unexpected Material News and Stock Price.*  Plaintiffs' expert, Dr. Nye, performed a standard event study for AMC stock to determine whether new, material corporate events or financial releases promptly caused measurable stock price reaction, accounting for contemporaneous market and industry effects.  *See* Nye Report, ¶ 50.  The event study is a process involving multiple steps to determine the impact of new, material information on AMC's stock price.  The event study steps include: (i) the *a priori* definition and selection of events to study; (ii) identification of a study period; (iii) estimation of a regression model to remove non-company-specific effects from the security's return; (iv) testing for statistical significance; and (v) interpretation of empirical results.  *Id.* at ¶ 49.  To determine which events to study, Dr. Nye relied on a large body of event-study literature that has evaluated what types of information affect stock prices.  *Id.* at ¶ 51.  Specifically, Dr. Nye

examined dates on which AMC released quarterly or year-end financial results and/or guidance, an objective set of events to examine, which financial literature has shown affect the price of securities. *Id.* at ¶ 51. Of the six events examined, three are associated with a statistically significant Company-specific return at the 95% confidence level. *Id.* at ¶ 52. Accordingly, here, 50% of the events examined during the Class Period are associated with statistically significant returns at the 95% confidence level. *Id.* At the 95% confidence level, a statistically significant return is expected to occur 5% of the time. Thus, these results are ten times more frequent than one would expect from a random sampling of days, confirming that AMC's stock price reacted more strongly on event dates than on non-event dates. *Id.* Further, although directionality may not be required to show general market efficiency for purpose of a securities class action, Dr. Nye's review of news and analyst reports demonstrates that the direction of Company-specific returns observed on each event date was consistent with that expected in an efficient market. *Id.* at ¶ 53.

Dr. Nye's event study demonstrates a cause-and-effect relationship between new, material, Company-specific disclosures and resulting movements in AMC's stock price during the Class Period. *Id.*; *see also* Nye Report, Exhibit 12. Accordingly, Dr. Nye determined that there was direct evidence that AMC common stock traded in an efficient market during the Class Period. *Id.*; *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (finding expert's event study and analysis showing statistically significant movement on selected event days provided evidence of market efficiency); *United States v. Schiff*, 602 F.3d 152, 173, n.29 (3d Cir. 2010) (finding that an event study "is the tool 'most often used by experts to isolate the economic losses caused by the alleged fraud'").

ii.     The *Krogman* Factors Further Support a Finding of Market
Efficiency

In addition to the *Cammer* factors, courts in this Circuit often consider three additional

factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 478(N.D. Tex. 2001), to determine

market efficiency.  These factors are: (1) the company's market capitalization; (2) the bid-ask

spread for stock sales; and (3) the public float.  *See In re Petrobras*, 862 F.3d at 276.  An

analysis of the *Krogman* factors confirms the conclusion that AMC stock traded in an efficient

market.

First, during the Class Period, AMC's market capitalization (the total value of a

company's equity) ranged between $2.58 billion and $4.17 billion.  *See* Nye Report, ¶ 55.

AMC's market capitalization at the end of the Class Period was greater than 49.0% and 84.6% of

NYSE-listed and NASDAQ-listed stocks, respectively.  *Id.* at ¶ 56.  Courts have found that a

large market capitalization is an indicator of market efficiency.  *Id.* at ¶ 55.  As such, AMC's

substantial market capitalization supports a finding of market efficiency.  *See id.* at ¶¶ 55-56.

Second, the average and median bid/ask spreads on AMC stock during the Class Period

were comparable to those of randomly sampled stocks listed on the NYSE.  *See* Nye Report, ¶

57.  In fact, during the Class Period, the average spread was $0.05 or 0.18% and the median

spread was $0.05 or 0.17%.  *Id.* at ¶¶ 42, 57.  Indeed, this was the smallest bid/ask spread

increment possible, given AMC's inclusion in the "Tick Size Pilot Program."[8] *Id.*, n.82.  Courts

---

[8]The "Tick Size Pilot Program" was a test to evaluate whether or not widening the tick size for
securities of smaller capitalization companies would impact trading, liquidity, and market quality
for those securities.  *See* Nye Report, n.85.  The program was approved by the SEC and
implemented by the National Securities Exchanges and FINRA.  *See id.*  AMC was included in a
test group, which would "be quoted and trade in $.05 minimum increments . . . ."  Nye Report,
n.85.  Because of AMC's inclusion in the test group, the bid/ask spread for AMC stock could not
have been smaller than $.05.  *See id.*  Indeed, the average and median bid/ask spreads for AMC

have found that a large bid/ask spread is indicative of an inefficient market.  *Id.* at ¶ 57.  AMC's very narrow bid/ask spread supports a finding of market efficiency.  *See id.*

Finally, applying the *Krogman* Factors, during the Class Period, there was an average of approximately 50.74 million AMC shares outstanding, while insiders held approximately 390,000 of these shares.  *See* Nye Report, ¶ 58.  Accordingly, the public float (the percentage of a security outstanding held by the public rather than insiders) of AMC stock was, on average, 99.2% of shares outstanding during the Class Period.  *Id.*  On a dollar basis, the public float of the stock ranged between $1.11 billion and $1.72 billion.  *Id.*  Courts have held that a large public float percentage may be an indicator of market efficiency; accordingly, the public float here supports a finding of market efficiency.  *See id.*

### c.  Damages Will be Calculated Using a Common Methodology and Mechanical Damage Tabulations for Individual Class Members Will Not Defeat Predominance

Courts in this Circuit regularly find that damages issues in securities fraud actions are common to all class members, as damages can be calculated on a class-wide basis using an event study to measure the price impact of material, company-specific information disclosed to the public.  *See, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016); *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 350 (S.D.N.Y. 2015) (certifying class "where Section 11(e) of the Securities Act provides a statutory formula for damages"); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 153 (2d Cir. 2017).  Where liability can be proven on a class-wide basis, it is "'well-established' Second Circuit precedent that 'the fact that damages may have to be ascertained on an individual basis is not

---

stock throughout the Class Period were each $.05, indicating the smallest bid/ask spread possible under the program.  *See* Nye Report, ¶ 42.

sufficient to defeat class certification' under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

Indeed, although damages for each individual Class member may vary, the methodologies for calculating damages would be commonly applicable to each Class member for Plaintiffs' claims under each the Securities Act and Exchange Act. *See* Nye Report, ¶¶ 55-64.

### 3. A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

Rule 23(b)(3) additionally requires that a class action be superior to other methods for adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3). The predominance and superiority requirements ensure that class actions are certified "when it would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness . . . ." *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (citing *Amchem Products, Inc.*, 117 S. Ct. at 2231)). Securities actions "easily satisfy" this requirement "because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re MF Global Holdings*, 310 F.R.D. at 239. Here, the class action device is superior to other available methods for the fair and efficient resolution of large securities actions, such as this matter.

In addition to the considerations outlined above, Rule 23(b)(3) provides four factors relevant to the superiority determination:

> (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see also Amchem Products, Inc.*, 117 S. Ct. at 2246.  Here, these factors clearly weigh in favor of class certification.

The members of the proposed Class have little incentive to pursue individual actions; indeed, the costs of doing so would be prohibitive.  *See In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail.").  Moreover, a class action would facilitate the objective of the securities laws to achieve a fair, orderly, trustworthy, and reliable securities market.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 n.4 (2007).  Litigating the case of each member of the proposed Class separately would be wasteful, resulting in delay to the Parties and the inefficient expenditure of judicial resources, not to mention that doing so would risk inconsistent results among those seeking redress for harm arising out of the same conduct.  *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).  Finally, there is no reason to anticipate any particular difficulties in managing this case as a class action; rather, class actions of this size and complexity are common in this Court.

## II.  SFMS SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

In confirming its appointment of Lead Counsel as Class Counsel, this Court must consider the factors enumerated in Rule 23(g)(1)(A):

> (i) the work counsel has done in identifying or investigating potential claims in this action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

SFMS is exceedingly qualified under these factors, and this Court should confirm its appointment as Class Counsel in this case.  For nearly two decades, SFMS has litigated significant securities fraud and other complex cases throughout the United States, recovering over $1 billion for its clients.  *See* Rubinow Decl., Ex. B.  As this Court found in its Order Appointing Lead Plaintiff and Approving Selection of Lead Counsel, "[SFMS] has the experience and resources necessary to serve [as Lead Counsel]."  Dkt. 88.  Since this Court appointed SFMS as Lead Counsel, SFMS has used its experience and resources to vigorously pursue this litigation and protect the interests of all members of the Class, together with Robbins Geller in its representation of the Hawaii Fund, including the filing of detailed and comprehensive pleadings, successful defense of the SAC against Defendants' motion to dismiss, retention of an expert to support this motion, and significant engagement of all parties in the discovery process to date.

## CONCLUSION

For the reasons provided herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this Action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing Plaintiffs as Class Representatives; (3) appointing Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: March 2, 2020                     SHEPHERD, FINKELMAN, MILLER
                                          & SHAH, LLP

                                         /s/ *Laurie Rubinow*
                                         Laurie Rubinow (LR-6637)
                                         James E. Miller (*Pro Hac Vice*)
                                         65 Main Street
                                         Chester, CT 06412
                                         Telephone: (860) 526-1100
                                         Facsimile: (866) 300-7367

Email: jmiller@sfmslaw.com
     lrubinow@sfmslaw.com

James C. Shah
Jayne A. Goldstein (*Pro Hac Vice*)
Eric L. Young
Bruce D. Parke
Alec J. Berin
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com
     jgoldstein@sfmslaw.com
     eyoung@sfmslaw.com
     bparke@sfmslaw.com
     aberin@sfmslaw.com

Kolin C. Tang
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
1401 Dove Street, Suite 510
Newport Beach, CA 92660
Telephone: (619) 235-2417
Facsimile: (866) 300-7367
Email: ktang@sfmslaw.com

***Attorneys for Lead Plaintiff The International
Union of Operating Engineers Pension Fund of
Eastern Pennsylvania and Delaware and Proposed
Class Counsel***

Samuel H. Rudman
David A. Rosenfeld
Christopher T. Gilroy
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
Email: srudman@rgrdlaw.com
     drosenfeld@rgrdlaw.com
     cgilroy@rgrdlaw.com

*Counsel for Plaintiff Hawaii Iron Workers*
*Pension Trust Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2020, I caused the foregoing Memorandum of Law in

Support of Class Certification to be electronically filed with the Clerk of Court using the

CM/ECF system, which will send notification to all counsel of record.

/s/ *Laurie Rubinow*
Laurie Rubinow (LR-6637)
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP